*Fed Copy*

# PONACA TRIBAL COURT

UNITED STATES DISTRICT COURT for the District of Nebraska

IN THE DISTRICT COURT OF SARPY COUNTY, NEBRASKA

CASE NUMBER CI 24-1315

FEDERAL CIVIL COMPLAINT 8:24-CV-00290

Tribal court under federal investigation hate crime

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA
2024 SEP -3  PM 4: 08
OFFICE OF THE CLERK

1. MOTION TO amendment complaint SECTION 3 WHEREFORE, THE PLAINTIFF RESPECTFULLY REQUESTS THE FOLLOWING RELIEF 29-3001. Postconviction relief; motion; limitation; procedure; costs.
2. Motion subpoena for production of documents from all defendants
3. Motion to overrule dismissal or transfer to federal jurisdiction
4. Motion to arrest warrants
5. Motion to submit USB drive as exhibit 2 proof of burned

YUKIE L. SOTO-ELLIOTT BY LAW 20-152 WILL NEED JAPANESE/ AMERICAN/ NATIVE AMERICAN INTERPERT SIGN LAUNGUAE

Sisseton- Wahpeton Oyate Lake reservation ID federal #347_*00017214 enrolled

News reporter ID #84265ELL/8536SOT Human Rights federal ID #H63nuwtb/ CERT FEMA #

Plaintiff


Vs.


State of Nebraska in official capacity

County Attorney Office in official capacity

City of Bellevue in official capacity

Bellevue police department in official capacity,

Papillion Police Department in official capacity

Sarpy County Jail in official capacity,

Aimee C Bataillon in official capacity and city of Bellevue law firm office

Bellevue Officer J Haggis in official capacity,

Officer D. Bafaro in official capacity,

LT Howard Banks in official capacity,

Sargent McDaniel in official capacity,

Auto Body authority towing and impound INC in official capacity

Honda Cars of Bellevue Dealership C/O Caitlin Staub sales consultant, Stephania Clapper

DEFENDANT

I YUKIE LOLA NASHAIA SOTO-ELLIOTT am the plaintiff and my mailing address i wish to provide to the courts is PO Box 641503 Omaha NE 68164 if the judge shall need my Physical Address i shall only give it to the Judge due to native American protection custody

The Defendants is Nebraska, and their mailing address is last known to be location is and can be serviced by the FBI, BIA, U.S Marshall, Sheriff's department, Certified mail USPS, Privet Service.

City of Bellevue in official capacity 1500 wall street Bellevue NE 68005

Bellevue police department in official capacity, 1500 wall street Bellevue NE 68005

Papillion Police Department in official capacity 1210 golden Gate drive #1420 Papillion NE 68046

Sarpy County Jail in official capacity, 210 golden Gate drive #1420 Papillion NE 68046

Aimee C Bataillon in official capacity and city of Bellevue law firm office , 1500 wall street Bellevue NE 68005

Bellevue Officer J Haggis in official capacity, 1500 wall street Bellevue NE 68005

Officer D. Bafaro in official capacity, 1500 wall street Bellevue NE 68005

LT Howard Banks in official capacity, 1500 wall street Bellevue NE 68005

Sargent McDaniel in official capacity, 1500 wall street Bellevue NE 68005

Auto Body authority towing and impound INC in official capacity

Honda Dealership

I Declare the Following:

The Jurisdiction with the Ponca Tribal courts,  UNITED STATES DISTRICT COURT for the District of Nebraska,IN THE DISTRICT COURT OF SARPY COUNTY, NEBRASKA is proper because of the following: The plaintiff is a member of the Sisseton Wahpeton Oyate  Lake Travers Enemy Swim District and lives within the Ponac Serice Are and is with the Program of the Domestic Violence program out of Omaha Nebraska  area the case manager before

going on about my case i need to have you understand i am disabled and the judicial ADA laws are there to protect me as well as i know that i do thing backward or different but i need a interpret for this case please as well as my statement to you your honor please take the time to read it i am disabled and will need a American sign langue interpret

On MAY 29, 2024, my own council tribe headquarters and all 7 districts voted yes to and told me to file in this court and determined what happen a HATE Crime on sex, gender, and disability .

Good day to the judge and jury please understand i am disabled as well as the ADA laws as self-reprehensive is Gona be backwards so please take the time to yes it may not be word right or correct how the professional want it to be but however the judicial laws for disabled people as well protect that discrimination due to this sensitive case matters i do not have much money due to my disability so there for please take the time to understand i am just jumping through the loops to comply with the tort claim act law

I come now to the courts that this case is not frivoluse, ill manner, wrong actions or anyway shape or fomer I have file formal complaints and all defendants refuse to follow all the laws of the land there for I have and am filing in all three court houses just in case of jurisdiction problems thus the bodily injury that was caused to the plaintiff is set for surgely in October as well as the on May 29 2024 at 10am with the Sisseton wapaton oyata   i have filed Tort Claim Act, Cease and desist order letter, FIOA and Made complaints formerly  on the date on December 13th, 2023, January 28th, 2024, February 2024, March 1, 2024, April 30th, 2024, May 2024 the plaintiff started back in 2023 to follow the correct step has given the defendants all plenty of time in this matters to cease and desist all harassing  profiling actions on her as well as a Nebraska state tort claim attachment as well the defendants all to this day have failed to comply as well break the laws of city, state, federal laws in this action this now is to ask the judge to move forward to this action is now passed  a notice and to file a lawsuit against all defendants in their full capacity for their actions.have not only caused damages but also bodily damages as well as more as the complaint will show the proof of burned the defendants area aware of a lawsuit at the time is still active and was served by legal law of subpoena tort on case number in Douglas County CI 23-9723 thus the defendants kept intimidation the plaintiff to cause her to fear for her life and on the date in full question did assault and attempted to murder her due to her disability the city  of Bellevue of Nebraska Title VI of the Civil Rights Act of 1964 and related statutes, which prohibit discrimination on the basis of race, color, national origin or limited English proficiency. https://bellevuewa.gov/resident-resources/adatitle-vi-resources

 The defendants also broke the city laws also works to ensure that individuals with disabilities have equal access and opportunities to our programs and services in

accordance as well as state of Nebraska law 28-111.Enhanced penalty; enumerated offenses. Any person who commits one or more of the following criminal offenses against a person or a person's property because of the person's race, color, religion, ancestry, national origin, gender, sexual orientation, age, or disability or because of the person's association with a person of a certain race, color, religion, ancestry, national origin, gender, sexual orientation, age, or disability shall be punished by the imposition of the next higher penalty classification than the penalty classification prescribed for the criminal offense, unless such criminal offense is already punishable as a Class IB felony or higher classification: Manslaughter, section 28-305; assault in the first degree, section 28-308; assault in the second degree, section 28-309; assault in the third degree, section 28-310; terroristic threats, section 28-311.01; stalking, section 28-311.03; kidnapping, section 28-313; false imprisonment in the first degree, section 28-314; false imprisonment in the second degree, section 28-315; sexual assault in the first degree, section 28-319; sexual assault in the second or third degree, section 28-320; sexual assault of a child, sections 28-319.01 and 28-320.01; arson in the first degree, section 28-502; arson in the second degree, section 28-503; arson in the third degree, section 28-504; criminal mischief, section 28-519; unauthorized application of graffiti, section 28-524; criminal trespass in the first degree, section 28-520; or criminal trespass in the second degree, section 28-521. What makes matter worse is the defendants also broke the federal law Bill summary: HB 185 (PN 3501) would amend 18 Pa.C.S. § 2702 (a) to classify any attempt to cause, or intentionally or knowingly cause, bodily injury to a person on the autism spectrum or with a physical or intellectual disability as an aggravated assault, graded as a felony of the second degree and punishable by up to 10 years' incarceration and $25,000 in fines.

The courts and the untied stats of America does not take kind to government corruption nor dose the courts of any take kind to violation of any civil rights, violation of human rights, violation of ADA laws the United States president, supreme courts, congress men and woman, Bar Assocation prohibt such things which the laws says H.R.9029 - Anti-Corruption and Public Integrity Act as well as FACT SHEET: U.S. Leadership in the Fight Against Global Corruption

The plaintiff can show not only physical proof of videos and audio recordings but also has 34 witnesses as well as medical doctors to testify, medical records, as the plaintiff has to have go have surgery with DR Figgy agine to refix the bodily injury assault that the defendants did or is still allowed and covering up this action.

The defendants also refuse to follow the state law of FOIA Under the Nebraska Public Records Law § 84-712 et seq., I am requesting an opportunity to inspect or obtain copies of public records that [Describe the records or information sought with enough detail for the

public agency to respond.  Be as specific as your knowledge of the available records will allow. But it is more important to describe the information you are seeking.

As this date as well, what makes the matters worse the video of that was posted went virial over 33.9 million views and likes as well will show the hate crime action was effective immediately when the defendants took it upon themselves to refuse interpret and assaulted the plaintiff the defendants the lied to make a case

18 U.S.C. §249 says, "Whoever willfully causes bodily injury to someone or, through using a firearm, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to anyone, because of the actual or perceived race, color, religion, or national origin of any person, shall be fined and imprisoned for up to ten years or life in prison if death results or the offense includes kidnapping, aggravated sexual abuse or an attempt to kill." 18 U.S.C. 249 makes it a felony to commit either of the acts above against victims based on their actual or perceived association with the following:

Their specific race, color, religion, or national origin in general; OR

Their religion, national origin, gender, sexual orientation, gender identity, or disability IF the action involves crossing state lines or affects interstate or foreign commerce. This provision covers hate crimes across state boundaries where individual state laws would only cover crimes within their respective state WHAT ARE THE RELATED FEDERAL LAWS?

18 U.S. Code Chapter 13 lists the federal statutes dealing with civil rights violations, which include the following:

18 U.S.C. § 241 – this stature makes it a crime to conspire to injure, suppress, threaten, or intimidate any person in the United States into being unable to exercise or enjoy their constitutional rights;18 U.S.C. § 248 – this statute prohibits blocking access to reproductive health services using threats or force, intentionally causing injury or damaging clinic property.

WHAT ARE THE PENALTIES FOR VIOLATING 16 U.S.C. 249?

The penalties for violating 18 U.S.C. § 249 will depend on the specific circumstances of each case, but they can be pretty severe. In general, anyone who is convicted of a federal hate crime under this law can be sentenced to:

Imprisonment for up to 10 years; or

A fine of up to $250,000.

However, in certain conditions, the maximum sentence for this hate crime may be extended to life imprisonment. This is the case if the crime involves any of the following:

Kidnapping;

Attempted kidnapping;

Aggravated sexual assault;

Attempted aggravated sexual assault;

Attempted murder; The death of anyone as a result of the crime;

THE PLAINTIFF has 5 videos off unit 187 Relliott community emergency respond team/ relliott company critic worldwide news Inc/ Elliotts ministry vehicle. As well witness that recorded the whole time, she was on the ground then the officers refused a ASL interpret this is where it went into a hate crime as well as 6 wittiness that watch the assault happen. As well the plaintiff in free will in her summary of proof of burden to bring forward the lawsuit shall copy and paste her medical records as well as a surgery date has been set in October 2024 by DR Figgy after the officers ruptured the left breast.

PLEASE WATCH THE FLASH DRIVE VIDEO OF ALL VIDOES IN THE MATTERS TO SHOW PROOF OF BURNED AS WELL PLEASE

## SUMMARY OF ARGUMENT of findings to help show proof of the following allegations are made to why the plaintiff is sued on the defendants

1. The plaintiff in the matter can show proof what officers are should by law to-do
   https://www.lexipol.com/resources/blog/first-responders-and-the-deaf/

2.  The plaintiff in the matter can show proof what officers are should by law to-do
    https://www.nad.org/resources/justice/police-and-law-enforcement/
3.  The plaintiff in the matter can show proof what officers are should by law to-do https://archive.ada.gov/humbolt_pca/humboldtattD.htm#:~:text=In%20a%20simple%20encounter%2C%20such,or%20a%20confession%20of%20wrongdoing
4.  The plaintiff in the matter can show proof what officers are should by law to-do
    https://www.ava.me/blog/solving-the-problem-with-law-enforcement-the-deaf-community
5.  The plaintiff in the matter can show proof what officers are should by law to-do
    https://www.nad.org/resources/justice/police-and-law-enforcement/communication-access-with-police-and-law-enforcement/
6.  to show proof of the Tort Claim Act law that would protect Sovereign immunity to where the laws would not allow anyone with any kind of immunity to be sued to show proof of burned how the tort claim act laws that they defendants will try to hide behind has and is revoked due to bodily injury and hate crime On this date of April 30th 2024 at 930am the plaintiff meets with Dr figgy and the surgery was okay as the medical record of copy and paste shows right hear

Maggie Y Yang at 4/30/2024 9:30 AM

**Chief Complaint**
Gender dysphoria

S/p Bilateral Breast Augmentation with Silicone Implants - 4/10/24

OPERATIVE FINDINGS:
Right Breast

Implant
SN: 27244606
Ref: SSX-800

Left Breast

Implant
SN: 27116732
Ref: SSX-800

**History of Present Illness**

Yukie L N Soto-Elliott is a 41 y.o. adult who presents postoperatively from above-mentioned surgery on 4/10/24. She is doing fine. Her left breast pain has improved. She does feel that right breast sits higher. No fevers or chills. Prineo fell off.

**Physical Exam:**

**Vitals:**

|        | 04/30/24 0902 |
|--------|---------------|
| BP:    | 140/83        |
| Pulse: | 89            |
| Temp:  | 36.4 °C       |

**Gen**: alert and oriented x3, in NAD
**Resp**: breathing comfortably on room air, in no respiratory distress
**Right breast:** Incision intact, no drainage. Skin is intact without necrosis or blistering. No surrounding erythema, underlying fluid collections, or signs of infection.
**Left breast:** Incision intact, no drainage. Skin is intact without necrosis or blistering. No surrounding erythema, underlying fluid collections, or signs of infection. My left breast dropped slightly since surgery.

**Assessment and Plan**
Yukie L N Soto-Elliott is a 41 y.o. adult who is s/p bilateral breast augmentation with silicone implants. She gave presents today for follow up. She is overall doing well. We again discussed that right breast would drop some and will match the left breast overtime. No other issues.

- Continue to wear a sports bra without underwire.
- Wear bandeau as discussed.
- 10 lb weight and ROM restrictions for 4 weeks post-op.
- Can shower, no submerging in water. Avoid scrubbing at incision vigorously.
- Follow up when 4 weeks post-op.
- Call if there are any issues and there is someone on call overnight and weekends.

Patient agrees to the plan going forward and their questions were answered during the visit.

Maggie Y Yang, PA-C

7. On the date of April 30th the defendants refused to allow proper communication while Jermy 3601 interpret watch and had to report to his supervisors of the illegal handcuff behind and the plaintiff did not understand full what was going on and the Defendants rushed the doctor of Bellevue UNM and would not wait for DR Figgy to oversee what happen since he was the surgical doctor they went on their own seeing of malpractice

but did put in the medical file to follow up with primary and surgical doctors ED Provider
Notes

Andrew R Barnett at 4/30/2024 12:51 PM

Bellevue Medical Center

HISTORY OF PRESENT ILLNESS

History obtained from:Patient Spouse Parent Nursing Home EMS Personnel Relative
Caregiver Friend Police Medical Records PCP Interpreter

Chief Complaint,,

Patient presents with,,

•, Medical Clearance,

, , BPD requesting medical clearance; pt had a recent breast augmentation and wants her
incisions examined.

Yukie L N Soto-Elliott is a 41 y.o. adult who arrived by Police presented to the emergency
department for medical clearance before incarceration. Patient presents with police after
being pulled over and arrested. During arrest patient was placed prone, is concerned for
damage to breast implants. Per patient history patient had implants placed on April 10,
and an appointment with plastic surgery follow-up today. Per patient history at follow-up
appointment today there were no acute complications or concerns.

PAST MEDICAL / SURGICAL / FAMILY / SOCIAL HISTORY

Past Medical History: ,

Diagnosis,, Date

•, Alcohol abuse,

•, Allergy,

•, Anxiety,

- •, Arthritis,

- •, Asthma,

- •, Attempted suicide (HCC),

- •, Bipolar 1 disorder (HCC),

- •, Borderline personality disorder (HCC),

- •, Cancer (HCC), Skin cancer

- •, Carpal tunnel syndrome of left wrist, 09/2009

- , Good Sam Kearney,

- •, Depression,

- •, Hearing loss,

- •, History of incarceration, 2019

- •, Hypertension,

- •, MRSA (methicillin resistant staph aureus) culture positive,

- •, OCD (obsessive compulsive disorder),

- , Germophobia,

- •, Otitis media,

- •, Positive PPD, treated,

- •, PTSD (post-traumatic stress disorder),

- , from stepmother beating him and from war in Iraq/Afghanistan,

- •, RLS (restless legs syndrome), 03/2010

- •, Sleep apnea,

- , doesn't use CPAP,


Past Surgical History: , ,

Procedure,, Laterality, Date

•, AMPUTATION OF FINGER OF RIGHT HAND, Right, 2006

, right middle and ring fingers,,

•, ARM SURGERY, Left, 2006

, Screws and wires, ,

•, BREAST AUGMENTATION, Bilateral, 4/10/2024

, Procedure: BREAST AUGMENTATION SILICONE; Surgeon: Figy, Sean C, MD; Location: NM FSC OR; Service: General Surgery Plastic; Laterality: Bilateral;, ,

•, GASTRIC BYPASS,  , 02/09/2023

, RY surgery per pt, ,

Family History, , ,

Problem, , Relation, Age of Onset

•, Lung cancer, Mother,

•, Cancer, Mother,

•, No Known Problems, Father,

•, No Known Problems, Sister,

•, No Known Problems, Brother,

•, No Known Problems, Son,

•, Lung cancer, Maternal Grandmother,

•, Liver cancer, Maternal Grandmother,

•, Liver cancer, Maternal Grandfather,


Social History


Socioeconomic History, , ,

•, Marital status:, , Divorced

•, Number of children:, , 2

•, Years of education:, , 13

Occupational History, , ,

, , Comment: dishwasher at Cheesecake and Golden corral,

Tobacco Use, , ,

•, Smoking status:, , Former

, , Types:, Cigars

, , Quit date:, 12/4/2017

, , Years since quitting:, 6.4

•, Smokeless tobacco:, , Never

Vaping Use, , ,

•, Vaping status:, , Never Used

Substance and Sexual Activity, , ,

•, Alcohol use:, , No

, , Comment: sober for 10 years,

•, Drug use:, , Not Currently

, , Comment: morphine and oxy,

•, Sexual activity:, , Not Currently

Social History Narrative, , ,

, Dog in the home. Best friend has cat. , ,


Social Determinants of Health


, Interpersonal Safety Screen


REVIEW OF SYSTEMS / PHYSICAL EXAM

Vitals (Arrival)

T: 37.1 °C (98.8 °F) - BP: 151/104 (MAP: 120) - HR: 105 - RR: 22 (SpO2: 93 %)


Review of Systems Respiratory: Negative for shortness of breath. Cardiovascular: Negative for chest pain. Gastrointestinal: Negative for abdominal pain, nausea and vomiting. Musculoskeletal: Negative for back pain. Skin: Negative for wound. Neurological: Negative for headaches. , Physical ExamVitals and nursing note reviewed. Constitutional: General: She is in acute distress. Appearance: Normal appearance. She is well-developed. She is not diaphoretic. HENT: Head: Normocephalic and atraumatic. Eyes: Pupils are equal, round, and reactive to light. Neck: Vascular: No JVD. Cardiovascular: Rate and Rhythm: Normal rate and regular rhythm. Heart sounds: Normal heart sounds. No murmur heard.No friction rub. No gallop. Pulmonary/Chest: No respiratory distress. Pulmonary effort is normal. Normal breath sounds. No wheezing or rales. Abdominal: General: Bowel sounds are normal. There is no distension. Palpations: Abdomen is soft. There is no mass. Tenderness: There is no abdominal tenderness. There is no guarding or rebound. Musculoskeletal: Cervical back: Normal range of motion. Skin:General: Skin is warm and dry. Findings: No rash. Skin location: Inframammary incisions noted bilaterally. Skin well-approximated without suture tear of new laceration. Breasts symmetrical. Neurological: Mental Status: She is alert.


Procedures


MDM / ED COURSE

 ASSESSMENT/ED COURSE:Patient presents following arrest for medical clearance for incarceration. Physical exam was benign showing intact inframammary sutures with well-approximated skin and no signs of implant rupture. Patient was cleared for discharge with plastic surgery follow-up as needed.  DDX: Skin suture laceration, breast implant rupture, Labs, reviewed:Labs Reviewed - No data to display DISPOSITION:Discharge with plastic surgery follow-up as needed.

Radiology Tests Reviewed

No procedures or tests found.

Medications - No data to display, Lab tests reviewed and normal unless identified abnormal below:Labs Reviewed - No data to display

Clinical Calculators

ED PLAN SUMMARY

Diagnosis

, Diagnosis, Comment

, Medical clearance for incarceration,

Follow-up Information

, Follow up With, Specialties, Details, Why, Contact Info

, 1BED-1ST FLOOR BELLEVUE EMERGENCY DEPARTMENT, Emergency Medicine, , If symptoms worsen, 2500 Bellevue Medical Center Dr.Bellevue Nebraska 68123-1591402-763-3000

ED Disposition

,

ED Disposition

Discharge

Condition

Stable

Comment

Plan of care discussed with Yukie L N Soto-Elliott and questions answered. Both verbal and printed discharge instructions were provided. The patient is to seek outpatient follow up as noted in the discharge instructions. The patient verbalized unders tanding and ability to comply. The patient is discharged in stable condition. The patient was instructed to return to the emergency department for worsening symptoms.

Radiology Overread  Andrew R Barnett, MD   Keenan, Christopher David, MBAResident04/30/24 1259 I Andrew R Barnett, MD, personally interviewed and examined this patient. I discussed the findings, diagnostic studies, interventions, and treatment plan with Christopher David Keenan.  I agree with the assessment, management, and disposition as presented by the resident/APP in the documentation above.  Unless otherwise indicated, I was present for the key portion of performed procedures. Andrew R Barnett, MD5/3/2024 9:21 PM  Barnett, Andrew R, MD05/03/24 2123

ED Notes

Nurse Atalia K at 4/30/2024 12:17 PM

Bed: E16-0Expected date: Expected time: Means of arrival: Comments:Sarpy countyKemp, Atalia N, RN04/30/24 1217

8.  The plaintiff went to CHI primary doctor to follow up and as well the DR Pond finding is this on her medical chart Progress Notes
    Joslyn E Pond at 5/2/2024 10:20 AM

**Subjective:**

Subjective
**Patient ID: Yukie Lola Nashaia Soto Elliott is a 41 y.o. adult.**

**Chief Complaint**
Patient presents with
- Follow-up

HPI
Yukie Lola Nashaia Soto Elliott is a 41 y.o. adult presenting today for: Follow-up.

She states she was assaulted by police officers on 05/30/2024 around 11 o'clock. She was pulled over by the cops in a parking lot for reckless driving and also states that somebody called her in for impersonating a police officer. They asked for a diving license while reaching out to get her driving license they suddenly slammed her to the ground even though she was not resisting. She mentions that she was not resisting and was laying on the ground. She also asked for an interpreter and they kept refusing. Then her cochlear implant turned off. She states they said "she is not have hard-of-hearing". She was handcuffed tightly till 02:11 PM. They took her to UNMC around 12 PM and UNMC examined her incision as she recently had breast augmentation, Because as per patient, police officers had put pressure on her more than 10 lb. After that officers took her to the jail and also took her hearing aids and her implants at jail. Today, she mentions last night, the FedEx nurse took her heart rate and it was around 60s-70s. She has tingling in her hand and has no feeling on her fingertips from "they cut her right wrist severely"(as per patient). She has pain in the frontal lower aspect of her rib. She has numbness and tingling in left wrist. She is planning to see ENT for her hearing issue.

**Elevated blood pressure**
Her blood pressure today was measured to be elevated at 140/80 and 120/70 on recheck.

Review of Systems

Constitutional: Negative for chills, diaphoresis, fatigue and fever.
Respiratory: Negative for shortness of breath.
Cardiovascular: Negative for chest pain.
Gastrointestinal: Negative for abdominal pain, diarrhea, nausea and vomiting.
Musculoskeletal: Positive for arthralgias and myalgias **(pain in the frontal lower aspect of her rib)**.
Neurological:
**Positive for numbness and tingling in left wrist**

**Objective:**

Objective
BP 120/70 | Pulse 65 | Temp 36.2 °C (97.1 °F) (Temporal) | Wt 89.5 kg (197 lb 4.8 oz) | SpO2 97% | BMI 28.31 kg/m²

**<u>Physical Exam</u>**
<u>Constitutional</u>:
Appearance: She is well-developed.
<u>HENT</u>:
Head: Normocephalic.
<u>Eyes</u>:
Conjunctiva/sclera: Conjunctivae normal.
<u>Chest</u>:
Comments: **Breast implants appear to be healing well.**
**She has the incisions underneath that both breasts appear to be healing well.**
<u>Musculoskeletal</u>:
Cervical back: Neck supple.
Comments: **Tenderness to palpation over the frontal lower aspect of her ribs; however, no bruising noted**
**Pain with rotation of the left wrist. The right side was normal.**
**Numbness to the fourth fingers, but her thumb was normal. Left upper extremity weakness. Decreased grip strength on the left side**
<u>Skin</u>:
General: Skin is warm and dry.
<u>Neurological</u>:
Mental Status: She is alert and oriented to person, place, and time.
Comments: .
<u>Psychiatric</u>:
Behavior: Behavior normal.

**Assessment/Plan:**

Assessment
**1. Assault**


**2. Rib pain on right side**


**3. Deafness, unspecified laterality**


**4. Elevated blood pressure reading**

- Her repeat blood pressure is 120/70.

**5. Left hand pain**

- Ambulatory referral to Orthopedic Surgery
- XR Hand Minimum 3 Views Left; Future

**6. Left wrist pain**

- Ambulatory referral to Orthopedic Surgery
- XR Wrist Minimum 3 Views Left; Future

**7. Numbness and tingling**

- Ambulatory referral to Orthopedic Surgery
- XR Wrist Minimum 3 Views Left; Future
- XR Hand Minimum 3 Views Left; Future
- Will notify patient regarding the radiology comments on the X-ray.

- Advised to avoid pushing, pulling and lifting weight over the 10 lb.
- Advised to keep strengthening

**Attestation**
The patient indicates understanding of these issues and agrees with the plan. I reviewed
the patient's medical information and medical history. I have reviewed the past medical,
family, and social history sections including the medications and allergies listed in the
above medical record.

**Signature**
I, Amit Kumar, am scribing for and in the presence of Joslyn E Pond, APRN.
Electronically Signed by Amit Kumar on 5/2/2024 at 4:10 PM.

I have reviewed the notes written by Amit Kumar, I concur with her/his documentation.

Electronically signed by Joslyn E Pond, APRN on 5/6/2024 at 6:59 AM.

- A total of 40 minutes was spent with the patient as well as in review of records.

MA Lenzy L at 5/2/2024 10:20 AM

Patiet, Yukie does consent to Joslyn E Pond, APRN's use of Augmedix at today's visit.

Electronically signed by Lenzy Lomeli-Agraz, MA on 5/2/2024 at 9:58 AM

9. The plaitiff went to see a nerver specialist from follow up the defendants beating
   her Progress Notes MA Tracy C at 5/7/2024 8:20 AM

Patient, Yukie does consent to Gangadasu Sagar Reddy, MD's use of Augmedix at today's
visit.

Electronically signed by Tracy Cubrich, CMA on 5/7/2024 at 8:50 AM

Gangadasu Reddy at 5/7/2024 8:20 AM

**Gangadasu Reddy MD, MS, FACS**
**Hand surgery and Microsurgery**

**CHI Health**

<u>CHIEF COMPLAINT</u>
Left wrist pain and bilateral hand paresthesias, left worse than right

<u>HPI</u>
Yukie Lola Nashaia Soto Elliott is a 41 y.o. adult, ambidextrous, employed at FedEx presenting to clinic today for consultation regarding bilateral hand paresthesias, left worse than right and left wrist pain following encounter with police officers on 4/30/2024. During her encounter she states she was handcuffed tightly and was slammed to the ground even though she was not resisting. Since being handcuffed she has had the numbness and tingling in bilateral hands. She states on the left hand the entire hand feels numb into the forearm. She states she needs to wear a robot on the left forearm for work and is unable to do so due to the pain and paresthesias. She was seen by her primary care where x-rays did not reveal any fractures or dislocations. She has an extensive history of surgery to bilateral hands including plate and screw fixation of left ulna and radius roughly 20 years ago at the VA, amputation of right long and ring fingers from a crush injury with a concrete wall in 2008, stab wound to left thumb that required surgical intervention. She states she is not having any pain or paresthesias prior to most recent injury on 4/30/2024. She has not tried any treatments.

<u>MEDICATIONS</u>

**Outpatient Encounter Medications as of 5/7/202**

<u>PMH</u>

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Adjustment disorder | |

- Alcoholism (HCC)
- Anxiety
- Asthma
  *pcp*
- Autism
- Bipolar disorder (HCC)
- Depression
  *dr. bonnie psychiatrist*
- Drug addiction in remission (HCC)
- Frequent patient in emergency department
- GSW (gunshot wound)
- Headache
  *migraines*
- Hx MRSA infection                                    2010
  *back neck skin-tatoo-drainded in er local*
- Hyperlipidemia
- Hypertension
- Obsessive-compulsive disorder
- Polysubstance abuse (HCC)
- PTSD (post-traumatic stress disorder)
- Skin cancer                                          2010
  *back and chest-melanoma*
- Sleep apnea
  *has sleep study update in June-no longer has previous cpap-recalled not using*
- Suicide attempt (HCC)
- Transgender

## PSH

**Past Surgical History:**

| Procedure | Laterality | Date |
| --- | --- | --- |
| • FINGER AMPUTATION | Right | |
| *index and ring finger* | | |
| • FRACTURE SURGERY | | |
| *left arm-plates and pins* | | |
| • PR ESOPHAGOGASTRODUODENOSCOPY TRANSORAL DIAGNOSTIC | N/A | 6/1/2022 |

*Procedure: ESOPHAGOGASTRODUODENOSCOPY WITH BIOPSIES; Surgeon: Kalyana C Nandipati, MBBS; Location: ACH BMMC GI; Service: Gastroenterology*

- PR LAP GASTRIC BYPASS/ROUX-EN-Y                N/A              2/9/2023
  *Procedure: ROBOTIC GASTRIC BYPASS AND EGD; Surgeon: Kalyana C Nandipati, MBBS; Location: ACH IMC OR; Service: Robotics-General*


## FH

**Family History**

| Problem | Relation | Age of Onset |
| --- | --- | --- |
| Alcohol abuse | Mother | |
| Drug abuse | Mother | |
| Lung cancer | Mother | |
| Anxiety disorder | Father | |
| Bipolar disorder | Father | |
| OCD | Father | |
| Post-traumatic stress disorder | Father | |
| Diabetes | Father | |
| Brain cancer | Maternal Grandmother | |
| Colon cancer | Maternal Grandfather | |


## SH

Education and Employment
Employment: Employed

Living Conditions
Marital Status: Married Comments: previously divorced
Children: Yes Comments: has 2 children/ doesn't see them because of ex wife
Occupants In Home: Lives with spouse

Safety
Domestic Violence: No
Feel Safe In Home and With Partner?: Yes

Patient Devices
Glasses: Yes

Contacts: Yes

Lifestyle
Religious Affiliation: Mormon
Exercise: Daily

**Review of Systems**
Constitutional: Negative.
HENT: Negative.
Eyes: Negative.
Respiratory: Negative.
Cardiovascular: Negative.
Gastrointestinal: Negative.
Endocrine: Negative.
Genitourinary: Negative.
Musculoskeletal: Bilateral hand paresthesias. Left wrist pain.
Skin: Negative.
Allergic/Immunologic: Negative.
Neurological: Negative.
Hematological: Negative.
Psychiatric/Behavioral: Negative.

Review of systems was reported by patient.

PHYSICAL EXAM

BP (!) 143/84 | Pulse 62 | Ht 177.8 cm (5' 10") | Wt 89.4 kg (197 lb) | BMI 28.27 kg/m²

Yukie Lola Nashaia Soto Elliott is a pleasant 41 y.o. adult patient.

Abdomen: soft/NT/ND
Pulmonary/Chest: Effort normal. No respiratory distress.
Constitutional: Appears well-developed.
Neurological:Alert and oriented X 3.
HENT:
Head: Normocephalic and atraumatic.
Neck: No C-spine tenderness.
Throat: No TMJ ankylosis or restricted jaw movement.
CVS: B/l radial artery pulsations palpable

**Both upper extremity examination:**
Skin is clean, dry, and intact.
No open wounds.
Well-healing scar to volar aspect of left forearm from prior surgery.
Amputation of right long and ring fingers near the level of the DIP joint.
Well-healing scar to radial aspect of left thumb from prior stab injury.
Flexors and extensors intact to all digits.
Able to make a fist and extend digits fully without difficulty.
Patient reports decreased sensation to entire left thumb and the tips of the left index, long, ring, and small finger. She also reports decreased sensation to entire dorsal aspect of left hand, and left distal forearm.
Patient reports decreased sensation to dorsal aspect of right thumb from the MP joint to the radial aspect of the right wrist.
Positive Tinel's over left cubital tunnel.
Negative Tinel's over left carpal tunnel.
Negative Tinel's over right cubital tunnel.
Positive Tinel's over right carpal tunnel.
Unable to complete Durkan's and Phalen's due to current paresthesias.
Digits are warm and well-perfused.

**Radiographic studies:**
3 views of x-rays of left wrist and hand:
DISCUSSION:
3 views of the left wrist and 3 views of the left hand demonstrate no acute fracture or dislocation. Mineralization and joint spaces are normal. Prior ORIF of the radius. The hardware is incompletely imaged and incompletely evaluated.

IMPRESSION:
No acute radiographic abnormality of the left wrist and left hand.

ASSESSMENT:
Yukie Lola Nashaia Soto Elliott is a 41 y.o. adult patient with bilateral hand paresthesias and left wrist pain following encounter with police officers in which patient reports she was handcuffed tightly and thrown to the ground. Xrays shows no acute fractures or dislocations.

PLAN
Anatomy and diagnoses were discussed in full detail with Yukie Lola Nashaia Soto Elliott.
Treatment modalities were also discussed including conservative versus operative
interventions. Conservative treatments discussed include bracing, activity modification, use
of anti-inflammatory medications, occupational therapy, EMG studies.

We will refer patient to neurology for bilateral upper extremity EMG studies.
In the meantime wear bilateral wrist braces. These were provided to patient today in clinic.
Patient stated she cannot take ibuprofen due to history of stomach surgery. She was
advised to take Tylenol if tolerated as needed for pain.
We will call patient once we receive results of the EMG study.

Ms. Soto Elliott indicates understanding of these issues. She participated in decision making
and agrees with the plan.

**CHI Clinic Surgical Risk Optimization Policy:**
Patients who use nicotine, have BMIs more than 40, and uncontrolled diabetes are at
increased risk for surgical complications. Surgical risks associated with nicotine use, high
body mass index, and poor glycemic control related with a diagnosis of diabetes were
discussed, if relevant. If these risk factors were present, patient was advised to decrease
nicotine use, lose weight if BMI more than 40, and control blood glucose to obtain
hemoglobin A1c less than 8 in diabetics.


Patient was instructed to contact my office if there are any new concerns or questions.

Electronically signed by: Megan Kucks, PAC, 5/7/2024 8:27 AM


**Hand Surgery attending note**

I, Gangadasu Reddy MD, have personally interviewed and examined the above patient. I
have reviewed and agree with the documentation of the care provided by Megan Kucks,
PA-C including the patient's medical history, findings on the physical examination, and any
laboratory or other testing results. I personally developed the patient's assessment and
treatment plan.

She presented with bilateral hand paresthesias.
Of note, she had multiple surgeries on her both upper extremities in the past.
Unable to elicit durkin's and Phalen's test on both carpal tunnels due to constant hand
paresthesias.
Status post amputations of right long and ring fingers.

S/p ORIF of left radius and ulna fractures.
Positive Tinel's sign over left cubital tunnel. Negative on the right.
Will obtain bilateral upper extremity electrodiagnostic studies and follow-up with her after that.

Electronically signed by: Gangadasu Sagar Reddy, MD, MS, FACS 5/7/2024 12:37 PM

Dragon dictation software was used for generating this document. It may contain typographical errors.

10. The plaintiff went in on may 21 2024 follow up after being beaten by the defendants and violated Progress NotesSean C Figy at 5/21/2024 11:05 AM

**Chief Complaint**
Gender dysphoria

S/p Bilateral Breast Augmentation with Silicone Implants - 4/10/24

OPERATIVE FINDINGS:
Right Breast

Implant
SN: 27244606
Ref: SSX-800

Left Breast

Implant
SN: 27116732
Ref: SSX-800

**History of Present Illness**
Yukie L N Soto-Elliott is a 41 y.o. adult who presents postoperatively from above-mentioned surgery on 4/10/24. She is doing fine. Since her last appointment, she had a reported altercation at the place where she was placed facedown on the ground. She notes that since then her left breast is fallen pretty significantly compared to the right.

**Physical Exam:**

**Vitals:**

|        | 05/21/24 1041 |
|--------|---------------|
| BP:    | (!) 155/90    |
| Pulse: | 64            |
| Temp:  | 36.5 °C       |

**Gen**: alert and oriented x3, in NAD
**Resp**: breathing comfortably on room air, in no respiratory distress
**Right breast:** Incision intact, no drainage. Skin is intact without necrosis or blistering. No surrounding erythema, underlying fluid collections, or signs of infection.
**Left breast:** Incision intact, no drainage. Skin is intact without necrosis or blistering. Left breast with significant drop compared to right.

**Assessment and Plan**
Yukie L N Soto-Elliott is a 41 y.o. adult who is s/p bilateral breast augmentation with silicone implants. She presents today for follow up. After her last visit, unfortunately she had an altercation with the police which appears to have ruptured her left breast inframammary fold. The implant is now fallen pretty significantly.

I have asked her to stop wearing the bandeau. She can wear a supportive bra. I do think that she will require revision surgery of her left breast in order to reset the inframammary fold. This will require placement of a bio resorbable mesh in order to reset the fold and position the implant in a better position on the chest wall. Like to do this 3 months after her injury to allow for inflammation to calm down. She will follow-up in a few weeks time to further assess her healing and discuss her revision surgery.

11. The plaintiff went in on may 21 2024 follow up after being beaten by the defendants and violated THE ADA LAWS BUT AS WELL AS THE STATE OF NEBRASKA TORT CLAIM ACT LAWS HAS BEEN REVOKED AND BEING WATCH FOR THE CRIMES THAT ARE FOUNDED IN THE MATTERS THE PLAINTIFF ALL HER LIFE HAS BEEN DISABLED AS WELL AS IN 2007- 2015 THE PLAINTIFF WAS AWARED OF THE STATE OF NEBRAKSA AS MENTAL ILL IN CUSTER COUNTY BROKE BOW THERE FOR THE STATE VS DEPARTMENT OF JUSTICE AS WELL IS PROTECTING THE PLAINTIFF RIGHTS

## U.S. Department of Justice

Civil Rights Division

*Disability Rights Section 4 Constitution Square 150 M St., N.E. Washington, DC 20002*

May 14, 2024

## By First Class Mail and Electronic Mail

1

control their own lives. People with SMI can get jobs where they work alongside people without disabilities, doing the same work for the same pay.

Nebraska offers covered services that people with SMI need to live and work in the community, including permanent supportive housing, Assertive Community Treatment (ACT), case management, peer supports, and supported employment. The community-based services that Nebraska covers can help people live independently, manage their mental health symptoms, build relationships, and find and keep jobs. But Nebraska severely limits access to its community-based services. Instead, the State over-relies on segregated settings like assisted living facilities and day program facilities. In segregated settings, people with SMI are grouped together and supervised by paid staff and have little outside contact with people without disabilities.

There are many Nebraskans with SMI who used to live in their own homes and hold jobs in the community. But without community-based services—like case management or job coaching—they were forced to enter segregated settings to get the help they needed. Many of these people now live in segregated settings, like assisted living facilities (ALFs),

surrounded only by other people with disabilities. Many also spend their days in segregated day programs. Once people enter ALFs and day programs, Nebraska offers them little help to get out. One person, who has been institutionalized in an ALF and day program for more than a decade, described what leaving would mean to her: "Freedom."

Nebraska fails to ensure that individuals with SMI know about and can access the State's covered services in the community even though these services are more therapeutic and cost- effective than institutionalization. For Nebraskans with SMI, a lack of access to community- based services, including crisis services, can trigger unnecessary admissions to hospitals or ALFs. When individuals experience mental health crises in Nebraska, law enforcement are often the first responders because the State has failed ensure access to necessary community-based crisis services.

Work is a critical part of mental health recovery. Even people with high behavioral health needs can get and keep jobs with the right services. Nebraskans living in the State's ALFs are overwhelmingly interested in working if they could get the help they need. But without community-based services, including supported employment services to connect them to and support them in workplaces, these individuals instead languish in day programs, with no path to employment. They want to—and can—do much more.

Nebraska is violating Title II of the ADA by failing to serve adults with SMI in the most integrated setting appropriate to their needs. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d). Nebraska's administration of its behavioral health system results in unnecessary segregation in several ways. First, the State uses restrictive service authorization criteria to limit the services an individual with SMI can receive in the community, including supported employment services and permanent supportive housing. Second, the State has underdeveloped its workforce necessary to provide access to community-based services. Thus, even when authorized, Nebraskans with SMI often cannot receive the services they need to avoid unnecessary segregation. Third, Nebraska fails to ensure that its agencies and State-licensed service providers and contractors provide covered services in integrated settings. Finally, the State

2

makes it difficult for licensed community-based service providers to serve individuals with SMI. Nebraska can reasonably modify the behavioral health services that it already offers so that people with SMI can live and work in their communities.

## II. Investigation

The United States Department of Justice (the Department) opened this investigation in response to complaints that Nebraska over-relies on segregated service settings to serve people with SMI, in violation of Title II of the ADA. In June 2021, we notified the State that we had opened a statewide investigation into whether Nebraska serves people with SMI in the most integrated setting appropriate to their needs.

During our investigation, we interviewed Nebraskans with SMI and their families in rural and urban areas across the State. We met these individuals where they live and spend their days: in assisted living and other residential facilities, day programs, hospitals, and the community. We interviewed behavioral health service providers across the State, including in the Lincoln Regional Center, Nebraska's psychiatric hospital. We interviewed behavioral health staff in hospitals, crisis centers, secure and unlocked residential facilities, and day programs. We interviewed community-based providers, including supported employment providers. We also met with corrections staff and law enforcement in multiple counties.

The State facilitated our interviews of relevant state agency officials at every level. We spoke with the heads of the agencies that administer services for people with SMI, including Nebraska's Division of Behavioral Health,[1] Division of Medicaid and Long-Term Care,[2] and Vocational Rehabilitation.[3] We also interviewed staff from the behavioral health regions, Medicaid Managed Care Organizations, and the Offices of Public Guardian and Public Counsel. We interviewed the administrator of the State's new 988 suicide and crisis lifeline. Finally, we requested and reviewed information from the State about its administration of the behavioral health service system.

### III. Nebraska's Behavioral Health Service System

Nebraska's behavioral health service system includes facility-based and community- based services for adults with SMI. The primary state agency charged with overseeing this system is the Division of Behavioral Health (DBH) within the Department of Health and Human Services. DBH contracts with six regional behavioral health authorities (the Regions) and three

[1] The Division of Behavioral Health is a division within Nebraska's Department of Health and Human Services.

[2] The Division of Medicaid and Long-Term Care is a division within Nebraska's Department of Health and Human Services.

[3] Nebraska Vocational Rehabilitation is within Nebraska's Department of Education. 92 Neb. Admin. Code § 72- 001.02.

3

Medicaid Managed Care Organizations (MCOs) to administer services to individuals receiving publicly-funded behavioral health services.

Nebraska state law requires DBH to make sure there are enough community-based [4] behavioral health services statewide to help people with SMI find work and live independently. But approximately 5,000 Nebraskans with SMI live in facilities, many in state-licensed ALFs. ALFs serve primarily or exclusively people with disabilities.[5]People with SMI live in ALFs throughout the State, but at least nineteen facilities primarily house individuals with SMI. Approximately 1,000 adults with SMI reside in those nineteen ALFs.

Nebraska also has twenty-two Medicaid and State-funded day program facilities for people with SMI across the State, often located near ALFs. Nebraska's largest day program facilities can serve over 100 people.[6]Many ALF residents attend day program facilities during the day, alongside other adults with SMI.[7]Day programs vary, with some offering only supervision of adults and activities like crafts.

Nebraska funds other facilities that provide more intensive behavioral health services. The State operates a 250-bed psychiatric hospital, the Lincoln Regional Center (LRC), which provides residential treatment for involuntarily-committed individuals. The State funds behavioral health services in private hospitals, mental health crisis centers, and hospital emergency rooms. In these intensive residential facilities, people can receive 24-hour behavioral health services, including symptom management, psychosocial rehabilitation, educational and vocational activities, skill acquisition and treatment, and programming on community living.[8]Thousands of Nebraskans with SMI enter these intensive facilities to receive behavioral health services each year. Although some people remain in these settings for years, many cycle through for shorter periods. On discharge, many enter ALFs, day programs, or both.

[4]Neb. Rev. Stat. § 71-811 ("The division shall coordinate the integration and management of all funds appropriated by the Legislature or otherwise received by the department from any other public or private source for the provision of behavioral health services to ensure the statewide availability of an appropriate array of community-based behavioral health services and continuum of care and the allocation of such funds to support the consumer and his or her plan of treatment.")

[5]175 Neb. Admin. Code § 4-006.07A ("To be eligible for admission to an assisted-living facility, a person must be in need of or wish to have available shelter, food, assistance with or provision of personal care, activities of daily living, or health maintenance activities or supervision due to age, illness, or physical disability.").

⁶Neb. Dep't of Health and Hum. Servs., *State of Nebraska Roster: Adult Day Services* (Apr. 15, 2024),https://dhhs.ne.gov/licensure/Documents/adultday.pdf.

⁷471 Neb. Admin. Code § 35-004.08 (describing Day Rehabilitation); Neb. Dep't of Health and Hum. Servs., Div. of Behavioral Health, *Nebraska Continuum of Care Manual for Mental Health and Substance Use Disorders* 123– 24 (Dec. 2023),https://dhhs.ne.gov/Behavioral%20Health%20Documents/Continuum%20of%20Care%20Manual.pdf

⁸471 Neb. Admin. Code §§ 35-004.09 (describing Psychiatric Residential Rehabilitation as a facility-based program that "provides skill building in community living skills, daily living skills, medication management, and other related psychiatric rehabilitation services as needed to meet individual client needs.") and 35-014 (describing Secure Residential Rehabilitation as "a secure facility-based, non-hospital or non-nursing facility program...[that] provides skill building and other related recovery oriented psychiatric rehabilitation services as needed to meet individual client needs").

4

Although Nebraska covers the community-based behavioral health services that could allow individuals with SMI to live and work in their communities, these services are far more limited than facility-based options. For example, the State has only three Assertive Community Treatment (ACT) teams.⁹ It also has few crisis response and stabilization services, such as peer- run crisis respite programs and mobile crisis teams, including teams that respond to mental health crises alongside law enforcement.¹⁰ The State covers permanent supportive housing, which pairs rental assistance with community-based services, but its availability varies by geographic region.¹¹ Nebraska also has a Community Support service, which helps people with SMI to manage their mental health symptoms and daily life tasks while living at home, but the State makes it available only on a limited basis.¹²

Similarly, the State covers supported employment services that could help people with SMI get and keep jobs.¹³ But the unavailability of these services to most people who need them means many people with SMI attend day programs in facilities instead. Nebraska has only six community-based supported employment providers statewide. In contrast, the State has twenty- two facility-based day program providers. Day programs do not typically include job training or help with finding work.¹⁴

## IV . Findings

Nebraska's administration of its behavioral health service system violates the integration mandate of Title II of the ADA. Although Nebraska's covered services include the

necessary services to support people with SMI in the community, the State has severely restricted the

[9]Neb. Response to Dep't of Justice Request for Information (Aug. 12, 2022) (on file).
[10]Univ. of Neb. Pub. Policy Ctr., *Nebraska's Regional Planning Discussion Summary* 1–2 (July 2021),

https://dhhs.ne.gov/Behavioral%20Health%20Documents/Regional%20Planning.pdf.

[11]Neb. Rev. Stat. § 71-812 (establishing the Behavioral Health Services Fund for the provision of behavioral health services, including housing-related assistance for very low-income adults with serious mental illness); Neb. Comm'n on Housing and Homelessness, *Opening Doors: 10 Year Plan to Prevent and End Homelessness in the State of Nebraska* 7 (Jan. 2015), https://opportunity.nebraska.gov/wp-content/uploads/2022/02/NCHH_OpeningDoors_StateofNE10YearPlantoPreventandEndHomelessness.pdf (noting that the State's Housing-Related Assistance Program "provides ongoing rental assistance to seriously mentally [ill] persons to be discharged from state psychiatric facilities but lacking safe and affordable housing"). *See also, e.g.*, Region V Systems, *Housing*, https://region5systems.net/how-we-help/housing/ (last visited Apr. 16, 2024) (describing housing and supportive services to individuals "

); Region 6 Behavioral Healthcare, *Housing*, https://www.regionsix.com/programs/housing/ (last visited Apr. 16, 2024) (describing its "

).

[12]Neb. Medicaid State Plan, *Methods and Standards for Establishing Payment Rates*, Attachment 4.19-B, Item 13d (2021).

[13]471 Neb. Admin. Code § 35-013 (describing Assertive Community Treatment services, including employment services); Neb. Dep't of Health and Hum. Servs., Div. of Behavioral Health, *Nebraska Continuum of Care Manual for Mental Health and Substance Use Disorders* 143–44 (Dec. 2023), https://dhhs.ne.gov/Behavioral%20Health%20Documents/Continuum%20of%20Care%20Manual.pdf.

[14]471 Neb. Admin. Code § 35-004.08A (describing Day Rehabilitation program components).

with serious and persistent mental illness, who ar ndigent or have extremely low income, and who are discharging from an inpatient Mental Health Board

commitment, or those that are at risk of an inpatient commitment"

rental assistance program

that assists with access to decent, safe, and affordable housing to individuals who are recovering from a serious

mental illness and have extremely low income"

supply of these services such that very few people with SMI can access the services they need outside of facilities. As a result, Nebraskans with SMI frequently enter ALFs and segregated day programs because they are unable to live and work in integrated settings without necessary services. People with SMI who are not currently living in ALFs or receiving segregated day services may face serious risk of such institutionalization. Indeed, the State's MCOs often funnel people with SMI to ALFs to get their basic needs met.

The State's overreliance on segregated settings extends to its day and employment services. ALFs often partner with, or operate, day programs for people with SMI, sometimes transporting residents in vans between the facilities at set times each day. As a result, many people with SMI spend their entire lives in segregated settings. And many Nebraskans with SMI who live in their own homes may nonetheless spend their days in segregated settings, because when they reach out to providers or case managers to get services during the day, they are more likely to be connected to day programs instead of to supported employment services. People with SMI leaving hospitals, jails, and other segregated settings are also at serious risk of unnecessary admission to day programs because the State does not make community-based alternatives available and readily accessible.

Title II of the ADA prohibits public entities from subjecting qualified individuals with disabilities to discrimination. Public entities may not, based on disability, exclude qualified individuals from participating in, or deny them the benefits of, the entity's services, programs, or activities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). When enacting Title II, Congress explicitly identified unjustified segregation of persons with disabilities as a "for[m] of discrimination." 42 U.S.C. §§ 12101(a)(2), 12101(a)(5). Title II includes an integration mandate which requires public entities to "

28 C.F.R. § 35.130(d). The "most integrated setting" is one that "enables individuals with

disabilities to interact with nondisabled persons to the fullest extent possible[.]" 28 C.F.R. pt. 35, app. B, at 711 (2020). Thus, a state violates the ADA when it administers and funds

services for people with disabilities—including behavioral health services—in a manner that unnecessarily segregates them. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

The Supreme Court has held that unjustified isolation is a form of discrimination prohibited by the ADA. *Olmstead*, 527 U.S. at 597. Public entities must provide community- based services to individuals with disabilities when (a) these services are appropriate, (b) the individuals do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, considering the resources available to the entity and the needs of other people with disabilities it serves. *Id.* at 607. The ADA's integration mandate applies not only to people with disabilities who are currently segregated, but also to those at serious risk of segregation. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460–61 (6th Cir. 2020); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 321–22 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100, 1116–17 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir. 2012); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003); *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1026 (D. Minn. 2016) (finding that the *Olmstead* decision "supports a broad reading of the integration mandate," including recognition of at-risk claims); *Hiltibran v. Levy*, 793 F. Supp. 2d 1108, 1116 (W.D. Mo. 2011) ("Persons at risk of institutionalization may make an integration mandate challenge without having first been

administer [their] services, programs, and activities i

the most integrated setting appropriate to the needs of qualified individuals with disabilities.

placed in institutions."). *But see United States v. Mississippi*, 84 F.4th 387, 398 (5th Cir. 2023) (holding that the risk of institutionalization, without actual institutionalization, does not give rise to discrimination under Title II). A public entity must modify its policies, practices, or procedures when necessary to avoid disability discrimination, unless it can show that the modifications would fundamentally alter the nature of a service, program, or activity. 28 C.F.R. § 35.130(b)(7)(i).

Below, we detail our findings relating to Nebraska's violation of Title II's integration mandate. In short, Nebraska relies on segregated ALFs and day programs to serve adults with SMI who would prefer to receive community-based services to help them live and work in integrated settings. Nebraska's limitations on community-based services mean that Nebraskans with SMI who are in the community or leaving hospitals or homeless shelters have little choice but to enter ALFs and day programs to get services. Community-based services are appropriate for these individuals, and Nebraska can reasonably modify its

system by expanding existing services so that Nebraskans with SMI can return to or stay in their own homes and work in the community.

## A. Nebraska Is a Public Entity and Its Assisted Living Facilities and Day Programs Serving Adults with SMI Are Segregated Settings.

Title II of the ADA applies to the State of Nebraska because it is a "public entity" as defined by the statute. 42 U.S.C. § 12131(1). Title II requires public entities to ensure that their services, programs, and activities comply with Title II, even when operated by private entities through contracts or other arrangements. 28 C.F.R. § 35.130(b)(3). The State, through DBH, retains responsibility for complying with Title II when it contracts with, licenses, and funds private entities to coordinate or provide services. *Id.* § 35.130(b)(1).

The ALFs and day program facilities where Nebraska offers behavioral health services are segregated settings under Title II.[15] ALFs exclusively or primarily serve individuals with disabilities; the eligibility criteria for ALF admission require individuals to need help in various life domains, including personal care, activities of daily living, health maintenance activities, or supervision, "due to age, illness, or physical disability."[16] In nineteen of the State's ALFs, all or nearly all residents have SMI. These ALFs range in size from ten to nearly 250 residents.[17] Some ALFs have physical layouts that resemble hospitals, with long corridors connected by central staff stations. ALF residents typically must share bedrooms, sometimes with three or more adults in one room. Common areas, like dining halls and other public spaces, are much like those in nursing facilities. Like nursing facilities, ALFs may offer organized group activities at pre-determined times, but with limited opportunities for interaction with people other than ALF residents and paid staff. The facilities impose limits on what residents can do and when, limiting privacy and autonomy. ALFs restrict outside visitors with set visiting hours and, because living spaces are communal and bedrooms are often shared, private spaces for visiting

[15] *See* 28 C.F.R. § 35.130(d); 28 C.F.R. pt. 35, app. B, at 711 (2020). [16] 175 Neb. Admin. Code § 4-006.07A.

[17] Neb. Dep't of Health and Hum. Servs., *State of Nebraska Roster: Assisted Living Facilities* (Apr. 15, 2024), https://dhhs.ne.gov/licensure/Documents/ALF%20Roster.pdf

with non-resident guests are rarely available. In addition, residents generally do not have access to the kitchen and must eat at set times when meals are served in the dining halls.

Day programs for people with SMI in Nebraska also bear the hallmarks of segregation. These day programs exclusively serve people with SMI and offer few opportunities to interact with people without disabilities other than paid staff. Program participants' options for how to spend their days are restricted, with set schedules and activities each day. These facilities often post daily schedules of activities—some decorated with cartoon animals—

that may list art projects, movies, basic pre-vocational activities like resume writing, and group discussions on topics like stress management.

Many ALFs partner with day programs or operate their own segregated day programming. ALFs offer ready access to day programs but rarely, if ever, refer their residents to supported employment services. Instead, ALFs and day programs incentivize a continual loop of segregation. For day program providers to be paid, state regulations require their participants to attend the program for a certain number of hours each weekday.[18] This financial incentive leads ALFs that operate or partner with day programs to limit the daytime hours residents are permitted to spend in the ALF while offering transportation to the day program facility. Some ALFs post notices advising residents that they must leave the ALF for set hours on weekdays. Many ALF residents fulfill this requirement by lining up on weekday mornings to ride in a van that transports them together to a day program and brings them back as a group at the end of the day. At least one ALF offers two of the day's three meals at the day program facility, incentivizing residents to attend the day program to eat. Unsurprisingly, some ALF residents believe that participation in day programs is required to live in the ALF.

## B. Community-Based Services Are Appropriate for Nebraskans with SMI, and Most Prefer These Services.

Community-based services are appropriate for Nebraskans with SMI who currently live in ALFs, attend facility-based day programs, or who are at serious risk of entering an ALF or day program.[19] ALF and day program providers agree that the people they serve could live and work in the community with appropriate services to meet their needs.

Even people with the highest needs can find and keep jobs in typical workplaces. Providers have success stories of people with histories of mental health crises and hospitalizations who went on to have great careers with supported employment services. Many Nebraskans with SMI who currently live and work in the community are at serious risk of entering ALFs and day programs because the State limits the services they need to stay at home

---

[18] *See* 471 Neb. Admin. Code § 35-004.08A(6) (day rehabilitation "shall provide . . . [a] scheduled program of services to clients for a minimum of five hours per day, five days per week").

[19] *See, e.g., Olmstead*, 527 U.S. at 602, 607; *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 994 (N.D. Cal. 2010) (appropriateness prong satisfied where plaintiffs' individual plans of care documented their need for specific community services, which were "critical to their ability to avoid institutionalization, and to remain in a community setting"); *see also* U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.* Q. 4 (June 22, 2011), https://www.ada.gov/resources/olmstead-mandate-statement/ (listing types of evidence an individual can rely on to establish that an integrated setting is appropriate).

and at work long-term. By living and working in the community, these individuals show that community-based services are appropriate for them.[20]

Most Nebraskans with SMI would prefer to live and work in integrated, community- based settings. Indeed, Nebraskans with SMI across the State dream of living in their own homes and having jobs in their communities. Many of these people have work histories. They have pride in their work, and say they want to work again. People with and without previous work experience describe the jobs they would like to do in restaurants, construction, retail, or emergency medicine. Some people describe the businesses they would start, like selling their art online, if they had help with the process. Providers confirm that many people they serve prefer community-based services.

## C. Nebraska Restricts Access to the Covered Community-Based Services that People with SMI Need to Live and Work in Their Communities.

We found that Nebraskans with SMI enter ALFs and day programs because they do not have access to the community-based services they need to live and work in integrated homes and workplaces. Covered services include the daily supports and crisis interventions that individuals need to avoid entering ALFs and day programs, as well as the case management necessary to connect individuals with community-based options to live and work in the community. The State's administration of its behavioral health system severely restricts access to covered services that individuals with SMI need to manage their disability, both at home and at work.

Nebraska has long been aware that people with SMI are "likely to remain in institutional environments longer than necessary,"[21] the State has left "gaps in the services, supports, and residential options available for individuals with behavioral health needs," [22] and the State needs to "[i]ncrease the number of persons receiving supported employment services."[23] The State's

---

[20] *E.g. Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 612–13 (7th Cir. 2004); *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003).

[21] Neb. Dep't of Health and Hum. Servs., *A Vision for Community Integration: Nebraska's Olmstead Plan* 12 (Dec. 13, 2019),https://nebraskalegislature.gov/FloorDocs/106/PDF/Agencies/Health_and_Human_Services_Depart ment_of/708_2 0191216-111512.pdf (stating that people with disabilities are "more likely to remain in institutional settings longer than necessary, live in substandard environments, have high rates of recidivism to jails and prisons, and enter or return to homelessness").

²²Neb. Legis. LR 296, State-Licensed Care Facilities Oversight Committee, *Final Report* ii (Dec. 15, 2018),https://www.nebraskalegislature.gov/pdf/reports/committee/select_special/lr296/lr296_2018.pdf. The State Senate Committee investigated the living conditions, treatment quality, and State oversight of ALFs that predominantly serve people with SMI. The resulting report found that DBH had violated state law by "leaving gaps in the services, supports, and residential options available for individuals with behavioral health needs." *Id*. The committee concluded that these failures resulted in "a segment of the population with serious mental illness [that] has turned to assisted living facilities to fill their housing needs." *Id*.

²³Univ. of Neb. Coll. of Pub. Health, *Nebraska Behavioral Health Needs Assessment* 100–01 (Sept. 2016),https://app1.unmc.edu/PublicAffairs/TodaySite/images/siteimages/BHStudy1011.pdf (listing challenges to supported employment services, including the "need to increase the number of providers to improve access" and goals such as "[i]ncreas[ing] the number of persons receiving supported employment services"); U.S. Dep't of Health and Hum. Servs., Ctr. For Mental Health Servs., Substance Abuse and Mental Health Servs. Admin.,

2019 *Olmstead* plan notes that Nebraska has failed to remedy barriers to integrated services, including barriers to supported employment.[24] For example, the State acknowledged that its supplemental income payment for low-income individuals was responsible for "ALFs becoming one of the primary residential options for individuals with serious mental illness (SMI)."[25] The State pays ALFs an extra $438 for each resident who receives federal Social Security Income (SSI) and Social Security Disability Income (SSDI), but contributes only $5 toward independent housing. Nebraska also acknowledges its long waitlists for community-based housing services[26] and the resulting lack of community-based housing opportunities for people with disabilities. Similarly, public comments summarized in the State's 2019 *Olmstead* plan conclude that "[t]he plan lacks focus on key areas including integrated employment."[27]

We found these problems—and others—still exist in Nebraska. Nebraska restricts access to its integrated services in several ways. First, the State fails to authorize community-based services for many individuals with SMI. Second, the State has underdeveloped its community- based workforce. So, even when authorized, Nebraskans with SMI often cannot receive the services they need to avoid unnecessary segregation. Third, the State fails to ensure that its contractors (MCOs and Regions) connect people with SMI to community-based services. Finally, the State makes it difficult for licensed community-based service providers to navigate the State's system and serve individuals with SMI.

*1. The State Restricts Service Authorization and Fails to Maintain Community-Based Providers for Nebraskans with SMI.*

Although Nebraska covers a variety of community-based services as part of its behavioral health system, including supported employment services, the State fails to make those services available to most Nebraskans with SMI who need and qualify for them.

*Employment Development Initiative: Fiscal Year 2011 & 2012 Projects* 17–19 (June 6, 2013),https://www.nasmhpd.org/sites/default/files/2013_EDI.pdf (Nebraska's self-report states: "[t]he goal has always been to increase employment opportunities for people with mental illness and/or substance use disorders in Nebraska" but after a review "it was clear SE [supported employment] needs to be updated").

²⁴Neb. Dep't of Health and Hum. Servs., *A Vision for Community Integration: Nebraska's Olmstead Plan* 11–15 (Dec. 13, 2019),https://nebraskalegislature.gov/FloorDocs/106/PDF/Agencies/Health_and_Human_Services__Department_of/708_2 0191216-111512.pdf.

²⁵*Id.* at 12.

²⁶Nebraska's community-based housing services are funded through its Behavioral Health Services Fund. The Behavioral Health Services Fund is a cash fund "for the provision of behavioral health services," and certain funding is set aside "for housing-related assistance for very low-income adults with serious mental illness." Neb. Rev. Stat. § 71-812.

²⁷Neb. Dep't of Health and Hum. Servs., *A Vision for Community Integration: Nebraska's Olmstead Plan* 51 (Dec. 13, 2019),https://nebraskalegislature.gov/FloorDocs/106/PDF/Agencies/Health_and_Human_Services__Department_of/708_2 0191216-111512.pdf.

10

### Limits on Community Support Services

Nebraska routinely denies Community Support and instead authorizes people to attend facility-based day programs. For people who do receive Community Support, per State policy, the MCO or Region can only authorize a total of 36 hours over approximately 26 weeks, or an average of 1.5 hours per week.²⁸ These restrictions mean that community living is widely unavailable to individuals who need more regular support than the maximum rate allows.

### Limits on Higher-Intensity Community-Based Services

Even when people with SMI are authorized for community-based services, they often do not receive those services. Although Nebraska covers higher-intensity community-based services like ACT, it has under-developed its provider network. As just one example, the State currently has only three ACT teams. ACT is therefore unavailable to most

individuals who need it, with only 166 people throughout the state receiving the service in September 2022.[29] And although ACT is intended to be a long-term service,[30] Nebraska routinely revokes authorization for the few people who receive the service once they start to improve. Nebraska also offers another higher-intensity service called Emergency Community Support (ECS), but ECS is short- term[31] and only 145 individuals were enrolled in September 2022.[32] Similarly, Nebraskans with SMI report challenges obtaining permanent supportive housing. Without access to permanent supportive housing, people with SMI have few alternatives to ALFs.

*Limits on Supported Employment Services*

The State similarly restricts supported employment services. Instead of making these services broadly available, the State funnels Nebraskans with SMI into facility-based day programs, sometimes for many years. Direct service providers reported that integrated, competitive work experiences are crucial for their clients' mental health recovery, but Nebraska's system makes it difficult to provide supported employment services. Day programs are more accessible, both in terms of the number of available providers and the State's willingness to authorize services, than supported employment. The State frequently denies supported employment services if the person is receiving any other services, like Community Support or Peer Supports, during the day. And across the board, providers have difficulty navigating the State's payment system for funding the services. In contrast, individuals

[28] Neb. Medicaid State Plan, *Methods and Standards for Establishing Payment Rates*, Attachment 4.19-B, Item 13d, at 1a. Community Support services are billed in 15-minute units, up to a maximum of 144 units per 180 days, i.e. 36 hours over an approximately 25.7-week period (an average of 1.5 hours per week).

[29] Neb. Response to Dep't of Justice Request for Information (June 16, 2023) (on file).

[30] *See* U.S. Dep't of Health and Hum. Servs., Substance Abuse and Mental Health Servs. Admin, Ctr. for Mental Health Servs., *Maintaining Fidelity to ACT: Current Issues and Innovations in Implementation* 5 (2023), https://store.samhsa.gov/sites/default/files/pep23-06-05-003.pdf (describing ACT as "[t]ime-unlimited," where "[t]he ACT team provides services *for as long as needed*" (emphasis added)).

[31] Neb. Dep't of Health and Hum. Servs., Div. of Behavioral Health, *Nebraska Continuum of Care Manual for Mental Health and Substance Use Disorders* 25–26 (July 2022), https://dhhs.ne.gov/Behavioral%20Health%20Documents/Continuum%20of%20Care%20Manual.pdf.

[32] Neb. Response to Dep't of Justice Request for Information (June 16, 2023) (on file).

receiving facility-based day program services can receive the service for extended periods of time, sometimes years.

Nebraska fails to provide facility-based day program participants with the information and help they need to transition to community-based jobs. Some day program participants who have expressed interest in working believe they have no choice but to stay in the facility all day. In theory, Nebraska offers benefits counseling to help individuals understand how they can work without jeopardizing their public benefits. Nebraska has long been aware of the need to "[a]ddress the misconception that persons with behavioral health disorders cannot work" and to provide benefits counseling.[33] But many people are unaware that benefits counseling exists, and providers tell them that they cannot work because they would lose access to benefits.

### Limits on Case Management

Nebraska limits case management that people with SMI need to avoid unnecessary segregation in ALFs and day programs. Although case management is a covered service, Nebraska relies primarily on Community Support providers to perform some case management tasks, along with the other services they provide. This results in restricted case management hours for individuals with SMI because Nebraska limits Community Support services to an average of 90 minutes per week. This is not enough time to provide both necessary Community Support services and case management.[34]

Nebraska's limits on case management create a significant barrier to transitioning people with SMI from ALFs and day programs to integrated settings. Behavioral health providers across the State find the process of transitioning Nebraskans with SMI from facilities to community settings difficult and sometimes impossible. The State does not reimburse community-based providers for time spent transition planning for people with SMI living in ALFs. This leaves people with SMI and their families to find community-based services and housing opportunities on their own. People with SMI routinely discharge from institutions with no community-based services in place, making them at serious risk of having to enter ALFs or day programs. And when individuals with SMI reenter the community, the lack of case management further compounds their inability to secure services needed to avoid placement in ALFs and day programs.

People with SMI need case management to coordinate the various services so they can find and maintain community-based housing and work. Effective case managers also help people with SMI transition from facilities to the community with appropriate services. But many Nebraskans with SMI receive no or limited case management. Some ALFs have never had a case manager visit a resident at the ALF. Some people with SMI are assigned a case manager

[13] Univ. of Neb. Coll. of Pub. Health, *Nebraska Behavioral Health Needs Assessment* 100–01 (Sept. 2016),https://app1.unmc.edu/PublicAffairs/TodaySite/images/siteimages/BHStudy1011.pdf.

[14] Community Support providers are expected to perform case management functions—including benefits applications, arranging medical appointments, and getting people to those appointments—in addition to their core responsibilities of helping people with SMI live at home and work, and providing active rehabilitation and support interventions when an individual is in crisis. *See* 471 Neb. Admin. Code § 35-004.01A (describing Community Support service components).

through their MCO. But MCO case managers are typically minimally involved with their clients. Hospital staff try to alert MCO case managers when people with SMI are admitted during a mental health crisis. But the MCO case managers often respond after the person has already discharged, or do not respond at all. Other providers have similar challenges contacting MCO case managers. Without a case manager who is familiar with the individual's preferences, service history, and community-based options, hospital staff typically refer the individual for ALF or other group housing instead of referring the person to permanent supportive housing, ACT, or other community-based services. The State is in the process of adding several services, including care coordination for some individuals with SMI living in ALFs. This positive step, without more, does not ensure that individuals with SMI who wish to transition from ALFs and day programs will receive the services they need to live and work in integrated, community settings.

*Limits on Crisis Response Services*

Nebraska's community-based crisis response services for people with SMI are, along with other community-based services, underdeveloped. In large areas of the State, police officers are often the first responders to mental health crises. When police officers respond to a mental health crisis, they may bring the person to a hospital or crisis center or arrest the person and charge them with a nuisance crime like loitering or disturbing the peace. Some jurisdictions in Nebraska have tried to make crisis response services more available, for example, by establishing mental health co-responder programs that pair behavioral health workers with law enforcement to respond to mental health crises. But these local efforts—concentrated in cities— are insufficient to plug the holes in the State's crisis response services.

*Impact on Nebraskans with SMI*

Nebraska's administration of behavioral health services keeps many individuals with SMI segregated in ALFs and day programs or in the community but at serious risk of segregation.
For example, the capacity of ALF and day programs far exceeds the capacity of supported employment providers in the State. Indeed, State-commissioned reports have repeatedly

cited the need to expand access to supported employment services.[33] Yet the number of adults with SMI receiving supported employment services in the state has remained static for many years, as has the number of supported employment providers.[34] The State routinely authorizes community-based services just long enough for individuals with SMI to achieve stability living

[33] Technical Assistance Collaborative, *Nebraska Olmstead Plan Evaluation 9*, 20–21 (Dec. 15, 2021),https://nebraskalegislature.gov/FloorDocs/107/PDF/Agencies/Health_and_Human_Services__Depart ment_of/708_2 0211215-142757.pdf (noting the State's overarching goal of promoting employment for people with disabilities); Univ. of Neb. Coll. of Pub. Health, *Nebraska Behavioral Health Needs Assessment* 100–01 (Sept. 2016), https://app1.unmc.edu/PublicAffairs/TodaySite/images/siteimages/BHStudy1011.pdf; U.S. Dep't of Health and Hum. Servs., Ctr. For Mental Health Servs., Substance Abuse and Mental Health Servs. Admin., *Employment Development Initiative: Fiscal Year 2011 & 2012 Projects* 17–19 (June 6, 2013), https://www.nasmhpd.org/sites/default/files/2013_EDI.pdf.

[34] *Compare* Liu, Heng-Hsian N., *Policy and practice: an analysis of the implementation of supported employment in Nebraska* 70 (2011) (unpublished Ph.D. dissertation, Univ. of Nebraska), https://digitalcommons.unl.edu/psychdiss/30/, *with* Neb. Response to Dep't of Justice Request for Information (Oct. 3, 2022) (on file)

at home or in their new jobs before terminating the service. By suddenly cutting off community- based services, Nebraska places people with SMI at serious risk of mental health decompensation and institutionalization. While these services should be aimed at supporting recovery, many people with SMI need varying levels of support over time and services must be available to meet those ongoing needs.[37] Like ACT, the supported employment services that Nebraska covers should be available for as long as necessary to assist individuals with SMI who have long-term support needs.[38] Instead, the State generally only offers these individuals facility-based services.

## 2. Nebraska Fails to Ensure that its Behavioral Health Service System Provides Covered Services in Integrated Settings.

Nebraska fails to ensure that its State agencies, contractors (Managed Care Organizations and Regions), and service providers provide community-based services so that adults with SMI can live at home and work. Instead, Nebraska's system pushes individuals with SMI into ALFs and day programs. As discussed above, the State is responsible for administering its Medicaid and other services for people with SMI in a manner consistent with the ADA's integration mandate. Yet Nebraska administers behavioral health services, including supported employment services, through various funding streams and multiple departments and contractors, in ways that favor ALF and day program services over community-based options. The entities within the behavioral health service system operate in silos. There is limited information sharing and service coordination across the State

agencies, Managed Care Organizations (MCOs), Regions, and service providers that Nebraska uses to authorize and provide behavioral health services.

Nebraska's failure to ensure that its covered services are available in integrated settings results in unnecessary segregation. The Regions and the MCOs routinely funnel people with SMI to ALFs and day programs because the State has underdeveloped community-based services. Thus, thousands of people with SMI spend their days cloistered in segregated ALFs

[77] *See, e.g.*, U.S. Dep't of Health and Hum. Servs., Ctr. For Mental Health Servs., Substance Abuse and Mental Health Servs. Admin., *Executive Order: Saving Lives Through Increased Support for Mental and Behavioral Health Needs Report* 15 (Dec. 2020), https://www.samhsa.gov/sites/default/files/saving-lives-mental-behavioral-health- needs.pdf ("A primary principle [of mental health services] must be the recognition that mental illness and SUDs [substance use disorders] are chronic, relapsing illnesses and, for those with more severe conditions, will require ongoing care. For many, this will take the form of ongoing case management and long-term care.").

[78] U.S. Dep't of Health and Hum. Servs., Substance Abuse and Mental Health Servs. Admin, Ctr. for Mental Health Servs., *Maintaining Fidelity to ACT: Current Issues and Innovations in Implementation* 17–18 (2023) https://store.samhsa.gov/sites/default/files/pep23-06-05-003.pdf (supported employment services should be "continuous and time-unlimited" and "integrat[ed] into mental health services"). *See also* U.S. Dep't of Labor, Office of Disability Emp't Policy, *Competitive Integrated Employment (CIE), Mental Health*, https://www.dol.gov/agencies/odep/program-areas/cie (last visited April 17, 2024) (increasing competitive integrated employment for individuals with SMI includes combining supported employment services with mental health services to support life needs that must be addressed to pursue employment); IPS Employment Center, *IPS Practice and Principles*, https://ipsworks.org/index.php/documents/ips-practice-and-principles/ (last visited April 17, 2024) (one of the eight principles of Individualized Placement and Support (IPS), a supported employment model for people with SMI, is time-unlimited support: "Job supports . . . continue for as long as each worker wants and needs the support.").

and day programs instead of receiving the services they need to live and work in the community. Many more are at serious risk of unnecessary segregation.

Because the State's system operates in silos, Nebraska does not effectively gather and share information or coordinate entities to keep people with SMI from falling through the cracks and into institutions. For example, Nebraska does not consistently and accurately gather and analyze data about Nebraskans with SMI. Since Nebraska lacks information about its citizens with SMI, the State cannot determine which services these individuals need to leave or avoid entering ALFs and day programs. Nor does the State gather, analyze, or act on data about its community-based provider network's capacity to meet the needs of adults with SMI. There is a high demand for community-based services. But the State fails to identify individuals for whom community-based services are appropriate and

preferred and ensure sufficient community-based provider capacity. Instead, the system defaults to segregated settings.

*Impact on Nebraskans with SMI*

By failing to ensure the provision of behavioral health services in the community with effective oversight, the State has fostered a routine, system-wide practice of referring individuals who could receive services in the community to segregated ALFs and day programs instead. Indeed, behavioral health service providers across the system, including institutional and community-based providers, cite ALFs and day programs as the main service options for Nebraskans with SMI. Almost any need for community-based services triggers referral to an ALF—from challenges taking medications at home to discharging from LRC after years of hospitalization. Once admitted, ALF residents often enter day programs, too. *See* Section IV.A, above.

## V. Nebraska Could Remedy These Violations

Nebraska could remedy these violations without fundamentally altering its behavioral health service system.[39] Nebraska already has a statutory goal of providing greater access to community-based services and improved outcomes for people with SMI.[40] Changes like those below, built on Nebraska's existing behavioral health service system, would reasonably modify the system by expanding community-based alternatives to treatment in segregated settings, allowing more Nebraskans with SMI to live and work in the community.[41]

[39] Public entities are required to make reasonable modifications to their services, programs, and activities to avoid discriminating against people with disabilities, 28 C.F.R. § 35.130(b)(7)(i), as long as the modifications are not a fundamental alteration, *Olmstead*, 527 U.S. at 603, 607.

[40] Neb. Rev. Stat. § 71-810(1)(a) ("[DBH] shall encourage and facilitate the statewide development and provision of an appropriate array of community-based behavioral health services and continuum of care for the purpose[] of providing greater access to such services and improved outcomes for consumers of such services.").

[41] *Radaszewski v. Maram*, 383 F.3d 599, 611–12 (7ᵗʰ Cir. 2004) (providing existing services in the community is a reasonable modification); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280–81 (2d Cir. 2003) (changes and increased access to existing services are reasonable modifications); *Guggenberger v. Minn.*, 198 F. Supp. 3d 973, 1030 (D. Minn. 2016) (providing existing Medicaid waiver services to eligible people is a reasonable modification); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1304–05 (M.D. Fla. 2010); *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 344–45 (D. Conn. 2008).

*First*, Nebraska could expand access to its existing community-based services like Community Support, ACT, case management, and permanent supportive housing, and

ensure sufficient provider capacity so that Nebraskans with SMI can receive the services they need to transition to, or remain in, the community. The State should authorize services to fill the day-to- day needs of individuals with SMI. Case managers should follow their clients throughout the State's behavioral health service system, so that clients receive consistent, continuous, and timely information and service coordination.

*Second*, Nebraska could offer supported employment services, including benefits planning, to every person with SMI receiving State-administered behavioral health services who expresses an interest in working. Nebraska could streamline its approval and funding processes for supported employment services so that people with SMI experience continuous and seamless service delivery. Supported employment service authorization and funding should continue for as long as the person needs supported employment services to pursue their employment goals.

*Third*, Nebraska could ensure that services it covers for individuals with SMI, regardless of whether Nebraska uses contracted or licensed entities to authorize or connect individuals to the service, are available and accessible in the community. This could involve enforcing existing contracts requiring that necessary services be provided in the community.

*Fourth*, Nebraska could administer its behavioral health service system to communicate and coordinate across State agencies and contracted entities. DBH could serve as the State's hub for information and technical support relating to behavioral health services, including employment services, for people with SMI. The State should develop a process for collecting and analyzing accurate, up-to-date information about Nebraskans with SMI and their service needs and preferences, and the State's provider network capacity.

*Fifth*, Nebraska could identify people with SMI in ALFs and day programs who may be open to living and working in the community. Nebraska could educate these individuals about community-based options and provide transition planning to people who want to move. Transition planning should start with the presumption that people with SMI can live and work in the community with the right services in place. Transition planning should be person-centered, and identify and arrange the services the person needs to move to, live, and work in the community.

## VI. Conclusion

We would like to work cooperatively with you to resolve the Department's findings. We hope to enter settlement negotiations with Nebraska and agree on changes the State will make to remedy the violations. If Nebraska will not negotiate, or if our negotiations fail,

the United States may take appropriate action—including filing a lawsuit —to remedy the State's ADA violations.[42]

[42] We will share a copy of this letter with the complaining parties. Under 28 C.F.R. § 35.172(d), a complainant may file a private suit at any time under Title II of the ADA, 42 U.S.C. § 12133.

12. The plaintiff will also show and prove with video recording, audio recording as well as pictures of proof of burned of this case by the defendants
https://archive.ada.gov/lawenfcomm.htm

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



# Communicating with People Who Are Deaf or Hard of Hearing: ADA Guide for Law Enforcement Officers

As a law enforcement officer, you can expect to come into contact with people who are deaf or hard of hearing. It is estimated that up to nine percent of the population has some degree of hearing loss, and this percentage will increase as the population ages.

Under the Americans with Disabilities Act (ADA), people who are deaf or hard of hearing are entitled to the same services law enforcement provides to anyone else. They may not be excluded or segregated from services, be denied services, or otherwise be treated differently than other people. Law enforcement agencies must make efforts to ensure that their personnel communicate effectively with people whose disability affects hearing. This applies to both sworn and civilian personnel.

Your agency has adopted a specific policy regarding communicating with people who are deaf or hard of hearing. It is important to become familiar with this policy.

## Requirements for Effective Communication

The ADA requires that . . .

Law enforcement agencies must provide the communication aids and services needed to communicate effectively with people who are deaf or hard of hearing, except when a particular aid or service would result in an undue burden or a fundamental change in the nature of the law enforcement services being provided. Agencies must give primary consideration to providing the aid or service requested by the person with the hearing disability.
Agencies cannot charge the person for the communication aids or services provided.
Agencies do *not* have to provide personally prescribed devices such as hearing aids.
When interpreters are needed, agencies must provide interpreters who can interpret effectively, accurately, and impartially.
Only the head of the agency or his or her designee can make the determination that a particular aid or service would cause an undue burden or a fundamental change in the nature of the law enforcement services being provided.

Your agency's policy explains how to obtain interpreters or other communication aids and services when needed.

## Communicating with People Who are Deaf or Hard of Hearing

Officers may find a variety of communication aids and services useful in different situations.

Speech supplemented by gestures and visual aids can be used in some cases.
A pad and pencil, a word processor, or a typewriter can be used to exchange written notes.
A teletypewriter (TTY) can be used to exchange written messages over the telephone.
An assistive listening system or device to amplify sound can be used when speaking with a person who is hard of hearing.
A sign language interpreter can be used when speaking with a person who knows sign language.

An oral interpreter can be used when speaking with a person who has been trained to speech read (read lips). **Note:** Do not assume that speech reading will be effective in most situations. On average, only about one third of spoken words can be understood by speech reading.

The type of situation, as well as the individual's abilities, will determine which aid or service is needed to communicate effectively.

## Practical Suggestions for Communicating Effectively

Before speaking, get the person's attention with a wave of the hand or a gentle tap on the shoulder.

Face the person and do not turn away while speaking.

Try to converse in a well-lit area.

Do not cover your mouth or chew gum.

If a person is wearing a hearing aid, do not assume the individual can hear you.

Minimize background noise and other distractions whenever possible.

When you are communicating orally, speak slowly and distinctly. Use gestures and facial expressions to reinforce what you are saying.

Use visual aids when possible, such as pointing to printed information on a citation or other document.

Remember that only about one third of spoken words can be understood by speech reading.

When communicating by writing notes, keep in mind that some individuals who use sign language may lack good English reading and writing skills.

If someone with a hearing disability cannot understand you, write a note to ask him or her what communication aid or service is needed.

If a sign language interpreter is requested, be sure to ask *which* language the person uses. American Sign Language (ASL) and Signed English are the most common.

When you are interviewing a witness or a suspect or engaging in any complex conversation with a person whose primary language is sign language, a qualified interpreter is usually needed to ensure effective communication.

When using an interpreter, look at and speak directly to the deaf person, not to the interpreter.

Talk at your normal rate, or slightly slower if you normally speak very fast.

Only one person should speak at a time.

Use short sentences and simple words.

Do not use family members or children as interpreters. They may lack the vocabulary or the impartiality needed to interpret effectively.

## What Situations *Require* an Interpreter?

Generally, interpreter services are not required for simple transactions – such as checking a license or giving directions to a location – or for urgent situations – such as responding to a violent crime in progress.

**Example**: An officer clocks a car on the highway going 15 miles per hour above the speed limit.  The driver, who is deaf, is pulled over and is issued a noncriminal citation. The individual is able to understand the reason for the citation because the officer points out relevant information printed on the citation or written by the officer.

**Example:** An officer responds to an aggravated battery call and upon arriving at the scene observes a bleeding victim and an individual holding a weapon. Eyewitnesses observed the individual strike the victim. The individual with the weapon is deaf. Because the officer has probable cause to make a felony arrest without an interrogation, an interpreter is not necessary to carry out the arrest.

However, an interpreter may be needed in lengthy or complex transactions – such as interviewing a victim, witness, suspect, or arrestee – if the person being interviewed normally relies on sign language or speech reading to understand what others are saying.

**Example:** An officer responds to the scene of a domestic disturbance. The husband says the wife has been beating their children and he has been trying to restrain her. The wife is deaf. The officer begins questioning her by writing notes, but her response indicates a lack of comprehension. She requests a sign language interpreter. In this situation an interpreter should be called. If the woman's behavior is threatening, the officer can make an arrest and call for an interpreter to be available later at the booking station.

It is inappropriate to ask a family member or companion to interpret in a situation like this  because emotional ties may interfere with the ability to interpret impartially.

**Example:** An officer responds to the scene of a car accident where a man has been seriously injured. The man is conscious, but is unable to comprehend the officer's

questions because he is deaf. A family member who is present begins interpreting what the officer is saying.

A family member or companion *may* be used to interpret in a case like this, since it is an emergency involving an imminent threat to the safety or welfare of an individual and no interpreter is available. However, in general, do not expect or demand that a deaf person provide his or her own interpreter. As a rule, when interpreter service is needed, it must be provided by the agency.

List your agency's contact information for obtaining an interpreter, an assistive listening device, or other communication aid or service here.

13. The plaintiff also backs up the findings against all defendants in there official capacity in the matter of city of Bellevue city it self's says this to help this case as such https://www.bellevue.net/information/ada/overview The Americans with Disabilities Act (ADA) prohibits all state and local governmental agencies from discriminating against persons with disabilities and from excluding participation in, or denying benefits of programs, services or activities to, persons with disabilities.

It is the policy and practice of the City of Bellevue to ensure exceptional public service by providing full access to programs, services, and activities for all members of the public, including persons with disabilities. The City continually strives to eliminate barriers that may prevent persons with disabilities from access to or participation in City programs, services, activities, and facilities.

For more information about the City's efforts towards ADA compliance, please review the ADA Public Notice and ADA Transition Plan available under Quick Links on the left, which was approved by the City Council in February 2013.

The City of Bellevue shall make reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the City can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. If you would like to make a request for Reasonable Accommodation, please select the City of Bellevue's Reasonable

Accommodation or Accommodation Request Form available under Quick Links on the left.

If you would like to submit a grievance, please select the City of Bellevue Grievance Policy and Procedure or the ADA Grievance Form available under Quick Links on the left.

The City of Bellevue is committed to preventing or elimination barriers that may prevent persons with disabilities from employment opportunities, access to City facilities, or participating in programs, activities, and services.

14. The plaintiff also has found that the defendants of the Bellevue police department and its officers have major history of police misconduct as well and this is not the first time by high rank officers https://www.bellevue.net/information/event-calendar/event-list/city-of-bellevue-statement-regarding-bellevue-police-chief-allegations-of-misconduct City of Bellevue Statement Regarding Bellevue Police Chief; Allegations of Misconduct
Bellevue City Attorney Patrick Sullivan has issued the following press release regarding Bellevue Police Chief Mark Elbert; allegations of misconduct:
"September 14, 2017
Re: Bellevue Police Chief Mark Elbert; allegations of misconduct
Bellevue, Nebraska - This is a personnel matter which will remain confidential, but the BPOA's press release will not lessen the City's focus on investigating and disciplining any alleged acts of employee impropriety.
This also relates to matters in dispute before the Commission of Industrial Relations, and notwithstanding the BPOA comments, the City is respecting the Commission and will move forward with adjudication through that body and not through media comments.
Further, Chief Elbert has requested to be on administrative leave during the investigation. His leave has been granted. Captain Dave Stukenholtz has been designated Acting Police Chief.

15.    Amend To update    The plaintiff also backs up the findings against all defendants in there official capacity in the matter of city of Bellevue city

a. Impression 1. Tiny disc protrusion at the C3-4 level does not result in significant spinal canal or neural foraminal stenosis. 2. Otherwise unremarkable MRI spine.
Narrative

REASON FOR EXAM:Cervicalgia. Neck pain and left arm numbness. DISCUSSION: Comparison:None. Technique: Multiplanar multisequence imaging of the cervical spine without contrast. Findings: Nonenhanced MRI evaluation of the cervical spine demonstrates normal alignment of the anterior and posterior elements without evidence of significant subluxation. Cervical vertebral body heights are maintained. Marrow signal is benign. Alignment at the craniocervical junction is normal. The visualized portions of the posterior fossa including the cerebellar tonsils are normal. No abnormal signal is identified within the cervical spinal cord. No syrinx is noted. No cervical epidural fluid collection is identified. C1-C2: Normal C2-3: Normal C3-4: There is a tiny central disc protrusion which only minimally indents the ventral thecal sac without abutting or there is uncovertebral joint spurring. Facets are normal. No spinal canal or neural foraminal stenosis is noted. C4-5: Normal C5-6: Normal C6-7: Normal C7-T1: Normal The visualized neck soft tissues are unremarkable. Impression : Negative cervical spine.

Narrative

REASON FOR EXAM: Neck pain DISCUSSION: Two views of the cervical spine. Vertebral bodies are normal in stature and alignment. Intervertebral disc spaces are maintained. There is no fracture, subluxation, or destructive lesion. The prevertebral soft tissues and pulmonary apices are unremarkable.

Planned Procedures ENDOSCOPIC RELEASE CARPAL TUNNEL Performed by Gangadasu Reddy and Megan Kucks Anesthesia Preprocedure Evaluation Tin Tran at 8/6/2024  8:07 PM

### Review of Systems and Medical History

Patient summary reviewed. Labs reviewed.

Patient has a negative history of anesthetic complicati

**Pulmonary**

(+) Patient has a positive history of asthma. (+) Patient I history of sleep apnea. Patient uses CPAP. Patient has history of cigarette smoking (Former, quit 2017 after 40

**Neuro/Psych**

(+) Patient has a positive history of headaches. (+) Patie positive psychiatric history (PTSD, OCD), bipolar disorc depression, anxiety.

Comments: Right carpal tunnel syndrome

(+) substance abuse (Sober since 2017), cocaine use d fentanyl use detected, methamphetamines use detect oxycodone use detected,

(+) Patient has a positive history of alcohol use (H/o EtOH use disorder, sober since 2017) :

## Cardiovascular

Exercise tolerance is 4-10 METS. (+) Patient has a positive history dysrhythmias (Incomplete RBBB). (+) Patient has a positive history of hypertension. (+) Patient has a positive history of hyperlipidemi ECG reviewed.

Comments:
EKG 4/1/24: SB with incomplete RBBB

## GI/Hepatic/Renal

(+) Patient has a positive history of GERD.

Comments: S/p gastric bypass

## Endocrine

Review of endocrine system is negative. **OB/GYN**

Not applicable.

## Rheum/Musculoskeletal

(+) Patient has a positive history of arthritis.

## Hematology/Oncology

Review of hematology/oncology is negative.Patient has a negative history of anemia. Patient has a negative history of thrombocytopenia. **Other**

Additional Comments:

Transgender

Hard of Hearing with Hearing aids

**Anesthesia Physical Exam**

**Airway**

Mallampati score: II

TM distance: >3 FB Neck ROM: full Mouth opening: normal

**Dental**

Dental exam normal. c**ardiovascular**

**PULMONARY BODY HABITUS** normal  **FACIAL HAIR**

Estimated body mass index is 42.76 kg/m$^2$ as calculated from the followir

Height as of this encounter: 177.8 cm (5' 10").

Weight as of this encounter: 135.2 kg (298 lb).

There were no vitals taken for this visit.

**Anesthesia Type**m General and TIVA

**Anesthesia Plan** Mask Multimodal Pain Management **Score** 3 **Induction**

intravenous**Informed Consent**Anesthetic plan and risks discussed with

patientMedications:

Medications list was documented, updated, or reviewed

IMAGING/RESULTS REVIEW

b.

16.     The plaintiff also backs up the findings against  all defendants in there official capacity in the matter of city of Bellevue city anesthesia Postprocedure Evaluation

Chantal Afuh-Leflore at 8/7/2024 11:36 AM Prepare for Your Visit

Want an earlier time?Get on the Wait List

All questionnaires for this appointment will be available for you to answer on Saturday September 07, 2024.

Directions for CHI Health Clinic Family Medicine - ImmanuelImmanuel Hospital - Medical Building One - Next to ER. Take elevator C to 3rd  6th floor.6829 N 72nd StreetMedical Office Building One Suite 6200

Omaha, NE 68122

Phone: (402) 572-3900

Fax: (402) 572-3793

Visit InstructionsBe sure to bring any paperwork you may have received from your surgeon for this visit.

 Please arrive 15 minutes prior to your appointment time with all of your medications, a copay if applicable, your insurance card, and photo ID. If you have had immunizations within the past 6 months outside CHI Health Clinic, please bring a record of those as well.

 If patient is age 0 to 18 years old in Nebraska or age 0 to 17 years old in Iowa :

Minor patient seen without a parent or guardian present:
Provider permission required (VRC call Must Answer).

17.     The plaintiff also backs up the findings against all
defendants in there official capacity in the matter of city of
Bellevue city ENDOSCOPIC RELEASE CARPAL TUNNEL
with Gangadasu Reddy Expected on Monday September
16, 2024
CHI Health Immanuel
6901     72nd StreetOmaha NE 68122-1709 402-572- 2121
This visit cannot be canceled online. To cancel, please
call 402-572-212

18.     The plaintiff also backs up the findings against all
defendants in there official capacity in the matter of city of
Bellevue cityAs also Dr Figgy has set surgery on Nov 27 2024 to refix the
left breast that the defendants willfully and knowingly caused bodly injury
intentionally



## Upcoming Procedures
Wednesday, November 27, 2024

### 2CPERIOP-2ND FLOOR
### CLARKSON TOWER PERIOP

4350 Dewey Ave.
Clarkson Tower, 2nd Floor
Omaha NE 68198-1010

402-552-3288

Procedures On Wednesday, November 27

### CAPSULECTOMY-BREAST WITH
### IMPLANT EXCHANGE
Sean C Figy will be your primary surgeon for
this procedure.



### VAGINOPLASTY - MALE TO FEMALE
Sean C Figy will be your primary surgeon for
this procedure.



19. The plaintiff also backs up the findings against all defendants in there official capacity in the matter of city of Bellevue city did in fact on April 30 2024 intentionally

Did break the laws of intimidations as well as conflict of interest AS THE LAWS OF CITY, STATE, FEDERAL, CIVIL, HUMAN RIGHTS AS WELL AS THE DEPARTMENT OF JUSTICE AND THE COURT OF LAWS NO ONE SHALL interfere nor intimidate nor shall be a conflict of interest at all of any sort while a case is active or they shall plead guilty and be arrested . the plaintiff on 4-30-2024 in her legal stand by all laws of city state federal ada laws as well as the department of justice under the law What does police corruption mean?

Corruption, in general, is defined as the misuse of power or authority for private gain. Therefore, a fitting definition for police corruption might be, the misuse of a police officer's power or authority for personal or material gain for himself or others.

What are the main causes of police corruption?

Police corruption occurs in departments where an imbalance of power can be found. Police corruption can also occur where supervisors are quick to turn their heads, where there is an us vs. them mentality, and where resources and funding are lacking.

Types of police corruption can be violent, sexual, or criminal in nature, or all three. An officer may accept bribes, coerce confessions, or use excessive force for improper gains for himself or others. In order to protect citizens against police misconduct and prevent officers from abusing the power they are given, there are many rules set up in the U.S. Constitution and its amendments. Under the Fourth Amendment, authorities cannot search or seize the property of a suspect, or arrest him or her, without a specific warrant created for these actions or with probable cause, meaning that officers had enough evidence to believe a crime had been committed. Police who commit such acts without a warrant or probable cause is guilty of illegal search and seizure and/or false arrest.

In addition, the Fifth Amendment sets in place the need for due process of the law, prohibiting unlawful trial and leading to the creation of the Miranda Rights. Every suspect arrested must be read their rights by an authority when placed under arrest in order to guarantee that he or she knows what they can do and what can be used against them during an arrest and trial. Among the rights given by the Eighth Amendment, arrestees cannot be subject to excessive bail or fines, and cannot be subjected to cruel and unusual punishment, such as torture.

While these are just some of the laws set to uphold citizens' rights and prevent abuses of power by authorities, there are many more detailing further rights. Unfortunately, these laws can still be broken and unlawful actions hidden by officers of the law. 25-328.

Intervention; right; procedure.

- Any person who has or claims an interest in the matter in litigation, in the success of either of the parties to an action, or against both, in any action pending or to be brought in any of the courts of the State of Nebraska, may become a party to an action between any other persons or corporations, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendants in resisting the claim of the plaintiff, or by demanding anything adversely to both the plaintiff and defendant, either before or after issue has been joined in the action, and before the trial commences. **2. Procedure**
- For a court as a preliminary matter to permit intervention as a matter of right, the intervenor must plead some interest in the subject matter of the litigation to give him or her standing in court, describing the ultimate facts evidencing the intervenor's interest in the matter of litigation; otherwise, the intervenor is a mere interloper and wholly incompetent to challenge the contentions of the opposing parties. Carroll v. Gould, 308 Neb. 12, 952 N.W.2d 1 (2020).

- Where no motion is filed under Neb. Ct. R. Pldg. § 6-1112, a hearing and ruling on a complaint to intervene is not required any more than it would be for any other complaint, though the Supreme Court has indicated that a court may exercise sua sponte its authority to exclude from the case an intervenor whose pleadings do not disclose a direct interest in the matter in litigation. Carroll v. Gould, 308 Neb. 12, 952 N.W.2d 1 (2020).
- Intervention after judgment cannot be obtained as a matter of right under this section. Leave to intervene after the entry of a final decree is not allowable as a matter of right and should seldom be granted, but equity sometimes requires a departure from the general rule; however, the burden of persuasion in such a case is a heavy one. Jeffrey B. v. Amy L., 283 Neb. 940, 814 N.W.2d 737 (2012).
- 

- May become party to suit without leave of court. Spalding v. Murphy, 63 Neb. 401, 88 N.W. 489 (1901).

**Top-left document:**

DOC09037480D01  SUBPOENA

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam-Clerk of District Court
1717 Harney-Separate Juvenile Court
Omaha          NE 68183

FILED BY
Clerk of the Douglas District Court
02/24/2024

Yukie L Soto-Elliott v. Jim Pillen

Case ID: CI 23 9723
Old Case ID:

TO: LT. Howard Banke

You are ordered to appear before this court on:

MAY 31, 2024, AT 9:00AM in Courtroom 504 - 5th Floor

to testify as a witness in this case on behalf of Yukie L Soto-Elliott.

Bring the following:

See Praecipe attached for further instruction.

As a witness in Douglas DISTRICT COURT, you are entitled to receive a witness fee in the amount of $20.00 for each day that you are required to be in court and, if you live more than one mile from the courthouse, you are also eligible to receive mileage at the rate that state employees receive. You should have received your witness fee for one day with this subpoena. Ask the lawyer or party who subpoenaed you or the clerk of the court for information about what you should do to receive the additional fees, if any, and mileage to which you are entitled.

Date: February 24, 2024   BY THE COURT:        Crystal Strecker
                                                Clerk

For questions, contact:  Yukie L Soto-Elliott
                         1209 Fort Crook Rd. North
                         Room #104
                         Omaha, NE 68023
                         (325)312-1891

Address of person to be served:

    LT. Howard Banke
    1510 Wall St
    Bellevue, NE 68005

Method of Service: Certified Mail

Certified Page 74 of 165

**Top-right document:**

DOC09037815D1  SUBPOENA          903781

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam-Clerk of District Court
1717 Harney-Separate Juvenile Court
Omaha          NE 68183

FILED BY
Clerk of the Douglas District Court
02/24/2024

Yukie L Soto-Elliott v. Jim Pillen

Case ID: CI 23 9723
Old Case ID:

TO: J Margies

You are ordered to appear before this court on:

MAY 31, 2024, AT 9:00AM in Courtroom 504 - 5th Floor

to testify as a witness in this case on behalf of Yukie L Soto-Elliott.

Bring the following:

See Praecipe attached for further instruction.

As a witness in Douglas DISTRICT COURT, you are entitled to receive a witness fee in the amount of $20.00 for each day that you are required to be in court and, if you live more than one mile from the courthouse, you are also eligible to receive mileage at the rate that state employees receive. You should have received your witness fee for one day with this subpoena. Ask the lawyer or party who subpoenaed you or the clerk of the court for information about what you should do to receive the additional fees, if any, and mileage to which you are entitled.

Date: February 24, 2024   BY THE COURT:        Crystal Strecker
                                                Clerk

For questions, contact:  Yukie L Soto-Elliott
                         1209 Fort Crook Rd. North
                         Room #104
                         Omaha, NE 68023
                         (325)312-1891

Address of person to be served:

    J Margies
    1510 Wall St
    Bellevue, NE 68005

Method of Service: Certified Mail

Certified Page 75 of 165

**Bottom-left document:**

ENDNOTES

- 28 C.F.R. § 115.6 [1a], 28 C.F.R. § 115.26 [1a].
- 28 C.F.R. § 115.6 [107]
- 28 C.F.R. § 115.6 [207]
- 28 C.F.R. § 115.6 [30]
- 28 C.F.R. § 115.42 [b] [The deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."]
- Id.
- 28 C.F.R. § 115.42 [e]
- 28 C.F.R. § 115.42 [c]
- 28 C.F.R. § 115.5 [c]
- 28 C.F.R. § 115.41 [d]
- 28 C.F.R. § 115.15 [d]
- 28 C.F.R. § 115.5 [e]
- 28 C.F.R. § 115.42 [f]
- 28 C.F.R. § 115.42 [d]
- 28 C.F.R. § 115.42 [f]
- 28 C.F.R. § 115.429 [4]
- PREA Resource Center, "Audit Process"
  http://www.prearesourcecenter.org/audit/audit-process
- 28 C.F.R. §§ 115.11[a], 115.11[b], 115.11[c], 115.11[d]
- 28 C.F.R. §§ 115.53[a][1]
- 28 C.F.R. §§ 115.52[a]

Certified Page 54 of 165

**Bottom-right document:**

These witness are hear by called to prove that officers of the law think that it is a choice to not comply with the federal laws to prove discrimination and ADA laws against the hard of hearing to show provable cause of recent events and that that's there for have been recorded and documented and the officers do get away without any punishment and shall be brought to show fourth these matters as well that other officers don't care about the american disability action laws that have been set since the 1700s or 1800s for the protection in the community!

1. To do that are order you are hear by called for the plaintiff yukie soto-elliott and have been founded under recored matters of violated the ADA laws for the hard of hearing and deaf community officer hargiss and LT banke that have confessed they are above the federal law and the hate and bias acting but also believe they are doctors of some kind of medical profession in this matter to say that the plaintiff without a interpret or using any kind of communication or writing thing down that she can comprehension on matters but she wel be calling her other witnesse that was in the car to help her know what was being said as well that the IALB banks confession shall be enough to show proof that officer are dangouse matter to the ADA laws that protect the disability people the community and that these officer are commanded by the chief of police to allow these attacks and don't follow policy and regulation or the state city or fedral or even bill of legalistic matter

2. Your are now comanded and hear by called to as a witness Officer J Hargissand you to come testiy that you are above the ADA laws of Deaf and hard of hearing and dont have to comply with the federal laws for the American disability act laws on 1/28/24 Officer J Hargissand that you don't have to follow any of the federal laws that prtect the deaf and hard of hearing civers , by Denise A. Johnson, Wisconsin Statewide Project Coordinator SUD/MH Services for the Deaf,Hard of Hearing and Deaf-Blind

Every day police officers are pulling people on the road during traffic stops. Now, what shal a person who is Deaf or, hard of hearing need to know what to do during the traffic stops and how to effectively work with the police officers?

When you see a police officer is behind you with his/her flashing lights. Put your car signal/blinker on to let the police officer know that you are aware and know to pull over and find a safe place to park. Park your car as soon as possible. You will need to pull off to safe area on the right side of the emergency lane on freeways, or pull to a safe and lighted area on the road, or pull into a store, gas station, or business' parking lot if there no place on the road to pull your car.

1st Step- Keys turn off 2nd Step – Roll down window 3rd Step – Keep Hands at 10 and 2

Certified Page 55 of 165

Please direct that the subpoena be served as follows:

☐ By the Sheriff of _____ County, Nebraska
☐ By the Constable of _____ County, Nebraska
☐ By: _____ who pursuant to Neb Rev. Stat
§ 25-1223(9) is a person 21 years of age or older and NOT a party to the action or proceeding
☒ By certified mail, return receipt requested

Signature: _____ Date: _____
Printed Name: Yukie Soto-Elliott
Street Address/P.O. Box: 1209 fort crook rd #113
City/State/ZIP Code: bellevue NE 68005
Telephone Number: 3253121891 vp
Email address: zelliottyam2371@92outlook.com

If completed by an attorney:
Bar Number: _____

Nebraska State Court Form
REQUIRED
CC 4 6 Rev 02/2022

☒ Printing of the form and handwriting the answers
☐ Completing the form electronically

IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

Yukie Soto-Elliott                    Case No. 23-9723
                     Plaintiff,
vs
Jim pillen ETC                        PRAECIPE FOR
                     Defendant        SUBPOENA

FEB 2 6 2024

To the Clerk of the district Court in Douglas County, Nebraska:

Please issue subpoena for service on the following named individual(s) to appear and give testimony on behalf of the ( ☒ plaintiff ☐ defendant)
Date: _____ Time: ___ 9 ___ o'clock (☒ am ☐ pm),
Place: 501

| NAME: | ** ADDRESS: |
| LT Howard Banks | 1510 wall St Bellevue NE 68005 |
| Officer J Harpis | 1510 wall st Bellevue NE 68005 |
| Chief Wendell Shirley | 1510 Wall st Bellevue NE 68005 |
| officer Valdez #357 | 1510 wall st Bellevue ne 68005 |

** Witness(es) employed by the State of Nebraska or a political subdivision or who are privately-employed security guard(s) pursuant to Neb. Rev. Stat § 25-1223(6) are designated by checking the box ☒ after the witness's name.

☒ The witness(es) shall be deemed to bring the following documents or tangible items:
see attachment you are hear by order and demanded to show up to the lawsuit to show that government officers dont follow the ighwa laws or the ADA laws on the plaintiff
and how you break the policy and regulation of the department and get away with breaking the federal and state laws That protect the American disability act of the

CC 4 6 Rev 02/2022    Page 2 of 2    Praecipe for Subpoena
Certified Page 52 of 165

CC 4 6 Rev 02/2022    Page 1 of 2    Praecipe for Subpoena
Certified Page 53 of 165

---

D6903036 2001    SUBPOENA    563762

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam-Clerk of District Court
1717 Harney-Separate Juvenile Court
Omaha            NE 68183            FILED BY
                          Clerk of the Douglas District Court
                          02/26/2024

Yukie L Soto-Elliott v. Jim Pillen            Case ID: CI 23 9723
                                              Old Case ID:

TO: Chief Wendell Shirley

You are ordered to appear before this court on:

MAY 31, 2024, AT 9:00AM in Courtroom 504 - 5th Floor

to testify as a witness in this case on behalf of Yukie L Soto-Elliott.

Bring the following:

See Praecipe attached for further instruction.

As a witness in Douglas DISTRICT COURT, you are entitled to receive a witness fee in the amount of $20.00 for each day that you are required to be in court and, if you live more than one mile from the courthouse, you are also eligible to receive mileage at the rate that state employees receive. You should have received your witness fee for one day with this subpoena. Ask the lawyer or party who subpoenaed you or the clerk of the court for information about what you should do to receive the additional fees, if any, and mileage to which you are entitled.

Date: February 26, 2024  BY THE COURT:
                          Crystal Fivecka
                          Clerk

For questions, contact: Yukie L Soto-Elliott
                        1209 Fort Crook Rd. North
                        Room #104
                        Omaha, NE 68352
                        (335)312-1891

Address of person to be served:
     Chief Wendell Shirley
     1510 Wall St
     Bellevue, NE 68005

Method of Service: Certified Mail

Certified Page 76 of 165

---

D6903036 3001    SUBPOENA    563763

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam-Clerk of District Court
1717 Harney-Separate Juvenile Court
Omaha            NE 68183            FILED BY
                          Clerk of the Douglas District Court
                          02/26/2024

Yukie L Soto-Elliott v. Jim Pillen            Case ID: CI 23 9723
                                              Old Case ID:

TO: PSU Valdez #357

You are ordered to appear before this court on:

MAY 31, 2024, AT 9:00AM in Courtroom 504 - 5th Floor

to testify as a witness in this case on behalf of Yukie L Soto-Elliott.

Bring the following:

See Praecipe attached for further instruction.

As a witness in Douglas DISTRICT COURT, you are entitled to receive a witness fee in the amount of $20.00 for each day that you are required to be in court and, if you live more than one mile from the courthouse, you are also eligible to receive mileage at the rate that state employees receive. You should have received your witness fee for one day with this subpoena. Ask the lawyer or party who subpoenaed you or the clerk of the court for information about what you should do to receive the additional fees, if any, and mileage to which you are entitled.

Date: February 26, 2024  BY THE COURT:
                          Crystal Fivecka
                          Clerk

For questions, contact: Yukie L Soto-Elliott
                        1209 Fort Crook Rd. North
                        Room #104
                        Omaha, NE 68052
                        (335)312-1891

Address of person to be served:
     PSU Valdez #357
     1510 Wall St
     Bellevue, NE 68005

Method of Service: Certified Mail

Certified Page 77 of 165

20. The plaintiff also backs up the findings against all defendants in there official capacity in the matter of city of Bellevue city did in fact on April 30 2024 intentionally tampered with evidence willing and knowing of conflict 28-922. 25 CFR § 11.440 - Tampering with or fabricating physical evidence. § 3-501.7. Conflict of interest; current clients.   [5] Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter. Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict. The lawyer must seek court approval where necessary and take steps to minimize harm to the clients. See **Rule 1.16**. The lawyer must continue to protect the confidences of the client from whose representation the lawyer has withdrawn. See **Rule 1.9(c)**.

## Tampering with physical evidence; penalty; physical evidence, defined.

(1) A person commits the offense of tampering with physical evidence if, believing that an official proceeding is pending or about to be instituted and acting without legal right or authority, he or she (b) Knowingly makes, presents, or offers any false physical evidence with intent that it be introduced in the pending or prospective official proceeding.

(2) Physical evidence, as used in this section, shall mean any article, object, document, record, or other thing of physical substance. (3) Tampering with physical evidence is a Class IV felony, except that if such offense involves a pending criminal proceeding which alleges a violation of another offense classified:

(a) As a Class II misdemeanor or a lower classification or a violation of a city or village ordinance, the offense is a Class I misdemeanor; or

(b) As a Class II felony or a higher classification, the offense is a Class II felony.

## Source

- Laws 1977, LB 38, § 207;
- Laws 2019, LB496, § 3.

## Annotations

- The crime of tampering with physical evidence, as defined by subdivision (1)(a) of this section, does not include mere abandonment of physical evidence in the presence of law enforcement. State v. Lasu, 278 Neb. 180, 768 N.W.2d 447 (2009).
- To conceal or remove physical evidence, within the meaning of subdivision (1)(a) of this section, is to act in a way that will prevent it from being disclosed or recognized. State v. Lasu, 278 Neb. 180, 768 N.W.2d 447 (2009).

- What Are the Penalties for Tampering With Evidence?
- In Nebraska, because tampering with physical evidence is a Class IV Felony, those charged could face:
- Up to 2 years in prison, and
- A fine of up to $10,000.
- There are only narrow exceptions to the felony charge. The Nebraska destroying evidence law deals with offenders swiftly and harshly.
  -

21.    The plaintiff also backs up the findings against all defendants in there official capacity in the matter of city of Bellevue city did in fact on April 30 2024 intentionally

# Investigations and Prosecutions

The Department of Justice ("The Department") vigorously investigates and, where the evidence permits, prosecutes allegations of Constitutional violations by law enforcement officers. The Department's investigations most often involve alleged uses of excessive force, but also include sexual misconduct, theft, false arrest, and deliberate indifference to serious medical needs or a substantial risk of harm to a person in custody. These cases typically involve police officers, jailers, correctional officers, probation officers, prosecutors, judges, and other federal, state, or local law enforcement officials. The Department's authority extends to all law enforcement conduct, regardless of whether an officer is on or off duty, so long as he/she is acting, or claiming to act, in his/her official capacity.

In addition to Constitutional violations, the Department prosecutes law enforcement officers for related instances of obstruction of justice. This includes attempting to prevent a victim or witnesses from reporting the misconduct, lying to federal, state, or local officials during the course of an investigation into the potential misconduct, writing a false report to conceal misconduct, or fabricating evidence.

The principles of federal prosecution, set forth in the United States Attorneys' Manual ("USAM"), require federal prosecutors to meet two standards in order to seek an indictment.

First, the government must be convinced that the potential defendant committed a federal crime. Second, the government must also conclude that the government would be likely to prevail at trial, where the government must prove the charges beyond a reasonable doubt.

The federal criminal statute that enforces Constitutional limits on conduct by law enforcement officers is 18 U.S.C. § 242. Section 242 provides in relevant part:"Whoever, under color of any law, …willfully subjects any person…to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States [shall be guilty of a crime]."Section 242 is intended to "protect all persons in the United States in their civil rights, and furnish the means of their vindication." Screws v. United States, 325 U.S. 91, 98 (1945) (quoting legislative history).

To prove a violation of § 242, the government must prove each of the following elements beyond a reasonable doubt: (1) that the defendant deprived a victim of a right protected by the Constitution or laws of the United States, (2) that the defendant acted willfully, and (3) that the defendant was acting under color of law. A violation of § 242 is a felony if one of the following conditions is met: the defendant used, attempted to use, or threatened to use a dangerous weapon, explosive or fire; the victim suffered bodily injury; the defendant's actions included attempted murder, kidnapping or attempted kidnapping, aggravated sexual abuse or attempted aggravated sexual abuse, or the crime resulted in death. Otherwise, the violation is a misdemeanor.

Establishing the intent behind a Constitutional violation requires proof beyond a reasonable doubt that the law enforcement officer knew what he/she was doing was wrong and against the law and decided to do it anyway. Therefore, even if the government can prove beyond a reasonable doubt that an individual's Constitutional right was violated, § 242 requires that the government prove that the law enforcement officer intended to engage in the unlawful conduct and that he/she did so knowing that it was wrong or unlawful. See

Screws v. United States, 325 U.S. 91, 101-107 (1945). Mistake, fear, misperception, or even poor judgment does not constitute willful conduct prosecutable under the statute.

## Physical Assault

In cases of physical assault, such as allegations of excessive force by an officer, the underlying Constitutional right at issue depends on the custodial status of the victim. If the victim has just been arrested or detained, or if the victim is being held in jail but has not yet been convicted, the government must, in most cases, prove that that the law enforcement officer used more force than is reasonably necessary to arrest or gain control of the victim. This is an objective standard dependent on what a reasonable officer would do under the same circumstances. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-97 (1989).

> If the victim is a convicted prisoner, the government must show that the law enforcement officer used physical force to punish , retaliate against, an inmate, or otherwise cause harm to the prisoner, rather than to protect the officer or others from harm or to maintain order in the facility. See Whitley v. Albers, 475 U.S. 312, 319 (1986).

## Deliberate Indifference to a Serious Medical Condition or a Substantial Risk of Harm

Section 242 prohibits a law enforcement officer from acting with deliberate indifference to a substantial risk of harm to persons in custody. Therefore, an officer cannot deliberately ignore a serious medical condition of or risk of serious harm (such as a risk that an inmate will be assaulted by other inmates or officers) to a person in custody.  To prove deliberate indifference, the government must prove that the victim faced a substantial risk of serious harm; that the officer had actual knowledge of the risk of harm; and that the officer failed to take reasonable measures to abate it.

## Failure to Intervene

An officer who purposefully allows a fellow officer to violate a victim's Constitutional rights may be prosecuted for failure to intervene to stop the Constitutional violation. To prosecute such an officer, the government must show that the defendant officer was aware of the Constitutional violation, had an opportunity to intervene, and chose not to do so. This charge is often appropriate for supervisory officers who observe uses of excessive force without stopping them, or who actively encourage uses of excessive force but do not directly participate in them.

## https://www.justice.gov/crt/law-enforcement-misconduct



Professional Standards

Bellevue Police Department
1510 Wall Street
Bellevue, Nebraska 68005
Lt. Banks

OMAHA NE 680
1 AUG 2024 PM 21

quadler
FIRST-CLA
IMI
$000.69
08/01/2024 ZIP 680
043M31250759

YUKIE SOTO-ELLIOTT
PO BOX 641503
OMAHA, NEBRASKA 68164

68164-750303



*Bellevue Police Department*

1510 Wall Street
Bellevue, Nebraska 68005
(402) 293-3100 Fax (402) 293-3090

July 30, 2024

Dear Yukie Soto-Elliott,

In May of 2024, you submitted paperwork and I later spoke to you on the telephone regarding your concerns with the actions of three Bellevue Police Officers during a contact with you on April 30th, 2024.

Your concerns regarding the actions of the Bellevue Police Officers during that contact have been investigated. The following includes, but is not limited to, information that was reviewed during this investigation:

        Verbal statements / written documents provided by you
        Statements from the officers involved
        Witness statement(s)
        Police reports/recordings and Department documentation
        Audio/Video recording of incident
        Department Policy / Nebraska State Statutes

The complete investigation has been reviewed by the officers' Division Commander, Assistant Chief of Police and the Chief of Police. The Chief of Police has determined the findings based on the actions of the officers involved in this allegation as "Exonerated".

I appreciate you taking the time to bring this concern to our attention, as our Department strives to serve the community with courage and integrity. I hope that any future contacts with Bellevue Police Officers will be more positive. If you have a question or concern about police services in the future, please contact my office.

Respectfully,

Lieutenant Howard Banks
Office of Professional Standards
(402)293-3084

*"Committed to Excellence"*

#2024-04

# Section 2. STANDARD OF REVIEW that the following allegations are made concerning the defendants:

1. The Nebraska state is guilty by the department of justice findings and the case is called state of Nebraska vs department of justice and all other defendants break not only the ADA laws but assaulting disabled people as well as the government corruption and breaking the bill of rights state laws city laws as well as federal laws as well as police misconduct and refuse to charge the officers or others that are in co-conspiracy government corruption and then allow them to hide behind the tort claim to have victims jump and allow them other defendants to file motion to dismiss and untruth and lies about the attacks and assaults from cops on citizen loops and then suffer when the plaintiff is being wrongful thus this is why they need to take action and Marshall law of all the other defendants and the defendant united states president should hold all defendants in question and in jail as they the truth of the plaintiff should come out and be show in court.

2. On the date of April 30th, 2024, the defendants in official capacity Officer J Haggis and Officer D Bafaro Sargent McDaniel unknow LT of Bellevue police did with 100% intention refused by law 20-152 10 times a ASL interpret for the plaintiff as well as handcuff her in the back and not allow her to use her hands

3. On the date of April 30th, 2024, the defendants in official capacity Officer J Haggis and Officer D Bafaro did cause bodily harm injury after the plaintiff was just

reaching for her purse for driver license and registries in glove box UNM DR Figgy will testy and have medical records and audio recording

4. On the date of April 30th, 2024, the defendants in official capacity Officer J Haggis and Officer D Bafaro did willing and acknowledged as they walked back behind the 2011 Kia Sorento ex CERT storm chaser vehicle seeing the decal of medical alert signs on her back window of the ADA laws and still refused to follow the Federal, city and state law

5. On the date of April 30th, 2024, the defendants in official capacity Officer J Haggis and Officer D Bafaro Sargent McDaniel did cause property damage ripping out wires and messing with Relliott community emergency respond team Inc Ambulance causing property damage of value $8,932.12

6. On the date of April 30th 2024 the defendants in official capacity Officer J Haggis and Officer D Bafaro Sargent McDaniel did cause damage to the front end of the 2011 Kia Sorento Relliott Community Emergency respond team Inc $3,239.21 to the front end of the vehicle while violation of the 8th amendment they said it was police policy to two unit 187 however that is a lie when there was a other owner present of the company to get a other employee to come get it but the officers all refused there for the 8th amendment say The Eighth Amendment prohibits certain types of punishment: excessive bail, excessive fines, and cruel and unusual punishments.1 As discussed in more detail in the following essays, these prohibitions were intended to protect persons convicted of crimes from government abuses of power.2 Viewed broadly, the Eighth Amendment responded to these historically grounded concerns about disproportionate or cruel punishments by attempting to ensure that punishment is proportioned to both the offender and the offense.3 What is excessive is also determined by reference to modern standards; the Supreme Court has suggested proportionality may evolve over time.4 Out of the Eighth Amendment's three clauses, the bar on cruel and unusual punishment has been most frequently interpreted by the Supreme Court, likely in part due to inherent ambiguities in determining what qualifies as cruel or unusual.5 The Eighth Amendment generally applies in criminal proceedings, as the most common locus of government punishment, but the Supreme Court has held the Eighth Amendment's prohibition on excessive fines can apply in civil forfeiture proceedings, noting that the text of the amendment is not limited to criminal

cases.6 Instead, the Court said the relevant constitutional test is whether the government is imposing punishment, focusing on the purpose of a sanction.7 In addition, although the Eighth Amendment (like the rest of the Bill of Rights) was understood originally to apply only to the federal government, the Supreme Court has held its prohibitions were incorporated in the Fourteenth Amendment's Due Process Clause, making them applicable to states. There for the officers in the full capacity with willing and willful intent violated their owe immunity in this action

7. On the date of April 30th 2024 the defendants in official capacity Officer J Haggis and Officer D Bafaro willing violated the 1st 4th 5th 6th 7th 8th 11th and 14th amendment as the plaintiff asked for a supervisor to come out due to officer J Haggis was conflict and has prior history as well as a amendment lawsuit case and was subpoenaed to case CI 23-9723 the both officers refused two times to get a supervisors Then did an illegal search and seizure then tried without a warrant touch unit 187 relliott community emergency respond team ambulance blue and white lights.

8. On the date of April 30th 2024 the defendants in official capacity Officer J Haggis willing knowing that while lawsuit case is active in Douglas county and he as a wittiness and perpetrator to violation of the ADA laws to a prior illegal action of 42 usc 1983 and with an eternal affairs investigation compliant Kowing that he was already conflict of interest to the any matter as well as a cease and desist order was given to him to stay away from the plaintiff there for retaliation was made due to this matters and intimidation to where on the back of unit 187 officer haggis told his partner officer Bafafo that they was Gona tow the car. Then as he stated it was police policy to tow the car if the owner could not pick it up my boyfriend said he would call my mother to pick it up there for the 8th amendment was violated and thus the sovereign immunity was revoked by the 14th amendment with along with police perjury as well going on based on hearsay and not wanting to know all facts

9. On the date of April 30th 2024 the defendants in official capacity  and Officer J Haggins  willing violated the 1st 4th 5th 6th 8th 11th 14th and police misconduct causing boldly injury to the excessive force this officer already got a formal complaint on the matters on the plaintiff back in February  2024 for violation the ADA department of justice laws of police interacting with deaf and hard of hearing people and how he

trumped a ticket on the matters the officer on this day ripped so hard and fast the plaintiffs left arm ripped the stiches and cis wall of the left breast after asking for their licenses and registering and she asked for a supervisor twice speaking to fast for the plaintiffs hearing aid tempory implant not to get was said then refused to get the supervisor first fearing for her life and safety this officer has been known to pull his gun or beat other people and make bogus charges there for Dr figgy will testify on these findings as well as the new surgery date has been set the witness Makaisten Downing was video camera it the whole time showing proof she was not resisting arrest

10. On the date of April 30th, 2024, the defendants in official capacity and Officer D Bafaro willing violated the law 20-152 on denied interpret as well acting as medical doctor on the plaintiff to illegally assault her as well as kneeing her in her right side

11. On the date of April 30th 2024 the defendants in official capacity and Officer D Bafaro willing violated the 1st 4th 5th 6th 8th 11th 14th amendment willing and with police misconduct 42 usc 1983 will being recorded by the plaintiff witness Makaisten Downing scream she is hard of hearing and just had surgery that when he still was beating the plaintiff on the right side of her while she was laying still and not moving at all

12. On the date of April 30th 2024 the defendants in official capacity and Officer D Bafaro willing violated the civil rights of the plaintiff there for the defendant refused as the 1st amendment to ask for freedom of speech and there for lead to where the officer beat the plaintiff the plaintiff due to the defendants handcuffs being to tight and put in the back of her not alone did never damage but also ruptured the left breast tit Dr figgy is willing to testify. There for police brutality and police misconduct to the extreme to where the sovereign immunity was effective revoked

13. On the date of April 30th 2024 the defendants in official capacity and Officer D Bafaro willing violated 1st amendment threating the plaintiff to arrest for aging obstruction of a peace officer her if she did not stop recording while she was live steaming on the news page about a traffic collision and tried as the officer was not paying no attention to anything else but her and was fix on only her there for he decide to reattraction by aging interfering with the 1st amendment rights thus the plaintiff has been a legal company under the state of Nebraska for many years

14. On the date of Feb 21 2024  defendant in official capacity  internal affairs LT Howard Banks over the phone was with the video relay caption confessed to the defendant Bellevue police department Does Not have to comply with the ADA laws for the deaf and hard of hearing that it's more like guidelines and there for that he was not Gona do anything to the defend officer J Haggis on his  police misconduct then in 48 hours (about 2 days) the Nebraska tort claim act was active to where the plaintiff gave notice to cease and desist. Then on this date the Defendant launch an illegal investigation on the plaintiff and violated non-disclosures contracts as well as then contacted the Nebraska deaf and hard of hearing and violated the HIPAA only applies to covered entities and their business associates. Stat § 43-512.06. The plaintiff can confirm this with her caption video relay interpret phone of confession, but the Defendant wants to say twist saying that i worked for them when she said that she was with them as a client there for this action has been violated due to when the plaintiff came to the department to file a complaint on officer haggis

15. On the date of April 30th , 2024, defendant in official capacity internal affairs LT Howard Banks took paperwork  that was not allowed for him but the chief of Bellevue police as the defendant did get subpoenaed to the lawsuit of case that is active of CI 23-9723 there for the conflict when it was address to the chief of police of Bellevue there for now the as proof of burned threw video relay phone can confirm on may 18th 2024 that he willfully took person mail to and opened it without consent and classified information.

16. On the date of May 18th 2024 defendant in official capacity internal affairs LT Howard Banks violated the right and tried take control then threaten the plaintiff with defamation while as under the color of freedom of the press as well as officer of the law are not protected by the 1st amendment that anything and everything can and shall be posted there for the conversation of the defendant was posted on a news page as well to show that the defendant was willing to not take any action on the defendant of officer J Haggis after the defendant willful denied and refused to follow the department of justice ADA laws of officers communicating with the hard of hearing and deaf by federal laws

17. The Defendant Bellevue police department in the official capacity is in violation of the ADA laws and non-compliance of the FOIA and to this day refuse the plaintiff of the equal rights of the law and does not want to follow the Federal, state and city law of the ADA laws as well as FOIA laws this has been going on since February 21 2024 they had gotten the letters and paper work for as the time clock started of the state of Nebraska tort and miscellaneous claim form was given to all defendant that time the clock started  the plaintiff dose have copies of her own to prove proof of burned

18. The City of Bellevue in the official capacity since February till current times has allowed many federal city and state laws to be broken as well, we will disclose more information in is complaint as well in detail but as you see how they are responding able of all defendants in question as well as malpractice of the bar assation and government corruption as well as the proof of email of the confession to not comply with legal document of FOIA.

19. On the date of April 30th , 2024, defendant in official capacity 911 Sarpy dispatch hung up on the plaintiff over 6 times while she was in pain and the stitch as well as refused under the law 20-152 interpreter the defendants officer haggis, officer Bafaro Sargent McDaniel, Bellevue fire and rescue department all show malpractice of medical attention and then made it sound as the plaintiff was trying to get out of custody after she was being beaten the 911 operators refused to stay online and hanged up until she remined them of their policy and regulation as well as the federal laws if a citizen was being assaulted or fear of a officer hurting them then the dispatcher stayed online till the fire and rescue got there over many times the defendants all canceled the interpret and didn't follow the laws policy and regulation of the department and laws of the land of federal state and city laws

20. The defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on February 21 2024 on this day he was parked on cornhusker and doing a end of quota illegal action and speed trap as he observed this matter two car before the plaintiff did the same action but speed past him as it was a control turn light lane the plaintiff used her turn singles to change lanes to the far right there for the defendant didn't go after the others he targeted her only and pulled her over as he came to the window she handed him a ADA compliance card to alarm him she is deaf and hard of hearing and she was

somewhat verbal she had two passengers as this time this time he refused to comply with the ADA laws and talked to fast the she had to have her implants read what was being said in Japanese  the is her primary her secondary is English still in college to learn it better but she speak Japanese and American sign he writer her a ticket for improper turn and was rude the other officer showed up for back ip and refused two time to identify herself the Nebraska law 20-152 is clear and very well know 20-152. Deaf or hard of hearing person; arrest; right to interpreter; use of statements. Then that later night the plaintiff launched a internal investigation. On February 26 2024 the plaintiff sent 5 people subpoenas to sue and be added to amend complaint

21. the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day refused his supervisor as he is a conflict to anything legally around the plaintiff case CI 23-9723 the law say 28-110. Statement of rights. A person in the State of Nebraska has the right to live free from violence, or intimidation by threat of violence, committed against his or her person or the destruction or vandalism of, or intimidation by threat of destruction or vandalism of, his or her property regardless of his or her race, color, religion, ancestry, national origin, gender, sexual orientation, age, or disability. This case is active and the defendants all area aware of these actions as well

22. The defendant he defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day there for by law of intimidation CIVIL RIGHTS CONSPIRACY Section 241 18 U.S.C. § 241 knowing this action the plaintiff asked for superior at said she refused to talk to him due to internal investigation as well as the case that officer haggis is in with her prior. As it took ten seconds to drag her out of her car after she was reaching for her driver licenses and regsition the defendant assaulted her to cause bodily injury ruptured the left breast UNM Dr. Figgy will testify on these matters of findings as well as on a video camera to show that

23. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day ripped her arm fast back and yet the boyfriend was yelling ( she just had surgery and she hard of hearing the defendant laughed as

well as didn't care and refused by law 20-152 interpret for her saying she can comprehend what's going on thus the officer then impersonated 38-2052. Physician assistants; misrepresentation; penalty. Any person who has not been licensed by the department, with the recommendation of the board, and who holds himself or herself out as a physician assistant, or who uses any other term to indicate or imply that he or she is a physician assistant, shall be guilty of a Class IV felony.
Source: Laws 1973, LB 101, § 7; R.S.Supp.,1973, § 85-179.10; Laws 1977, LB 39, § 319; Laws 1985, LB 132, § 7; R.S.1943, (2003), § 71-1,107.21; Laws 2007, LB463, § 710.38-2053. Physician assistants; negligent acts; liability. Any physician or physician groups utilizing physician assistants shall be liable for any negligent acts or omissions of physician assistants while acting under their supervision.
Source: Laws 1973, LB 101, § 14; R.S.Supp.,1973, § 85-179.17; Laws 1985, LB 132, § R.S.1943, (2003), § 71-1,107.28; Laws 2007, LB463, § 711; Laws 2020, LB755, § 14.Effective Date: November 14, 2020

24. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon his liberty to make the call of not allowing the plaintiff by law to have her interpret as well as the department of justice laws ADA say please see the ada laws that the defendant broke https://archive.ada.gov/omahaneattc.htm the law of federal law dose say also since the defendant officer haggis Title VI of the Civil Rights Act of 1964 and the "OJP Program Statute" Title II of the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973 18 U.S.C. §§ 241, 242). "Under color of law"

25. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully willing violated the plaintiff's 1st First Amendment Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

26. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day took it upon his liberty 4th amendment rights along with her civil rights Fourth Amendment
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

27. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day took it upon his liberty 5th amendment rights along with her civil rights Fifth Amendment
No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

28. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon his liberty 8th amendment rights along with her civil rights Amendment VIII Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. Most often mentioned in the context of the death penalty, the Eighth Amendment prohibits cruel and unusual punishments, but also mentions "excessive fines" and bail. The "excessive fines" clause surfaces (among other places) in cases of civil and criminal forfeiture, for example when property is seized during a drug raid.

29. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon his liberty 11th amendment rights along with her civil rights 11th Amendment Amendment XI The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

30. The defendant officer Bafaro official capacity & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon his liberty 14th amendment rights along with her civil rights Amendment XIV Section 1.All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

31. The defendant officer Bafaro official capacity, & the defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon his liberty the matter as well 28-109. Terms, defined. For purposes of the Nebraska Criminal Code, unless the context otherwise requires:

32. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon his liberty As well as conspire of government corruption https://www.justice.gov/usao-ne/pr/former-omaha-police-officer-sentenced-fraud-conspiracy 28-202. Conspiracy, defined; penalty. The plaintiff has video proof from her boyfriend as well as her unit 187 CERT vehicle plus medical files and doctor figgy UNM and DR POND CHI willing to testify against the defendants

33.  The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30ᵗʰ 2024 knowing and willfully on this day I-7.Search and seizure. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized. Searches and seizures must not be unreasonable. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. State v. Rocha, 295 Neb. 716, 890 N.W.2d 178 (2017).

34. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30ᵗʰ 2024 knowing and willfully then did not comply with the ADA laws for disabled people Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities section 502 of the Rehabilitation Act of 1973. 29 U.S.C. 792. 42 U.S.C. 4151 *et seq.* , 42 U.S.C. 12134(c), 12186(c), g title III, 28 CFR 36.103, provides the following:
(a) *Rule of interpretation.* Except as otherwise provided in this part, this part shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 791) or the regulations issued by Federal agencies pursuant to that title. (c) *Other laws.* This part does not invalidate or limit the remedies, rights, and procedures of any other Federal, State, or local laws (including State common law) that provide greater or equal protection for the rights of individuals with disabilities or individuals associated with them. The plaintiff can go on whate the defendants broke of the laws in this matter of the page for more on violated the plaintiff rights of laws
https://www.federalregister.gov/documents/2010/09/15/2010-21824/nondiscrimination-on-the-basis-of-disability-by-public-accommodations-and-in-commercial-facilities

35. The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30ᵗʰ 2024 knowing and willfully on this day took it upon his liberty the defendant

officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon his liberty as well take the time to understand knowing this action of law 42 usc 1983 police misconducted was in play Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia

36. the defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon assaulted a disabled person § 53a-61a. Assault of an elderly, blind, disabled or pregnant person or a person with intellectual disability in the third degree: Class A misdemeanor: One year not suspend able (d) Assault of an elderly, blind, disabled or pregnant person or a person with intellectual disability in the third degree is a class A misdemeanor and any person found guilty under this section shall be sentenced to a term of imprisonment of one year which shall not be suspended or reduced.

37. the defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal  law, city law on April 30th 2024 knowing and willfully on this day took it upon 14-32.1. Assaults on individuals with a disability; punishments.(a) For purposes of this section, an "individual with a disability" is an individual who has one or more of the following that would substantially impair the ability to defend oneself:(1)  A physical or mental disability, such as a decreased use of arms or legs, blindness, deafness, intellectual disability, or mental illness.
2)  An infirmity. (b) through (d) Repealed by Session Laws 1993 (Reg. Sess., 1994), c. 767, s. 31, effective October 1, 1994. (e) Unless the conduct is covered under some other provision of law providing greater punishment, any person who commits any aggravated assault or assault and battery on an individual with a disability is guilty

of a Class F felony. A person commits an aggravated assault or assault and battery upon an individual with a disability if, in the course of the assault or assault and battery, that person does any of the following:

(1) Uses a deadly weapon or other means of force likely to inflict serious injury or serious damage to an individual with a disability.

(2) Inflicts serious injury or serious damage to an individual with a disability. (3) Intends to kill an individual with a disability. (f) Any person who commits a simple assault or battery upon an individual with a

disability is guilty of a Class A1 misdemeanor. (1981, c. 780, s. 1; 1993, c. 539, ss. 15, 1139; 1994, Ex. Sess., c. 24, s. 14(c); 1993 (Reg. Sess., 1994), c. 767, s. 31; 2006-179, s. 1; 2018-47, s. 4(m).)

38. the defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day took it upon of police perjury 81-1414.19.Law enforcement officers; list on website, when; challenge; procedure (3) Beginning July 1, 2022, any time a law enforcement officer voluntarily surrenders such officer's certification, has such certification revoked, or is adjudicated by the council to have engaged in serious misconduct, the council shall notify the commission within thirty days after such surrender, revocation, or adjudication. As well as 42 USC 1983 police misconduct of the resisting arrest to have the chance to assault and beat the plaintiff knowing she is hard of hearing legally

39. the defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day took it upon to commit willing and willful action on the plaintiff hate crime as wel the plaintiff has video of proof to show this action 18 U.S.C. §249 says, "Whoever willfully causes bodily injury to someone or, through using a firearm, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to anyone, because of the actual or perceived race, color, religion, or national origin of any person, shall be fined and imprisoned for up to ten years or life in prison if death results or the offense includes kidnapping, aggravated sexual abuse or an attempt to kill." 18 U.S.C. 249 makes it a felony to commit either of the acts above against victims based on their actual or perceived association with the following:Their specific race, color, religion, or national origin in general; OR Their religion, national origin, gender, sexual orientation, gender identity, or disability IF the action involves crossing state

lines or affects interstate or foreign commerce. This provision covers hate crimes across state boundaries where individual state laws would only cover crimes within their respective state WHAT ARE THE RELATED FEDERAL LAWS? 18 U.S. Code Chapter 13 lists the federal statutes dealing with civil rights violations, which include the following: 18 U.S.C. § 241 – this stature makes it a crime to conspire to injure, suppress, threaten, or intimidate any person in the United States into being unable to exercise or enjoy their constitutional rights;18 U.S.C. § 248 – this statute prohibits blocking access to reproductive health services using threats or force, intentionally causing injury or damaging clinic property. WHAT ARE THE PENALTIES FOR VIOLATING 16 U.S.C. 249? The penalties for violating 18 U.S.C. § 249 will depend on the specific circumstances of each case, but they can be pretty severe. In general, anyone who is convicted of a federal hate crime under this law can be sentenced to:

Imprisonment for up to 10 years; or

A fine of up to $250,000.

However, in certain conditions, the maximum sentence for this hate crime may be extended to life imprisonment. This is the case if the crime involves any of the following:

Kidnapping;

Attempted kidnapping;

Aggravated sexual assault;

Attempted aggravated sexual assault;

Attempted murder; The death of anyone as a result of the crime;


40. The defendants City of Bellevue in official capacity

 Bellevue Officer J Haggis in official capacity,

Officer D. Bafaro in official capacity,

LT Howard Banks in official capacity,

Sargent McDaniel in official capacity

City of Papillion C/O Sarpy County Jail in official capacity,

Sarpy County sheriff correction officer

 Sargent Bank in official capacity ,911 Sarpy County Dispatch  in the official capacity

 in official capacity Fail to follow the FOIA laws and has been given plenty of notice to do so as requested by the state law FOIA Under the Nebraska Public Records Law § 84-712 et seq., I am requesting an opportunity to inspect or obtain copies of public records that [Describe the records or information sought with enough detail

for the public agency to respond. Be as specific as your knowledge of the available records will allow. But it is more important to describe the information you are seeking. Knowing this action of violation violates the 14th amendment which leads to all defendants tort claim act revoked as they break the law as well as the rules say if they fail to comply they make many jump loops or excuses to follow the law which say they cannot Since 1967, The Freedom of Information Act (FOIA(opens in a new tab)) allows the public to request records from federal agencies, which must disclose any information requested unless it falls under one of nine exemptions. All 50 states and the District of Columbia have similar statutes.

It is important to note that individual states may have their own FOIA laws that provide additional access to information and may have different requirements and exemptions.

To comply with the law, promote transparency, operate efficiently, and build public trust, it is essential that government agencies know their own state's individual FOIA requirements.

Mandated agencies that fail to comply with a FOIA request are opening themselves up to several potential consequences, and none of these are good.

Agencies beholden to the Act that should be aware of the risks associated with non-compliance include: Cities Universities Counties/State/Federal Agencies Special Districts Public Safety Agencies Now that we have identified the types of agencies covered by the Act, let us look at what you can expect to happen if you or yourorganization fails to properly comply with a FOIA request.

What Can Happen If Your Agency Fails to Comply with a FOIA Request?

There are several things that can happen if you or your organization fail to properly comply with a FOIA request:

Personal and Agency Litigation – Failure to comply with a FOIA request can result in a lawsuit being filed against you or your agency to compel the release of the requested information. The court can order that you or your agency provide the requested information and may also require payment for any attorney fees and court costs accrued.

Fines and Sanctions – Both your agency and you personally may be subject to fines and other sanctions if found to have acted in bad faith or willfully withheld information. Job Loss – Whether this is the result of being fired or resigning, from the clerk to the city attorney, all the way up to the mayor, failure to comply with a FOIA request has the potential to cost you your position.

Personal Stress – Failure to meet a FOIA request can cause personal stress for a variety of reasons. As requests can be time-consuming and complex, they can easily cause government employees to feel overwhelmed. Also, instances where a

request is denied or delayed can cause staff to feel frustrated or disappointed in their ability to serve the public as effectively as they would have liked.

Embarrassment – Failure to comply with FOIA requests can also lead to being called out on social media, potentially damaging your agency's reputation, and eroding public trust in the government.

Now that we have looked at some of the things that can happen if your organization fails to comply with a FOIA request let us now consider some of the most common ways that agencies fail to achieve compliance.

Make Complying with FOIA Requests Simpler Than Ever

Next Request software makes FOIA request intake, processing, and release an intuitive and painless experience. Request a demo to see Next Request in action and get started. Ways That Agencies May Not Be Properly Complying With the FOIA There are several ways that agencies can be non-compliant, which include but are not limited to:

On Purpose – It could be because an agency has a particularly vexatious requester, or because compliance with the request would open the agency up to significant litigation that could be worse than the potential penalties. Whatever the reason, sometimes agencies and individual staff members consciously make the decision to act against FOIA requirements.

Missed Records Request – It may be an honest mistake or the result of carelessness; however, it is important that agencies do not let records requests slip through the cracks, which is why effective processes should be put in place to deal with them systematically.

Failure to Redact Sensitive Information – Redacting sensitive information before a public record has been released is the responsibility of the agency and those involved in the public records request process, and failure to do so is likely to result in action against you or your organization. Again, it is important to become familiar with the laws that govern your agency, as requirements can be quite different from state to state.

Missing Deadlines for Supplying Requested Information – Something as simple as a missed deadline can cause non-compliance when it comes to a public records request.

Inefficient Payment Processing – When a payment is required, inefficient payment processing can slow down the delivery of requested information, indirectly causing non-compliance with a FOIA request. If the agency is not able to process the payment in a timely manner, it may miss the deadline for responding.Failure of Inter-Agency Units – Clerks and other government agency employees do their best to respond to public records requests but sometimes can be let down by a separate

unit responsible for helping respond to public records requests. This is one of the dangers of having a decentralized process.Lack of Accessibility – In order to comply with FOIA requests, it is common sense that requesters with disabilities have the ability to make information requests in the first place. Depending on the laws affecting your agency's public records requests process, you may have to make further considerations, such as language accessibility. The plaintiff now has asked and emailed as well as demanded many times over 23 times the FOIA on all dates in the complaint thus to prove the truth of police perjury and police misconduct police brutality as well as ADA laws broken and bodily injury by police and how it was prementidated and intimidation on a disabled person

41. The defendants City of Bellevue in official capacity
Bellevue Officer J Haggis in official capacity,
Officer D. Bafaro in official capacity,
LT Howard Banks in official capacity,
Sargent McDaniel in official capacity City of Papillion C/O Sarpy County Jail in official capacity,
Sarpy County sheriff correction officer Sargent Bank in official capacity ,
911 Sarpy County Dispatch in the official capacity State of Nebraska C/O County A on April 30th 2024 and current times in fact still have commited the crime and cover up of hate crime of the defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon 14-32.1. Assaults on individuals with a disability; punishments.(a) For purposes of this section, an "individual with a disability" is an individual who has one or more of the following that would substantially impair the ability to defend oneself:(1) A physical or mental disability, such as a decreased use of arms or legs, blindness, deafness, intellectual disability, or mental illness.
2) An infirmity. (b) through (d) Repealed by Session Laws 1993 (Reg. Sess., 1994), c. 767, s. 31, effective October 1, 1994. (e) Unless the conduct is covered under some other provision of law providing greater punishment, any person who commits any aggravated assault or assault and battery on an individual with a disability is guilty of a Class F felony. A person commits an aggravated assault or assault and battery

upon an individual with a disability if, in the course of the assault or assault and battery, that person does any of the following:

(1) Uses a deadly weapon or other means of force likely to inflict serious injury or serious damage to an individual with a disability.

(2) Inflicts serious injury or serious damage to an individual with a disability. (3) Intends to kill an individual with a disability. (f) Any person who commits a simple assault or battery upon an individual with a disability is guilty of a Class A1 misdemeanor. (1981, c. 780, s. 1; 1993, c. 539, ss. 15, 1139; 1994, Ex. Sess., c. 24, s. 14(c); 1993 (Reg. Sess., 1994), c. 767, s. 31; 2006-179, s. 1; 2018-47, s. 4(m).) The defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day took it upon of police perjury 81-1414.19.Law enforcement officers; list on website, when; challenge; procedure (3) Beginning July 1, 2022, any time a law enforcement officer voluntarily surrenders such officer's certification, has such certification revoked, or is adjudicated by the council to have engaged in serious misconduct, the council shall notify the commission within thirty days after such surrender, revocation, or adjudication. As well as 42 USC 1983 police misconduct of the resisting arrest to have the chance to assault and beat the plaintiff knowing she is hard of hearing legally

42. the defendant officer Bafaro official capacity, & the defendant officer haggis official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day took it upon to commit willing and willful action on the plaintiff hate crime as wel the plaintiff has video of proof to show this action 18 U.S.C. §249 says, "Whoever willfully causes bodily injury to someone or, through using a firearm, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to anyone, because of the actual or perceived race, color, religion, or national origin of any person, shall be fined and imprisoned for up to ten years or life in prison if death results or the offense includes kidnapping, aggravated sexual abuse or an attempt to kill." 18 U.S.C. 249 makes it a felony to commit either of the acts above against victims based on their actual or perceived association with the following:Their specific race, color, religion, or national origin in general; OR Their religion, national origin, gender, sexual orientation, gender identity, or disability IF the action involves crossing state lines or affects interstate or foreign commerce. This provision covers hate crimes

across state boundaries where individual state laws would only cover crimes within their respective state WHAT ARE THE RELATED FEDERAL LAWS? 18 U.S. Code Chapter 13 lists the federal statutes dealing with civil rights violations, which include the following: 18 U.S.C. § 241 – this stature makes it a crime to conspire to injure, suppress, threaten, or intimidate any person in the United States into being unable to exercise or enjoy their constitutional rights;18 U.S.C. § 248 – this statute prohibits blocking access to reproductive health services using threats or force, intentionally causing injury or damaging clinic property. WHAT ARE THE PENALTIES FOR VIOLATING 16 U.S.C. 249? The penalties for violating 18 U.S.C. § 249 will depend on the specific circumstances of each case, but they can be pretty severe. In general, anyone who is convicted of a federal hate crime under this law can be sentenced to:

Imprisonment for up to 10 years; of A fine of up to $250,000.

However, in certain conditions, the maximum sentence for this hate crime may be extended to life imprisonment. This is the case if the crime involves any of the following:

Kidnapping;

Attempted kidnapping;

Aggravated sexual assault;

Attempted aggravated sexual assault;

Attempted murder; The death of anyone as a result of the crime;

43. The defendant  Correction officer Sarpy County Sargent BANK  official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024 knowing and willfully on this day took it upon her liberty willfully knowing and hatefully 18 U.S.C. 249 makes it a felony to commit either of the acts above against victims based on their actual or perceived association with the following: Their specific race, color, religion, or national origin in general; OR Their religion, national origin, gender, sexual orientation, gender identity, or disability IF the action involves crossing state lines or affects interstate or foreign commerce. This provision covers hate crimes across state boundaries where individual state laws would only cover crimes within their respective state as she took the plaintiffs hearing aids and as she said tp the plaintiff (stop playing your hard of hearing or ill throw you in a cell for hours until you are willing to talk normal. As this action also violated the policy of Sarpy County sheriff's department under accommodation) The she ripped off the tempory jawbone Cochlear device but did not search her bra to where if she did she

would have found the other device mic the translates to Japanese/English thus the plaintiff was forced to read the lips and halfway understand and speak verbally the best she could understand until she was bonded out and was yelling over the phone to speak and could hear there for till her boyfriend showed up at the time 3:32 then the Sargent got scared the plaintiff was sign launge and told the plaintiff boyfriend they took her implants and hearing aids and said she was fake it to remember and write down the Sargent name to file the lawsuit and the boyfriend did after make contact and then as the Sargent got scared she closed the window bay so the plaintiff could not communicated with someone that new ASL.

44. The defendant Correction officer Sarpy County Sargent BANK official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day took it upon her liberty willfully knowing discriminated and violated the Prison rape elimination act laws **The regulations also require agencies to make individualized housing and program placements for all transgender and intersex individuals.**₃₃ **This includes assignment of transgender and intersex individuals to male or female facilities. Any policy that mandates placement of transgender and intersex individuals based solely on a person's genital characteristics or gender designation on state issued identification presents a clear PREA violation. Any policy or practice that determines facility, housing, work or bed assignments solely on the basis of an indi- vidual's actual or perceived LGBTI status violates PREA. What To Look For  Policies requiring genital searches by staff solely to determine the genital characteristics of a transgender or intersex person are prohibited by PREA.  Regardless of where transgender and intersex individuals are housed, any policy or practice that forces transgender or intersex individuals to shower in group shower settings violates PREA. • Policies or practices that treat transgender and intersex individuals as the sex of their housing assignment for purposes of triggering cross-gender search protections. • Policies and practices that do not provide for an individualized determination of cross-gender search protections for transgender and intersex individuals Any protective custody policy that does not have clear time limits and procedures for documenting the use of protective custody for vulnerable prisoners violates PREA's mandate. Any protective custody policy that limits or otherwise restricts access to programs, work assignments, educational opportunities and/or other privileges should be reviewed for PREA compliance. Any involuntary placement in protective custody or administrative segregation solely on the basis of one's actual or perceived LGBTI status or gender expression is inconsistent with the final PREA standards.The plaintiff was forced even thou her gender on her drivers linceses says FEMALE the defendant correction officer Sargetn Bell put her as male was gona place her illegally violated her and rape her in a male unit as the laws of PREA SHOWS AND DOSE EXPLAIN NOT TO BY LAW THE PLAINTIFF FOLLOWED THE THE PREA LAW AND ACTIVED TO PROTECT HER RIGHTS AND BONDED OUT FOR $500.00 AS WELL AS FOLLOWED THE HUMAN RIGTHS AS WELL DOCUMENTED FOR ACLU  Advocate for policies that eliminate the use of prolonged involuntary protective custody.**

• **Advocate for clear policies on the availability of programming and services to all individuals housed in restrictive settings including voluntary protective custody and involuntary protective custody.**

• **Monitor reports by transgender prisoners that they are being placed involuntarily in protective custody or other restrictive housing setting based solely on their gender identity or expression. Advocate for clear guidelines on searches of transgender individuals including prohibitions on any searches for the sole purpose of examining or determining a transgender or intersex person's genital characteristics.**

**American Civil Liberties Union**

• **Sample language: "Under no circumstances shall any search be conducted solely for the purpose of determining a prisoner or detainee's genital characteristics.**

• **Advocate for policies that allow transgender and intersex individuals to identify upon intake the gender of the officer that they would feel safest searching them.**

• **Sample language: "If a prisoner has been identified as transgender or intersex, he or she shall be asked at intake to indicate his or her preference as to the gender of the officer that will perform searches in the event searches are required, and that preference will be honored absent exigent circumstances."**

**Advocate for the agency to remove any policies that require transgender individuals to automatically be treated as the gender of their housing assignment for the purposes of triggering cross-gender search protections.**

**Advocate for policies that permit all transgender and intersex individuals to access private showers.**

**Strict limits on the use of protective custody**

**The PREA regulations strictly regulate the use of protective custody (separation from others to address a current need for protection). This regulation arises from the serious concern that protective custody in jails, prisons and juvenile detention centers is often synonymous with isolation or solitary confinement so that individuals subject to it are frequently harmed or "punished" as a result of their vulnerable status. Under PREA prisoners cannot be placed in "involuntary segregated housing" unless (1) an assessment of all available alternatives is made AND (2) a determination has been made that no alternative means of separation is available (and this determination must be made within the first 24 hours of involuntary segregation).44 Under the PREA regulations, involuntary segregated housing should generally not exceed 30 days.45 When prisoners are placed in protective custody, they must be given access to "programs, privileges, education, and work opportunities to the extent possible."46 Though agencies are given significant latitude with restrictions because of the "to the extent possible" qualification, the nature of, reason for and duration of any restrictions to program, privilege, education and**

**work opportunities must be documented.47**

**The regulations also prohibit agencies from "plac[ing] lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in**

**a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates."48 In juvenile facilities, no such placement based solely on LGBTI status may be made regardless of prior legal settlements or judgments. This includes placements in particular units or wings, including placement in protective custody or other isolated setting. Where such placement is made voluntarily it should be considered permissible under this standard.**

Sample language:"Transgender individuals may be identified during admission/intake based on:

A statement that he or she is transgender, is 'trapped in the wrong body,' or is really a different sex than his or her birth sex;

A request to be called by a name that is not traditionally associated with his or her birth sex;3 PREA • Advocacy Guide American Civil Liberties Union Any statements in arrest reports/jail or court records indicating the person is transgender or that the police were unsure of the person's sex."

• No one should inquire about an individual's medical transition, genital characteristics or surgical status unless necessary for a medical evaluation.

Advocate for policies that trigger regular and individualized assessments for the placement and program assignments of transgender and intersex individuals. This means that transgender women must be considered for placement in women's facilities and transgender men for placement in men's facilities.

Individual assessments should also include an individual's sense of his or her own safety in different placement options (i.e., male vs. female facilities, general population, protective custody). Sample Language: "A transgender or intersex individual shall be provided with a form or screening questionnaire to be conducted or filled out in private that will allow the person to select the following:

A preferred name,A preferred pronoun,Where the person would feel safest being housed;The sex of staff that the person would feel safest performing searches and/or urine testing."Monitor individual placements that are based solely on an individual's genital characteristics and report such placements and the underlying policies and practices to auditors. Searches and supervision of transgender individuals.

The PREA regulations prohibit any search that is conducted for the sole purpose of determining an individual's genital status.37 All cross-gender pat, strip and cavity searches are subject to strict guidelines under PREA but restrictions on cross- gender pat searches of female individuals do not go into effect until August 2015.38 Even though agencies are not required to be in compliance with all search provisions, all agencies should be taking steps to implement policies consistent with the cross-gender pat and strip search prohibitions prior to the 2015 effective date. Under the regular effective dates for PREA compliance, agencies are prohibited from conducting cross-gender strip and

4 PREA • Advocacy Guidecavity searches except in exigent circumstances or when performed by a medical practitioner.39 Agencies are also required to effectively train staff to conduct professional and respectful searches of transgender and intersex persons.40 PREA further mandates that facilities implement policies to ensure that individuals are able to shower and undress without being viewed by staff of the opposite gender and that staff of the opposite gender announce themselves prior to entering any housing area.41 Agencies are required to provide transgender and intersex individuals with access to private showers in all circumstances.42

The PREA regulations do not offer clear guidance on what constitutes a cross-gender search or cross-gender viewing for transgender and intersex individuals. The PREA Resource Center identifies three policy options

for conducting searches of transgender and intersex individuals: "1) searches conducted only by medical staff; 2) searches conducted by female staff only, especially given there is no prohibition on the pat-searches female staff can perform (except in juvenile facilities); and 3)

asking inmates/residents to identify the gender of staff with whom they would feel most comfortable conducting the search."43

ENDNOTES 1 Prison Rape Elimination Act of 2003 (PL 108-79), codified at 42 U.S.C. §§ 15601 et. Seq. 2 For data collected, see Prison Rape Elimination Act (Sexual Violence in Correctional Facilities), Bureau of Justice Statistics (last visited November 18, 2013), available at http://www.bjs.gov/index. cfm?ty=tp&tid=20 (listing Bureau of Justice Statistics data gathered since the act's passage). 3 Nat'l Prison Rape Elimination Comm'n., Nat'l Prison Rape Elimination Comm'n Rep. 1 (June 2009), available at https://www. ncjrs.gov/pdffiles1/226680.pdf.

4 See Press Release, Department of Justice, Justice Department Releases Final Rule to Prevent, Detect and Respond to Prison Rape (May 17, 2012), available at http://www.justice.gov/opa/pr/2012/ May/12-ag-635.html (summary of regulations).

5 National Prison Rape Elimination Commission, Report 73 (June 2009) (hereinafter Commission Report); A. Beck et al., Sexual Victimization in Jails and Prisons Reported by Inmates, 2008-09 14-15 (Bureau of Justice Statistics, Aug. 2010), available at http:// bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf; V. Jenness et al., Violence in California correctional facilities: An empirical examination of sexual assault (Center for Evidence-Based Corrections 2009); 167- 68; J.M. Grant et al., Injustice at Every Turn: A Report of the National Transgender Discrimination Survey 167-68 (Washington: National Center for Transgender Equality and National Gay and Lesbian Task Force, 2011), available at http://endtransdiscrimination.org/PDFs/ NTDS_Report.pdf.

6 42 U.S.C. 15607 (b) (2003). See also Memorandum from the President of the United States Implementing the Prison Rape Elimination Act (May 17, 2012), available at http://www.whitehouse. gov/the-press-office/2012/05/17/presidential-memorandum-implementing-prison-rape-elimination-act.

7 42 U.S.C. 15607 (e)(2) (2003). States must also audit state facilities every three years. See 28 C.F.R. §§ 115.93, 115.193, 115.293, 115.393, 115.401, 115.402, 115.403, 115.404, 115.405, 115.501 (2012), available at http://www.ojp.usdoj.gov/programs/pdfs/prea_final_rule.pdf. 8 28 C.F.R. §§ 115.401(b). 9 28 C.F.R. §§ 115.401(a). 10 42 U.S.C. 15607(c)(2); 28 C.F.R. §§ 115.501(a). 11 28 C.F.R. §§ 115.11, 115.111, 115.211, 115.311. 12 See PREA Standards, supra note 4, at §115(A). 13 Id. 14 Id. 15 PREA Resource Center, "Audit Process" http://www. prearesourcecenter.org/audit/audit-process (last visited November 18, 2013). 16 28 C.F.R. § 115.86(2), 28 C.F.R. § 115.186(2), 28 C.F.R. § 115.286(2), 28 C.F.R. § 115.386(2). 17 2013 Colo. Legis. Serv. Ch. 171 § 17–1–115.7 (West).18 S.B. 653, 82d Leg., Reg. Sess. (Tex. 2011). 19 Conn. Gen. Stat. § 18-81cc (Conn. 2012). Bill text available at http://www.cga.ct.gov/2012/sup/chap325.htm#Sec18-81cc.htm. 20 S.B. 716, 2013-2014 Leg., Reg. Sess. (Cal. 2013).21 S.B. 1394, 2013 Leg., 236th Sess. (N.Y. 2013). 22 H.B. 585, 2013 Gen. Assemb., Reg. Sess. (N.C. 2013). 23 H.B. 990, 83d Leg., Reg. Sess. (Tex. 2013); see also H.B. 3634, 83d Leg., Reg. Sess. (Tex. 2013). 24 S.B. 33, 77th Leg., Reg. Sess. (Nev. 2013). 25 S.B. 526, 51st Leg. Sess., 1st Sess. (N.M. 2013). 26 S.B. 427, 80th Leg., Reg. Sess. (W. Va. 2012). 27 See Alexander v. Sandoval, 532 U.S. 275, 291 (2003) (holding that, in the absence of explicit authorization by Congress, no private right of action is created simply by statute). 42 U.S.C. § 15602(3)(7) (2003). 28 28 C.F.R. § 115.5 29 28 C.F.R. § 115.41(b); 28 C.F.R. § 115.241 (b); 28 C.F.R. § 115.341(a). 30 28 C.F.R. § 115.41(d)(7). 31 28 C.F.R. § 115.42 (a) 32 28 C.F.R. § 115.42 (b) 33 28 C.F.R. § 115.42 (c) ("In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis

**whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.").7 PREA • Advocacy Guide34 Id. 35 28 36 28 37 28 38 28 39 28 40 28 41 28 42 28**
**C.F.R. § 115.42 (d). C.F.R. § 115.42 (e). C.F.R. § 115.15 (e) C.F.R. § 115.15 (b) and 28 C.F.R. §115.215(b) C.F.R. § 115.15 (a) C.F.R. § 115.15 (f) C.F.R. § 115.15 (d). C.F.R. § 115.42 (f). 43 PREA Resource Center, "Frequently Asked Questions," http:// www.prearesourcecenter.org/faq#n1069 (last visited November 18, 2013). 44 28 C.F.R. § 115.43 (a). 45 28 C.F.R. § 115.43 (c). 46 28 C.F.R. § 115.43 (b). 47 28 C.F.R. § 115.43 (b). 48 28 C.F.R. § 115.42 (g)**

46. The defendant Correction officer Sarpy County Sargent Bank official capacity did commit a crime under the Nebraska state law, federal law, city law on April 30th, 2024, knowing and willfully on this day took it upon her liberty willfully knowing broke the Sarpy County Sheriff department policy, regulation, merit and code of conduct. On merit page 27 18. GENDER BASED HIRING The Commission recognizes that the Sheriff's Office may, on occasion, have gender based hiring needs which are generally related to the County jail requirements. During any gender based hiring, the Sheriff's Office must comply with current Nebraska law and anti-discrimination laws. Accordingly, the following procedures will apply to any gender-based hiring process:
https://www.sarpy.gov/DocumentCenter/View/3633/Sarpy-County-Merit-Comm-ByLaws-July-2021?bidId= on the Sarpy County policy and regulation page
https://www.sarpy.gov/DocumentCenter/View/2422/Personnel-Policies--Procedures-Manual

Page 3  DISABILITY POLICY STATEMENT
Sarpy County is committed to equality of opportunity and freedom from discrimination for all employees, applicants for employment and customers regardless of any disability an individual may have.
Please refer to the County 'Americans with Disability Act Policy' available on the Human Resources Webpage.
Page 33 DISABILITY POLICY STATEMENT
5. Sarpy County is committed to equality of opportunity and freedom from discrimination for all employees, applicants for employment and customers regardless of any disability an individual may have.
Please refer to the County 'Americans with Disability Act Policy' available on the Human Resources Webpage.
Employees are expected to disclose waste, fraud and corruption to appropriate authorities. Employeesshalladheretoalllawsandregulationsthatmandateequalopportunity and treatment regardless of race, color, religion, sex, national origin, age, disability or maritastatus.
Page 35 Federal law requires that Sarpy County notify the federal government of any convictions in violation of our policy. Federal law further requires Sarpy County to impose sanctions, which may include discharge for any violation of the provisions of this notice or policy.
Page 37 DISCRIMINATORY & HARASSMENT POLICY
Please refer to the County Policy available on the Human Resources Webpage.

This action has happened before of a sheriff deputy getting terminated for violation and charged please see **Wheeler v. Cnty. of Sarpy**

SARPY COUNTY
CIVIL SERVICE PERSONNEL RULES AND REGULATIONS
Rule 7 Regulation 1: Discipline
M. Lying, making false statements, or being purposely deceptive;
P. Discrimination or harassment based in whole or in part on race, color, sex, religion, age, disability, or national origin, or any other protected group which manifests itself in the form of comments, jokes, printed material, and/or unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature;
R. Failure to abide by or violate these Rules, Personnel Policy Bulletins, or any other County/departmental policies;

47. The defendant Correction officer Sarpy County Sargent BANK  official capacity, did commit a crime under the Nebraska state law, federal law, city law on April 30th 2024, knowing and willfully on this day took it upon her liberty willfully knowing violated the state law of 20-152 20-152.Deaf or hard of hearing person; arrest; right to interpreter; use of statements. Whenever a deaf or hard of hearing person is arrested and taken into custody for an alleged violation of state law or local ordinance, the appointing authority shall procure a licensed interpreter for any interrogation, warning, notification of rights, or taking of a statement, unless otherwise waived. No arrested deaf or hard of hearing person otherwise eligible for release shall be held in custody solely to await the arrival of a licensed interpreter. A licensed interpreter shall be provided as soon as possible. No written or oral answer, statement, or admission made by a deaf or hard of hearing person in reply to a question of any law enforcement officer or any other person having a prosecutorial function may be used against the deaf or hard of hearing person in any criminal proceeding unless (1) the statement was made or elicited through a licensed interpreter and was made knowingly, voluntarily, and intelligently or (2) the deaf or hard of hearing person waives his or her right to an interpreter and the waiver and statement were made knowingly, voluntarily, and intelligently. The right of a deaf or hard of hearing person to an interpreter may be waived only in writing. The failure to provide a licensed interpreter pursuant to this section shall not be a defense to prosecution for the violation for which the deaf or hard of hearing person was arrested.


48. The defendant Lt Howard Banks eternal affairs official capacity on February  21 2024 and May 18th 2024 did commit a crime and illegal action on the plaintiff by doing a illegal background check on the plaintiffs' clients without proper consent when the plaintiff came to Mr Banks to file a formal complaint on the defendant officer haggis in official capacity  48-202.Public employer; applicant; disclosure of criminal record or history; limitation (a) Law enforcement agency means an agency or department of this state or of any political subdivision of this state which is responsible for the prevention and detection of crime, the enforcement of the penal, traffic, or highway laws of this state or any political subdivision of this state, and the enforcement of arrest warrants. Law enforcement agency includes a

police department, an office of the town marshal, an office of the county sheriff, the Nebraska State Patrol, and any department to which a deputy state sheriff is assigned as provided in section 84-106; The plaintiff did not authorize to be invest aged when the plaintiff did a formal complaint on the defendant officer haggis the plaintiff was not the one under investigation at all due to the complaint lead to violation of the ada laws and as the defendant LT Howard Banks on the Caption vidoe relay phone did say and will show proof of the transcrips says ( the bellevue police department dose not have to comply with the ADA compliance card its more like guidelines and it  is not a law at all there for they dont have to follow it) but however the ADA laws the oversea the department is the department of justice and they say this

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



45.

**Communicating with People Who Are Deaf or Hard of Hearing: ADA Guide for Law Enforcement Officers**



As a law enforcement officer, you can expect to come into contact with people who are deaf or hard of hearing. It is estimated that up to nine percent of the population has some degree of hearing loss, and this percentage will increase as the population ages.
Under the Americans with Disabilities Act (ADA), people who are deaf or hard of hearing are entitled to the same services law enforcement provides to anyone else. They may not be excluded or segregated from services, be denied services, or otherwise be treated differently than other people. Law enforcement agencies must make efforts to ensure that their personnel communicate effectively with people whose disability affects hearing. This applies to both sworn and civilian personnel.
Your agency has adopted a specific policy regarding communicating with people who are deaf or hard of hearing. It is important to become familiar with this policy.

**Requirements for Effective Communication**The ADA requires that ...

> Law enforcement agencies must provide the communication aids and services needed to communicate effectively with people who are deaf or hard of hearing, except when a particular aid or service would result in an undue burden or a fundamental change in the nature of the law enforcement services being provided.
> Agencies must give primary consideration to providing the aid or service requested by the person with the hearing disability.
> Agencies cannot charge the person for the communication aids or services provided.
> Agencies do *not* have to provide personally prescribed devices such as hearing aids.
> When interpreters are needed, agencies must provide interpreters who can interpret effectively, accurately, and impartially.
> Only the head of the agency or his or her designee can make the determination that a particular aid or service would cause an undue burden or a fundamental change in the nature of the law enforcement services being provided.Your agency's policy explains how to obtain interpreters or other communicationaids and services when needed.

### Communicating with People Who are Deaf or Hard of Hearing

> Officers may find a variety of communication aids and services useful in different situations. Speech supplemented by gestures and visual aids can be used in some cases.
> A pad and pencil, a word processor, or a typewriter can be used to exchange written notes.
> A teletypewriter (TTY) can be used to exchange written messages over the telephone.
> An assistive listening system or device to amplify sound can be used when speaking with a person who is hard of hearing.
> A sign language interpreter can be used when speaking with a person who knows sign language.
> An oral interpreter can be used when speaking with a person who has been trained to speech read (read lips). **Note:** Do not assume that speech reading will beeffective in most situations. On average, only about one third of spoken words can be understood by speech reading.
> The type of situation, as well as the individual's abilities, will determine which aid or service is needed to communicate effectively.

### Practical Suggestions for Communicating Effectively

> Before speaking, get the person's attention with a wave of the hand or a gentle tap on the shoulder.
> Face the person and do not turn away while speaking.
> Try to converse in a well-lit area.
> Do not cover your mouth or chew gum.
> If a person is wearing a hearing aid, do not assume the individual can hear you.
> Minimize background noise and other distractions whenever possible.
> When you are communicating orally, speak slowly and distinctly. Use gesturesand facial expressions to reinforce what you are saying.
> Use visual aids when possible, such as pointing to printed information on a citation or other document.

Remember that only about one third of spoken words can be understood by speech reading. When communicating by writing notes, keep in mind that some individuals who use sign language may lack good English reading and writing skills.

If someone with a hearing disability cannot understand you, write a note to ask him or her what communication aid or service is needed.

If a sign language interpreter is requested, be sure to ask *which* language the person uses. American Sign Language (ASL) and Signed English are the most common.

When you are interviewing a witness or a suspect or engaging in any complex conversation with a person whose primary language is sign language, a qualified interpreter is usually needed to ensure effective communication.

When using an interpreter, look at and speak directly to the deaf person, not to the interpreter. Talk at your normal rate, or slightly slower if you normally speak very fast.

Only one person should speak at a time.

Use short sentences and simple words.

Do not use family members or children as interpreters. They may lack the vocabulary or the impartiality needed to interpret effectively. **What Situations *Require* an Interpreter?**

Generally, interpreter services are not required for simple transactions – such as checking a license or giving directions to a location – or for urgent situations – such as responding to a violent crime in progress.

**Example:** An officer clocks a car on the highway going 15 miles per hour above the speed limit. The driver, who is deaf, is pulled over and is issued a noncriminal citation. The individual is able to understand the reason for the citation because the officer points out relevant information printed on the citation or written by the officer.

**Example:** An officer responds to an aggravated battery call and upon arriving at the scene observes a bleeding victim and an individual holding a weapon. Eyewitnesses observed the individual strike the victim. The individual with the weapon is deaf. Because the officer has probable cause to make a felony arrest without an interrogation, an interpreter is not necessary to carry out the arrest.

However, an interpreter may be needed in lengthy or complex transactions – such as interviewing a victim, witness, suspect, or arrestee – if the person being interviewed normally relies on sign language or speech reading to understand what others are saying.

**Example:** An officer responds to the scene of a domestic disturbance. The husband says the wife has been beating their children and he has been trying to restrain her. The wife is deaf. The officer begins questioning her by writing notes, but her response indicates a lack of comprehension. She requests a sign language interpreter. In this situation an interpreter should be called. If the woman's behavior is threatening, the officer can make an arrest and call for an interpreter to be available later at the booking station.

It is inappropriate to ask a family member or companion to interpret in a situation like this because emotional ties may interfere with the ability to interpret impartially.

**Example:** An officer responds to the scene of a car accident where a man has been seriously injured. The man is conscious, but is unable to comprehend the officer's questions because he is deaf. A family member who is present begins interpreting what the officer is saying.

A family member or companion *may* be used to interpret in a case like this, since it is an emergency involving an imminent threat to the safety or welfare of an individual and no interpreter is available. However, in general, do not expect or demand that a deaf person

provide his or her own interpreter. As a rule, when interpreter service is needed, it must be provided by the agency.

List your agency's contact information for obtaining an interpreter, an assistive listening device, or other communication aid or service here.

There for on the date in question of Febuary 21 2024 was in violation as well as the nebraska law 20-152 says 20-152.

Deaf or hard of hearing person; arrest; right to interpreter; use of statements. Whenever a deaf or hard of hearing person is arrested and taken into custody for an alleged violation of state law or local ordinance, the appointing authority shall procure a licensed interpreter for any interrogation, warning, notification of rights, or taking of a statement, unless otherwise waived. No arrested deaf or hard of hearing person otherwise eligible for release shall be held in custody solely to await the arrival of a licensed interpreter. A licensed interpreter shall be provided as soon as possible. No written or oral answer, statement, or admission made by a deaf or hard of hearing person in reply to a question of any law enforcement officer or any other person having a prosecutorial function may be used against the deaf or hard of hearing person in any criminal proceeding unless (1) the statement was made or elicited through a licensed interpreter and was made knowingly, voluntarily, and intelligently or (2) the deaf or hard of hearing person waives his or her right to an interpreter and the waiver and statement were made knowingly, voluntarily, and intelligently. The right of a deaf or hard of hearing person to an interpreter may be waived only in writing. The failure to provide a licensed interpreter pursuant to this section shall not be a defense to prosecution for the violation for which the deaf or hard of hearing person was arrested.

Thus the plaintiff on this date was in fact violated

49. The defendant Lt Howard Banks eternal affairs official capacity on February 21 2024 did commit a crime and illegal action on the plaintiff by doing a illegal by violated the 1st amendment the defendant willful knowing and spitful called non-discloser clients of the plaintiff to confirm sources which would lead to freedom of the press as the the plaintiff is a legal freelancer news reporter for uspresscorps.org and have been for over 5 years as well as violated the company 1st amendment relliott company critic worldwide news inc as well as relliott community emergency respond team news Inc as been operating since 2017 in the state of Nebraska and Iowa area  the law of the press protecting the press without a proper warrent or a concent form thus is subject to pentaly by fredral law Amdt1.7.10.1 Overview of Regulation of the Media Media organizations, such as newspapers, must comply with generally applicable laws although such laws may have incidental effects on the exercise of free speech rights.[1] The Supreme Court has, for example, affirmed that government may apply labor and antitrust laws to media organizations.[2] The First Amendment may, however, inhibit government's ability to enact laws that target or impact a particular medium.[3] The constitutional treatment of the media depends on several factors, including the specific medium being regulated.[4] While each form of media tends to present its own peculiar problems, the basic principles enshrined in the First Amendment do not apply to different forms of media with any less force.[5] Further, the Supreme Court has suggested there is no distinction between media and nonmedia speakers within a particular medium for First

Amendment purposes.6 Accordingly, whether a particular media regulation is constitutional frequently depends on the application of general free speech principles, rather than media-specific principles or principles that relate only to the freedom of the press.7

Before radio and television became commonplace in American households, government regulation of media focused on print media. The growth of broadcast media precipitated a change in the focus of federal media regulation. The Supreme Court has recognized that broadcast media may be subject to different First Amendment protections than print media.8 In the absence of characteristics that justify different First Amendment treatment, the Supreme Court analyzes restrictions on media using the same tools it uses generally to assess restrictions on speech, such as the use of strict or intermediate scrutiny to assess content-based or content-neutral regulations.9

Amdt1.9.1 Overview of Freedom of the Press **First Amendment:**
*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.*
Some have raised the question of whether the Free Speech Clause and the Free Press Clause are coextensive, with respect to protections for the media. A number of Supreme Court decisions considering the regulation of media outlets analyzed the relevant constitutional protections without significantly differentiating between the two clauses.1 In one 1978 ruling, the Court expressly considered whether the institutional press is entitled to greater freedom from governmental regulations or restrictions than are non-press individuals, groups, or associations. Justice Potter Stewart argued in a concurring opinion: That the First Amendment speaks separately of freedom of speech and freedom of the press is no constitutional accident, but an acknowledgment of the critical role played by the press in American society. The Constitution requires sensitivity to that role, and to the special needs of the press in performing it effectively.2 But, in a plurality opinion, Chief Justice Warren Burger wrote: The Court has not yet squarely resolved whether the Press Clause confers upon the 'institutional press' any freedom from government restraint not enjoyed by all others.3 The plurality ultimately concluded that the First Amendment did not grant media the privilege of special access to prisons.4
Several Supreme Court holdings firmly point to the conclusion that the Free Press Clause does not confer on the press the power to compel government to furnish information or otherwise give the press access to information that the public generally does not have.5 Nor, in many respects, is the press entitled to treatment different in kind from the treatment to which any other member of the public may be subjected.6 The Court has ruled that [g]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects.7 At the same time, the Court has recognized that laws *targeting* the press, or treating different subsets of media outlets differently, may sometimes violate the First Amendment.8 Further, it does seem clear that, to some extent, the press, because of its role in disseminating news and information, is entitled to heightened constitutional protections—that its role constitutionally entitles it to governmental sensitivity, to use Justice Potter Stewart's word.9
Amdt1.9.2 Protection of Confidential Sources **First Amendment:**
*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.*
News organizations have claimed that the First Amendment compels a reporter's privilege: an exception to the ancient rule that every citizen owes to his government a duty to give what testimony he is capable of giving.1 The Court rejected the argument for a limited exemption

permitting reporters to conceal their sources from a grand jury and to keep confidential certain information they obtain and choose at least for the moment not to publish in *Branzburg v. Hayes*.2 Emphasizing the importance of the grand jury in creating a [f]air and effective law enforcement [system] aimed at providing security for the person and property of the individual,the Court concluded the public interest in ensuring effective grand jury proceedings overrode the consequential, but uncertain, burden on news gathering that would result from requiring reporters to respond to relevant grand jury questions.3 Not only was it uncertain to what degree confidential informants would be deterred from providing information, said Justice Byron White for the Court, but the conditional nature of the alleged reporter's privilege might not mitigate the deterrent effect, eventually leading to claims for an absolute privilege. Confidentiality could be protected by the secrecy of grand jury proceedings and by the experience of law enforcement officials in themselves dealing with informers. Difficulties would arise as well in identifying who should have the privilege and who should not. But the principal basis of the holding was that the investigation and exposure of criminal conduct was a governmental function of such importance that it overrode the interest of reporters in avoiding the incidental burden on their newsgathering activities occasioned by such governmental inquiries.4

The Court observed that Congress, as well as state legislatures and state courts, are free to adopt privileges for reporters.5 As for federal courts, Federal Rule of Evidence 501 provides that the common law generally governs a claim of privilege.6 The federal courts have not resolved whether the common law provides a journalists' privilege.7

Nor does the status of an entity as a newspaper (or any other form of news medium) protect it from issuance and execution on probable cause of a search warrant for evidence or other material properly sought in a criminal investigation, the Court held in *Zurcher v. Stanford Daily*.8 The press had argued that to permit searches of newsrooms would threaten the ability to gather, analyze, and disseminate news, because searches would be disruptive, confidential sources would be deterred from coming forward with information because of fear of exposure, reporters would decline to put in writing their information, and internal editorial deliberations would be exposed. The Court thought that First Amendment interests were involved, but it seemed to doubt that the consequences alleged would occur. It observed that the built-in protections of the warrant clause would adequately protect those interests and noted that magistrates could guard against abuses when warrants were sought to search newsrooms by requiring particularizations of the type, scope, and intrusiveness that would be permitted in the searches.

### Amdt1.9.3 Access to Government Places and Papers Amdt1.9.3 Access to Government Places and Papers

First Amendment:

*Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.*

Conflict between constitutional rights is not uncommon. One difficult conflict to resolve is the conflict between a criminal defendant's Fifth and Sixth Amendment rights to a fair trial and the First Amendment's protection of the rights to obtain and publish information about defendants and trials. Convictions obtained in the context of prejudicial pre-trial publicity1 and during trials that were media

spectaculars2 have been reversed, but the prevention of such occurrences is of paramount importance to the governmental and public interest in the finality of criminal trials and the successful prosecution of criminals. However, the imposition of gag orders preventing press publication of information directly confronts the First Amendment's bar on prior restraints,3although the courts have a good deal more discretion in preventing the information from becoming public in the first place.4

When the Court held that the Sixth Amendment right to a public trial did not guarantee access of the public and the press to *pre*-trial suppression hearings,5 the decision raised questions concerning the extent to which, if at all, the speech and press clauses protected the public and the press in seeking to attend the trials themselves.6 In a split ruling in *Richmond Newspapers v. Virginia*, the Court held that the First Amendment protected the right of access to criminal trials against the wishes of the defendant.7

Chief Justice Warren Burger pronounced the judgment of the Court, but his opinion was joined by only two other Justices.8 The Chief Justice emphasized the history showing that trials were traditionally open. This openness, moreover, was no quirk of history but an indispensable attribute of an Anglo-American trial.9 He explained that this characteristic flowed from the public interest in seeing fairness and proper conduct in the administration of criminal trials; the therapeutic value to the public of seeing its criminal laws in operation, purging the society of the outrage felt at the commission of many crimes, convincingly demonstrated why the tradition had developed and been maintained.10 Thus, the opinion concluded that a presumption of openness inheres in the very nature of a criminal trial under our system of justice.11 Ultimately, the plurality ruled that in the context of trials . . . the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that amendment was adopted.12

Justice William Brennan, joined by Justice Thurgood Marshall, followed a different route to the same conclusion. He argued that rather than solely protecting individual communications, the First Amendment . . . has a *structural* role to play in securing and fostering our republican system of self-government.13 He argued that in order to secure robust public debate and other civic behavior, the First Amendment must also ensure that debate is informed, protecting not only communication itself but also . . . the indispensable conditions of meaningful communication.14

Two years later, the Supreme Court articulated a standard for determining when the government's or the defendant's interests could outweigh the public right of access. *Globe Newspaper Co. v. Superior Court*15 involved a statute, unique to one state, that mandated the exclusion of the public and the press from trials

during the testimony of a sex-crime victim under the age of 18. For the Court, Justice William Brennan wrote that the First Amendment guarantees press and public access to criminal trials, both because of the tradition of openness16 and because public scrutiny of a criminal trial serves the valuable functions of enhancing the quality and safeguards of the integrity of the factfinding process, of fostering the appearance of fairness, and of permitting public participation in the judicial process. The right recognized by the Court was not absolute; instead, in order to close all or part of a trial government must show that the denial is necessitated by a compelling governmental interest, and [that it] is narrowly tailored to serve that interest.17 The Court was explicit that the right of access was to *criminal* trials,18 leaving open the question of the openness of civil trials. The Court next applied and extended the right of access in several other areas of criminal proceedings, striking down state efforts to exclude the public from voir dire proceedings, from a suppression hearing, and from a preliminary hearing. The Court determined in *Press-Enterprise I*19 that historically voir dire had been open to the public, and that [t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.20 No such findings had been made by the state court, which had ordered closed, in the interest of protecting the privacy interests of some prospective jurors, forty-one of the forty-four days of voir dire in a rape-murder case. The trial court also had not considered the possibility of less restrictive alternatives, for example, *in camera* consideration of jurors' requests for protection from publicity. In *Waller v. Georgia*,21 the Court held that under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press Enterprise*,22 and noted that the need for openness at suppression hearings may be particularly strong because the conduct of police and prosecutor is often at issue.23 And, in *Press Enterprise II*,24 the Court held that there is a similar First Amendment right of the public to access most criminal proceedings (here a preliminary hearing) even when the accused requests that the proceedings be closed. Thus, an accused's Sixth Amendment-based request for closure must meet the same stringent test applied to governmental requests to close proceedings: there must be specific findings . . . demonstrating that first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent, and second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights.25 Openness of preliminary hearings was deemed important because, under California law, the hearings can be the final and most important step in the criminal proceeding and therefore may be the sole occasion for public observation of the criminal justice system, and also because the safeguard of a

jury is unavailable at preliminary hearings.26Thus the defendant willful violated the bill of rights an the plaintiff can show proof as well that Lt Howard Banks in official capacity did break the law to lead the investigation to terminate in favor of government corruption to cover up the defendant officer haggis that committed a crime and state and federal law violation

50.  The defendant Lt Howard Banks eternal affairs official capacity on February 21 2024, April 30th 2024 and May 18th, 2024, did commit a crime and illegal action on the plaintiff by doing hate crime to allowed the defendant officer Bafaro official capacity, & he defendant Lt Howard Banks eternal affairs official capacity didnt not stop and did encouger the attack but not doing a proper investigation as well to where the first hate crime then the second hate crime was on april 30th 2024 18 U.S.C. §249 says, "Whoever willfully causes bodily injury to someone or, through using a firearm, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to anyone, because of the actual or perceived race, color, religion, or national origin of any person, shall be fined and imprisoned for up to ten years or life in prison if death results or the offense includes kidnapping, aggravated sexual abuse or an attempt to kill." 18 U.S.C. 249 makes it a felony to commit either of the acts above against victims based on their actual or perceived association with the following:Their specific race, color, religion, or national origin in general; OR Their religion, national origin, gender, sexual orientation, gender identity, or disability IF the action involves crossing state lines or affects interstate or foreign commerce. This provision covers hate crimes across state boundaries where individual state laws would only cover crimes within their respective state WHAT ARE THE RELATED FEDERAL LAWS? 18 U.S. Code Chapter 13 lists the federal statutes dealing with civil rights violations, which include the following: 18 U.S.C. § 241 – this stature makes it a crime to conspire to injure, suppress, threaten, or intimidate any person in the United States into being unable to exercise or enjoy their constitutional rights;18 U.S.C. § 248  this statute prohibits blocking access to reproductive health services using threats or force, intentionally causing injury or damaging clinic property. WHAT ARE THE PENALTIES FOR VIOLATING 16 U.S.C. 249? The penalties for violating 18 U.S.C. § 249 will depend on the specific circumstances of each case, but they can be pretty severe. In general, anyone who is convicted of a federal hate crime under this law can be sentenced to:

Imprisonment for up to 10 years; or
A fine of up to $250,000.
However, in certain conditions, the maximum sentence for this hate crime may be extended to life imprisonment. This is the case if the crime involves any of the following:

Kidnapping;

Attempted kidnapping;

Aggravated sexual assault;

Attempted aggravated sexual assault;

Attempted murder; The death of anyone as a result of the crime;

51. The defendant Lt Howard Banks eternal affairs official capacity he defendant Lt Howard Banks eternal affairs official capacity and Sargent Mcdanial On the date of may 2024 –June 2024 did commit a crime knowing and willful on the date of april 30th 2024 and May 18th 2024 when a active lawsuit is in Douglas county to this day by judge Molly Kean due to the same things that this whole case now is about case number CI 23-9723 these defendants was service with duce subpoenas to testify why they are violating the ada laws civil rights human rights as well as 1st 4th 5th 6th 8th 11th 14th amendment rights thus the defendant willfully knowing this did in fact infringed intimintadtion 28-110.Statement of rights.

A person in the State of Nebraska has the right to live free from violence, or intimidation by threat of violence, committed against his or her person or the destruction or vandalism of, or intimidation by threat of destruction or vandalism of, his or her property regardless of his or her race, color, religion, ancestry, national origin, gender, sexual orientation, age, or disability. 8-311.08.

Unlawful intrusion; photograph, film, or record image or video of intimate area; distribute or make public; penalty; court; duties; registration under Sex Offender Registration Act; statute of limitations.

(1) It shall be unlawful for any person to knowingly intrude upon any other person without his or her consent in a place of solitude or seclusion. Violation of this subsection is a Class I misdemeanor. A second or subsequent violation of this subsection is a Class IV felony. 28-1310. Intimidation by telephone call or electronic communication; penalty. (1) A person commits the offense of intimidation by telephone call or electronic communication if, with intent to intimidate, threaten, or harass an individual, the person telephones such individual or transmits an electronic communication directly to such individual, whether or not conversation or an electronic response ensues, and the person: (a) Uses obscene language or suggests any obscene act;

(b) Threatens to inflict physical or mental injury to such individual or any other person or physical injury to the property of such individual or any other person; or

(c) Attempts to extort property, money, or other thing of value from such individual or any other person.

(2) The offense shall be deemed to have been committed either at the place where the call or electronic communication was initiated or where it was received.

(3) Intimidation by telephone call or electronic communication is a Class III misdemeanor.

(4) For purposes of this section, electronic communication means any writing, sound, visual image, or data of any nature that is received or transmitted by an electronic communication device as defined in section 28-833.

42 U.S.C. § 3631 Section 3631 makes it unlawful for an individual to use force or threaten to use force to injure, intimidate, or interfere with, or attempt to injure, intimidate, or interfere with, any person's housing rights because of that person's race, color, religion, sex, handicap, familial status or national origin. Thus judge Molly Kean is aware of the actions as of June 18th 2024 at 2pm when the plaintiff did alert her about he assault actions

52. the defendant Sargent Mcdanial capacity o April 30th 2024 , did commit a crime and illegal action on the plaintiff by doing hate crime to allowed the defendant officer Bafaro official capacity, & he defendant Lt Howard Banks eternal affairs official capacity

didn't not stop and did encouger the attack but not doing a proper investigation as well to where the first hate crime then the second hate crime was on April 30th 2024 18 U.S.C. §249 says, "Whoever willfully causes bodily injury to someone or, through using a firearm, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to anyone, because of the actual or perceived race, color, religion, or national origin of any person, shall be fined and imprisoned for up to ten years or life in prison if death results or the offense includes kidnapping, aggravated sexual abuse or an attempt to kill." 18 U.S.C. 249 makes it a felony to commit either of the acts above against victims based on their actual or perceived association with the following: Their specific race, color, religion, or national origin in general; OR Their religion, national origin, gender, sexual orientation, gender identity, or disability IF the action involves crossing state lines or affects interstate or foreign commerce. This provision covers hate crimes across state boundaries where individual state laws would only cover crimes within their respective state WHAT ARE THE RELATED FEDERAL LAWS? 18 U.S. Code Chapter 13 lists the federal statutes dealing with civil rights violations, which include the following: 18 U.S.C. § 241 – this stature makes it a crime to conspire to injure, suppress, threaten, or intimidate any person in the United States into being unable to exercise or enjoy their constitutional rights;18 U.S.C. § 248 – this statute prohibits blocking access to reproductive health services using threats or force, intentionally causing injury or damaging clinic property. WHAT ARE THE PENALTIES FOR VIOLATING 16 U.S.C. 249? The penalties for violating 18 U.S.C. § 249 will depend on the specific circumstances of each case, but they can be pretty severe. In general, anyone who is convicted of a federal hate crime under this law can be sentenced to:
Imprisonment for up to 10 years; or
A fine of up to $250,000.

However, in certain conditions, the maximum sentence for this hate crime may be extended to life imprisonment. This is the case if the crime involves any of the following:
Kidnapping;
Attempted kidnapping;
Aggravated sexual assault;
Attempted aggravated sexual assault;
Attempted murder; The death of anyone as a result of the crime;

52. The defendants all allowed to break the federal state laws As well as all the defendants City of Bellevue in official capacity

Bellevue police department in official capacity,  capacity, Sarpy County Jail in official capacity, Aimee C Bataillon in official capacity,

Bellevue Officer J Haggis in official capacity, Officer D. Bafaro in official capacity,

LT Howard Banks in official capacity, Sargent McDaniel in official capacity, Sargent Bank

Did violated the plaitiffs rights and broke the laws  Transgender rights and law of protectionhttps://www.whitehouse.gov/briefing-room/presidential-actions/2024/03/29/a-proclamation-on-transgender-day-of-visibility-2024/ , **police corruption** https://www.state.gov/policy-issues/anti-corruption-and-transparency/ , **police misconduct** https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/11/fact-sheet-u-s-leadership-in-the-fight-against-global-corruption/ , **police brutality police color action**https://www.whitehouse.gov/briefing-room/statements-releases/2022/05/25/fact-sheet-president-biden-to-sign-historic-executive-order-to-advance-effective-accountable-policing-and-strengthen-public-safety/ ,

**bill of rights, constitution rights** https://www.whitehouse.gov/about-the-white-house/our-government/the-constitution/ , **human rights** https://www.whitehouse.gov/briefing-room/presidential-actions/2023/12/08/a-proclamation-on-human-rights-day-and-human-rights-week-2023/ **as well as civil rights protection** https://www.whitehouse.gov/briefing-room/statements-releases/2024/07/01/a-proclamation-on-the-60th-anniversary-of-the-civil-rights-act/#:~:text=Sixty%20years%20ago%2C%20President%20Lyndon,%2C%20sex%2C%20or%20national%20origin.  of action since the defendants result of the actions of all the defendant's law is § 3-504.1. Truthfulness in statements to others shall Lie in this claim and will hide behind the tort claim act as well as untruthful statement to get out of their

actions they caused. As well as all the defendants Nebraska, County Attorney Office in official capacity, State Attorney Brandi Lang in in official capacity

53. City of Bellevue in official capacity  Bellevue police department in official capacity, Sarpy County Jail in official capacity,

Aimee C Bataillon in official capacity,Bellevue Officer J Haggis in official capacity,

Officer D. Bafaro in official capacity, LT Howard Banks in official capacity, Sargent McDaniel in official capacity, will try to file a motion to dismiss to their tort Claim act all the Defendant City("City") and respectfully submits its Brief in Support of the Motion to Dismiss filed in the above captioned action pursuant to Neb. Ct. R. Pldg. § 6-1112(b)(1) and Neb. Ct. R. Pldg. § 6- 1112(b)(6). In support thereof, the City states to the Court: A complaint, to survive when confronted with a motion to dismiss, must "allege sufficient facts, accepted as true, to state a claim to relief that is plausible on its face." Doe v. Bd. of Regents of University of Nebraska, 280 Neb. 492, 506, 788 N.W.2d 264, 278 (2010). Factual allegations are "plausible if they suggest the existence of the element and raise a reasonable expectation that discovery will reveal evidence of the element or claim." Id. at 506. "[A] court must assume that pleaded facts, as distinguished from legal conclusions, are true as alleged and must give the pleading the benefit of any reasonable inference from the facts alleged, but cannot assume the existence of a fact not alleged, make factual findings to aid the pleading, or consider evidence which might be adduced at trial." Hamilton v. City of Omaha, 243 Neb. 253, 559 (1993). law is § 3-504.1. Truthfulness in statements to others In the course of representing a client a lawyer shall not knowingly: Misrepresentation

54. all the defendants ,Sargent Bank  in official capacity, Sarpy county jail in official capacity, ,Sarpy county sheriffs department in official capacity,  did in fact cause a crime action and violated the rights of the plaintiff in the matters of these action and laws of PREA in the state of Nebraska https://lgbtqbar.org/bar-news/tiproject/ne-transgender-housing-policies/ as the laws are clear in the matter as well as PREA NE Transgender Housing PoliciesNE Transgender Housing Policies December 14, 2022 NebraskaSTATE

Please note that the Nebraska Department of Correctional Services publishes Prison Rape Elimination Act (PREA) audits to its website that include summaries of certain relevant policies.  For example, please see:  Nebraska Department of Corrections Prison Rape Elimination Act (PREA) Audit Report:  Adult Prisons and Jails, Nebraska State Penitentiary, final audit date July 7, 2021.  To put in a public records request for policies related to housing transgender inmates you may email DCS.PublicRecords@nebraska.gov.

Policy: Nebraska Department of Correctional Services Policy No. 203.11, Sexual Assault/Abuse, revised July 31, 2023. (Link unavailable)E. PREA Standard Secured Facility 115.15 a-f / Community Facilities 115.215 a-f Limit To Cross Gender Viewing And Searches 6. NDCS will recognize the gender of an inmate based on the legal classification of that inmate as listed on their birth certificate as it is recorded on the inmate's birth state. When a transgender inmate has been approved to change their birth certificate to reflect how the inmate identifies and the birth certificate has been changed, and the NDCS has received an official copy of the new birth certificate, the inmate may be approved to have a pat search and a safety search conducted by the appropriate team member. However, if an inmate has undergone gender transformation surgery but has not changed their gender on their birth certificate, the inmate's reproductive organs may be a factor in NDCS gender designation of the inmate (as determined by the initial medical screening) .Q. PREA Standard Secure Facility 115.42 a-g / Community Facility 115.242 a-g Use of Screening Information 2. In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, NDCS shall consider on a case-by-case basis whether a placement would ensure the inmates health and safety, and whether the placement would present management or security problems. 3. Placement and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year and shall consider any threats to safety experienced by the inmate. The PREA compliance manager will also complete an in person assessment and submit a written report that will be maintained in the inmate's file indicating a review was conducted 4. A transgender or intersex inmate's own view with respect to the inmate's own safety shall be given serious consideration.

5. Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.6. NDCS shall not place lesbian, gay, bisexual, transgender or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.Policy: Nebraska Department of Correctional Services Policy No. 201.03, Identification of Potential Aggressors and Victims/Survivors, July 31, 2023. (Link unavailable)I. SCREENING PROCEDURES (PREA standard Secure facilities -115.41 a-c/ Community facilities-115.241 a-c) All inmates shall be assessed during an intake screening at reception facilities and upon each transfer to another facility for their risk of being sexually  assaulted, sexually abused or sexually harassed by other inmates and/or their potential to be sexually abusive or sexually harassing toward other inmates. This screening shall take place within 72 hours of arrival at the facility and be conducted using an objective screening instrument. NDCS shall implement appropriate controls on the

dissemination of this information within facilities in order to ensure sensitive information is not exploited to an inmate's detriment by staff or other inmates. VI. USE OF SCREENING INFORMATION PREA ASSESSMENT (PREA Standard Secure Facility 115.42 a-g / Community Facility 115.242 a-g Use of Screening Information (PREA Assessment) A. Facilities will utilize information from the PREA screening assessment to inform housing, bed, work, education and program assignments with the goal of keeping those inmates who are at high risk of being sexually victimized from those who are at high risk of being sexually abusive. The institution's physical plant, staffing levels, size, and number of programs and services, as well as activity schedules, will determine the extent to which separation is possible or contacts minimized. Computer tracking of high-risk inmates within an institution may be utilized. Facilities will make individualized determinations about how to ensure the safety of each inmate. (ACI-3D-10, ACI-3D-12) B. In deciding whether to assign a transgender or intersex individuals to a facility for male or female inmates, and in making other housing and programming assignments, NDCS shall consider on a case-by-case basis whether a placement would ensure the individuals health and safety, and whether the placement would present management or security problems. C. Placement and programming assignments for each transgender or intersex individual shall be reassessed at least twice each year with a new PREA screening assessment completed and shall consider any threats to safety experienced by the inmate. The PREA Compliance Manager will also complete an in-person assessment and submit a written report that will be maintained in the individuals file indicating a review was conducted. D. A transgender or intersex individuals own views with respect to the inmate's own safety shall be given serious consideration. E. Transgender and intersex individuals shall be given the opportunity to shower separately from other inmates. F. NDCS shall not place lesbian, gay, bisexual, transgender or intersex individuals in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such individuals.


55. The Defendants in official capacity Auto Body authority towing and impound INC in official capacity did in fact cause damage to 2011 kia Sorento anit-theft system break booster causing the whole front end of total cost after NOT Dis-engamend by dragging the car up on their flatbed tow truck the emergency ambulance of relliott community emergency respond team news Inc. But as they broke the 8th amendment of charges of illegally towing while the plaintiffs boyfriend Makaisten Downing told them he would call her god mother to get the company vehicle and the defendant Officer Haggis said no its police department policy to tow a car however that is false due to 8th amendment prohibits

extra fees or cost thus this matter alone cost of damages $8,922.93 the lower ball joints on both sides damaged tire rods had to be replaced the driver side rotor damage and replaced all new break pads


Thus, the law is very clear about damages and the company along with the defendants of city of Bellevue and defendants Bellevue police department refuse to comply with Nebraska has strong laws regarding this issue. In regions with strong legislation on towing practices, if a vehicle is damaged during the towing or storage process, the tow company is typically required to reimburse the owner for damages. Robust regulations prioritize consumer protection, and strong legislation often includes provisions that hold towing companies accountable for any damages incurred during the towing or storage of a vehicle. This may involve clear guidelines for reporting and documenting damages, and the legislation may stipulate that the tow company is responsible for covering the costs of repairs or compensation for the diminished value of the vehicle. Nebraska has strong laws regarding this issue. In regions with strong legislation on towing practices, tow truck operators are typically required to maintain insurance coverage. Robust regulations establish clear standards for insurance types and coverage limits, ensuring that tow truck operators carry adequate insurance to protect the interests of consumers and third parties. Strong legislation may mandate liability insurance, cargo insurance, and other relevant coverage to mitigate financial risks in the event of accidents, property damage, or injuries. These requirements aim to protect the public and uphold the financial responsibility of tow truck operators. As a note, the owner is entitled to reimbursement and damages. Predatory towing is a nationwide issue, where profit-seeking property owners and towing companies tow cars without the owner's consent. Protections are crucial to prevent individuals from being taken advantage of. We've identified key safeguards and evaluated their implementation in Nebraska. Based on our criteria, Nebraska receives a grade of C+. If you believe that you have been towed illegaly contact a local attorney or your attorney general. To sum up all the laws that we have reviewed check out our overview. If you are intersted to read more go to the Nebraska legislatures laws on towing Revised Statutes Chapter 60 - MOTOR VEHICLES. See what steps to take when you have been towed.

There for the defendant by law is required to pay the damages but hides being the immunity of the defendant Bellevue police department

56. The defendant Honda cars of Bellevue Dealership C/O Caitlin Staub sales consultant, Stephania Clapper receptionist, on April 30th 2024 did in fact intended as well as acknowledged willfully as well as indented to post false allegation about the plaintiff on Facebook page called Bellevue 411 uncensored  (mostly) to get public attention on a issues that has caused defamation of charter, hate crime of gender-sexual ordination, and disability discrimination, Cyber bullying, cyber harassment, Stalking  Hearsay Slander, violation of social media handbook privacy of policy as well as Nebraska state laws say 20-203. Invasion of privacy; trespass or intrude upon a person's solitude. Any person, firm, or corporation that trespasses or intrudes upon any natural person in his or her place of solitude or seclusion, if the intrusion would be highly offensive to a reasonable person, shall be liable for invasion of privacy. while on company business time.  https://www.hondacarsofbellevue.com/privacy-policy/ as the company is respond able of there employees at this time thus their own policy and regulation stay this Dispute Resolution, Arbitration Agreement, Class Action Waiver

**Initial Dispute Resolution Procedure**

**Notice of Dispute, Requirement to Attempt to Resolve Disputes Informally.**

By visiting the Sites and/or using the Services you and Dealership agree that if there is any controversy, claim, action, proceeding, demand, or dispute arising out of or related to your visit to the Sites, use of the Services, or the breach, enforcement, interpretation, or validity of this Privacy Policy or any part of it (hereinafter "Dispute"), both you and we shall first try in good faith to resolve such Dispute informally by providing written notice to the other party describing the facts and circumstances of the Dispute and allowing the receiving party thirty (30) calendar days in which to respond to or resolve the Dispute. Notice shall be sent to us at ATTN: 510 Fort Crook Road North Bellevue, NE 68005 , and to you at the address or email we have on file for you. Both you and the Dealership agree that this dispute resolution procedure is a condition precedent that must be satisfied before initiating any litigation or filing any claim against the other party. This notice and informal resolution requirement will not apply to the extent it is prohibited by law.

**Arbitration, Class Action Waiver.**

IF ANY DISPUTE CANNOT BE RESOLVED BY THE ABOVE INITIAL DISPUTE RESOLUTION PROCEDURE, WE BOTH AGREE THAT THE DISPUTE WILL BE DECIDED BY BINDING ARBITRATION ON AN INDIVIDUAL BASIS.

This means that if you and we have a Dispute that is not resolved in the informal process described in section 3.1 above, we both agree to resolve it through arbitration. Arbitration means that a neutral third party will hear both sides and make a decision. This is different from a court trial, where a judge or jury hears the case in a formal court setting and makes a decision. We both agree not to sue each

other in court.

This arbitration agreement is governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16). The arbitration will be before a single arbitrator and the arbitrator's decision will be final and binding on both of us.

The arbitration will be held pursuant to the rules of the American Arbitration Association - Consumer Arbitration Rules (if you are a business, the American Arbitration Association - Commercial Arbitration Rules will apply instead) (as applicable, the "Rules"). You can access a copy of the rules at: www.adr.org/rules. The Rules provide the steps required to start an arbitration case.

This arbitration agreement does not apply to Disputes that you or we bring against the other party that are within the jurisdiction of small claims court. If the amount in controversy of a Dispute in small claims court exceeds the jurisdiction of the small claims court, that Dispute will be subject to this arbitration agreement.

**Class action waiver.** We both agree that any Dispute will be handled individually. This means that you or we cannot join together with other people who have a similar problem to bring a single case against the other party. You also cannot be part of a class action lawsuit (or class action arbitration) against us, and we cannot be a part of a class action lawsuit (or class action arbitration) against you.

By using our Services, and visiting our Site, you agree to this arbitration agreement and class action waiver. If you do not agree, please do not use our Services or visit our Site.

If any part of this arbitration agreement and/or class action waiver is found to be invalid or cannot be enforced, the rest of the arbitration agreement and class action waiver will still apply. The arbitrator will decide if any part is invalid or cannot be enforced.

## Other Arbitration Agreements

In the event of a conflict between this arbitration agreement and any other arbitration agreement between you and the us, such as an arbitration agreement contained in a retail installment sale contract, purchase order, lease agreement, or repair estimate (hereinafter "Other Arbitration Agreement"), the terms of the Other Arbitration Agreement shall govern and prevail in each instance.

## Venue And Choice Of Law

This Privacy Policy has been made in, and shall be construed in accordance with the laws of Nebraska without giving effect to any conflict of law principles. Any disputes or claims not subject to the arbitration provision discussed above shall be resolved by a court located in that state and you agree and submit to the exercise of personal jurisdiction of such courts for the purpose of litigating any such claim or action.

If any part of this Privacy Policy is found to be invalid or cannot be enforced, the rest of the Privacy Policy will still apply.

1. The defendant Honda cars of Bellevue lawyer Schworer motor company policy will be attach for there privacy that is on there official website as well as there company policy however the policy and regulation that the human resource dose would find there motion to dismiss to be very much overruled in this manner of perjury 28-915. Perjury; subornation of perjury; penalty.(1) A person is guilty of perjury if, in any (a) official proceeding he or she makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of a statement previously made, when the statement is material and he or she does not believe it to be true or (b) official proceeding in the State of Nebraska he or she makes a false statement in any unsworn declaration meeting the requirements of the Uniform Unsworn Foreign Declarations Act under penalty of perjury when the statement is material and he or she does not believe it to be true. Perjury is a Class III felony.(2) A person is guilty of subornation of perjury if he or she persuades, procures, or suborns any other person to commit perjury. Subornation of perjury is a Class III felony. As their own handbook for employees is highly Strick as well as the three website on all parties of dealership dose state the fact MY NOT USE PERSONAL SOCIAL MEIDA as this has happen while they was on the clock there for the defendants handbook policy and regulation dose show that the defendants are fully respond able of any actions caused as there rules policy, regulation and guidelines are iron tight

1. **Social Media**

We are committed to supporting your rights to interact knowledgeably and socially on the internet through blogging and in social media. Social media can be a fun and rewarding way to share your life and opinions with family, friends and co-workers. However, use of social media also presents certain risks and carries certain responsibilities. To assist you in making responsible decisions about your use of social media, we have established these guidelines.

Guidelines

"Social media" includes all means of communicating or posting information or content of any sort on the Internet, including to your own or someone else's web log or blog, journal or diary, personal web site, social networking or affinity web site, web bulletin board or a chat room, whether or not associated or affiliated with the Company, as well as any other form of electronic communication.

The same principles and guidelines found in Company policies and three basic beliefs apply to your activities online. Ultimately, you are solely responsible for what you post online. Before creating online content, consider some of the risks and rewards that are involved. Despite disclaimers, your online posts can result in members of the public forming opinions about the Company, its dealerships, employees, partners, products and you. Keep in mind that conduct that adversely affects your job performance, the performance of co-workers or otherwise adversely affects customers, suppliers, people who work on behalf of the Company or its legitimate business interests is prohibited.

Employee Handbook Page 75 of 81 December 10, 2021

### Know and follow the rules

Carefully read these guidelines, and the Confidential Information, Equal Employment Opportunity, Electronic Communications and No Harassment policies, and ensure your postings are consistent with these policies. Even when blogging or engaging in social media on your own time on your personal device, you are subject to all the Company's policies and procedures. Inappropriate postings that may include discriminatory remarks, harassment, bullying, and threats of violence or similar inappropriate or unlawful conduct will not be tolerated.

### Be respectful

Always be fair and courteous to co-workers, customers, suppliers or third parties who work on behalf of the Company. Also, keep in mind that you are more likely to resolve work related complaints by speaking directly with your co-workers or by utilizing our Problem Solving Policy than by posting complaints to a social media outlet. Nevertheless, if you decide to post complaints or criticism, avoid using statements, photographs, video or audio that reasonably could be viewed as malicious, obscene, discriminatory, threatening, intimidating, that disparage customers, employees or suppliers, or that might constitute harassment or bullying. Examples of such conduct might include offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment based on race, sex, disability, religion or any other status protected by law or company policy.

Please honor the privacy rights of our customers and employees by obtaining their permission before writing about or posting pictures of them and understand that doing so without their express permission might be a breach of their privacy and confidentiality.

### Be honest and accurate

Make sure you always are honest and accurate when posting information or news, and if you make a mistake, correct it quickly. Be open about any previous posts you have altered. Use privacy settings where appropriate. Remember that the Internet archives

almost everything; therefore, even deleted postings can be searched. Never post any information or rumors that you know to be false. Never ask anyone to post any information that you know to be false or not honest.

Post only appropriate and respectful content

Maintain the confidentiality of the Company's trade secrets and proprietary, private and confidential information. Trade secrets may include information regarding the development of systems, processes, products, knowledge and technology. Confidential and proprietary information includes, but is not limited to, customer information, information about products, sales, finances, pricing, number of products sold, number of employees, company strategy, internal reports and communications, and any other information that has not been publicly released by the Company.

Do not create a link from your blog, website or other social networking site to a Company website without identifying yourself as a Company employee.

Employee Handbook Page 76 of 81 December 10, 2021

You should always be clear that you are expressing your personal opinions. Never represent yourself as a spokesperson for Company. If the Company is subject to the content you are creating, be clear and open about the fact that you are an employee and make it clear that your views do not represent those of the Company, co-workers, customers, suppliers or people working on behalf of the Company. If you do publish a blog or post online related to the work you do or subjects associated with the Company, make it clear that you are not speaking on behalf of the Company. It is best to include a disclaimer such as "The postings on this site are my own and do not necessarily reflect the views of the Company."

Do not promote or sell any product or service that would compete with any of the Company's products or services without permission in writing from your Regional Vice President. This includes, but is not limited to, new or used vehicles, parts, service or any other products sold by the Company.

Using social media at work

Refrain from using social media on work time or on equipment we provide, unless it is work-related as authorized by your manager or other member of management and is consistent with the Electronic Communications Policy. Do not use the Company's email addresses to register on social networks, blogs or other online tools utilized for personal use.

Creating a Social Media Profile

If you would like to use your social media account for generating business for the dealership by identifying your employment status, you may do so. However, if you do create your own social media account in which any logos, pictures, statements or any other information that would identify Group 1 Automotive, Inc. or any of its dealerships or other affiliated entities are included in such site, please include the following disclaimer conspicuously on the site:

All opinions, beliefs and representations posted by me on this site are mine exclusively and do not reflect the position of my employer, or any other person employed by my employer or any of its affiliates and are hereby disclaimed by my employer.

Company policy strictly prohibits employees from using their own social media account to communicate their personal beliefs, opinions or any other position, controversial or otherwise, in a manner that could be construed by the reader as being the beliefs, opinions or positions of or supported by Group 1 Automotive, Inc. or any of its affiliated companies.

This is necessary since Google optimizes most social media channels. Google will pick up your individual posts that utilize key terms as those of your dealership in the search results alongside our Company account. This creates confusion to the consumer and creates the following issues for our Company:

1. Dilutes the visibility of our Company social media page, thus causing confusion and frustration for customers trying to connect directly with us;
2. We cannot control content that is posted away from our Company account;

Employee Handbook Page 77 of 81 December 10, 2021

3. Uncensored content can offend and incite our customer base causing lost revenue opportunities; and
4. Our Company cannot provide customer support if a customer in need of our services connects with the wrong social media account.

Retaliation is prohibited

You are encouraged to report violations of this policy. The Company prohibits retaliation against any employee for reporting a possible deviation from this policy or for cooperating in an investigation. Any employee who retaliates against another employee for reporting a possible deviation from this policy or for cooperating in an investigation will be subject to disciplinary action, up to and including termination.

Media contact

You should not speak to the media on the Company's behalf but should direct all media

inquiries to your General Manager or the highest-level management employee if you are at a non- dealership location (for example, Director or Regional Manager). The Company will designate a spokesperson to respond to the media so that no misinformation is provided.

For more information

If you have questions or need further guidance, please contact your Human Resources Representative.

## Solicitation - Distribution Policy

To prevent distractions and unwanted solicitation, the solicitation by an employee of another employee for the support of any organization is prohibited during the working time of any employee involved. In addition, the distribution of advertising materials, handbills or other literature always is prohibited in all working areas and sales areas. E-Mail, fax machines, and voice mail may not be used to advertise or solicit employees during the working time of any employee involved. As examples, non-working time would be lunch or break time and a non-working area would be the break room. Non-employees are prohibited from soliciting employees or distributing materials for any cause or purpose on Company premises. Only third parties who have been invited to enter our premises and who have business to transact with the Company are authorized to enter and be on our premises. All other third parties shall be considered trespassers and be subject to removal.

2. The plaintiff now is asking for the judge to see the defendants are lieing under oath to get out of a lawsuit due to the fact on this day there employee drove the plaintiff off the road and was drive road rage ad the plaintiff did call 911 and then the defendants unknow employee fled form i80 to us75 to chandler road to where on chandler road caused a other diver to be pushed off the road to flee from to the defendants loction as the plaintiff did in fact find him to where the unknow employee false reported to the police about what really happen while the defendant was on the phone with 911 and then the other defendants went upon hearsay and attacked the plaintiff. If it woild please the courts 60-6,213.
Reckless driving, defined. 60-6,140. Following vehicles; restrictions. (1) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway. 28-907.False reporting; penalty. The unknow employee that lied to the officer also did a hate crime action 28-111. Enhanced penalty; enumerated offenses.Any person who commits one or more of the following criminal offenses against a person or a person's property because of the person's race, color, religion, ancestry, national origin, gender, sexual

orientation, age, or disability or because of the person's association with a person of a certain race, color, religion, ancestry, national origin, gender, sexual orientation, age, or disability shall be punished by the imposition of the next higher penalty classification than the penalty classification prescribed for the criminal offense, unless such criminal offense is already punishable as a Class IB felony or higher classification: Manslaughter, section 28-305; assault in the first degree, section 28-308; assault in the second degree, section 28-309; assault in the third degree, section 28-310; terroristic threats, section 28-311.01; stalking, section 28-311.03; kidnapping, section 28-313; false imprisonment in the first degree, section 28-314; false imprisonment in the second degree, section 28-315; sexual assault in the first degree, section 28-319; sexual assault in the second or third degree, section 28-320; sexual assault of a child, sections 28-319.01 and 28-320.01; arson in the first degree, section 28-502; arson in the second degree, section 28-503; arson in the third degree, section 28-504; criminal mischief, section 28-519; unauthorized application of graffiti, section 28-524; criminal trespass in the first degree, section 28-520; or criminal trespass in the second degree, section 28-521.

SourceLaws 1997, LB 90, § 3;
Laws 2006, LB 1199, § 2; aws 2009, LB63, § 3.
AnnotationsvThe phrase "because of" requires the State to prove some causal connection between the victim's association with a person of a certain sexual orientation and the criminal act. State v. Duncan, 293 Neb. 359, 878 N.W.2d 363 (2016).
The unknow employee threw liquid at the plaintiff car strucking her passage in the face and body while the window was down and saying ( move the fuck out of the way fagots you don't belong hear) then the unknow defendant employee cut off the plainitf and lock there breaks to cause a false car wreck collision 60-6,244.

Motor vehicles; brakes; requirements. To where the plaintiff would rear end them as the safety system that has been set up the yellow blue and white light detected this and turned on while the plaintiff slammed on her break while she was going the same direction as he was to AMMCO and tire plus to make sure that he didn't cause no more damage thus as the defendant is aiding and bedding a fugitive in this manner to where the defendant lied to the officer and twisted the story to be arrested made a deflation charter statement and said the the plaintiff was pretending to be a officer of the law which the plaintiff is not She is a relliott Emergency respond team storm chaser as her company is legit threw the Nebraska sectary which led to the officers believing in hearsay and assaulting the plaintiff illegally.

3.  If the judge would see there is a hate crime action and bodily injury that leads back to where it all started HONDA CARS OF BELLUVE DEALERSHIP AND THE DEFANDANTS OF BELLEUVE POLICE DEPARTMENT and if the judge over looks these action of hate crime then we ask why is there any judges in the world thus as the 8-206. Prosecuting for aiding and abetting. A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender.

    All the plaintiff wants is proper justice as the defendant policy and regulation and code of conduct is Strick in this manner

    To allow them to get off this lawsuit shows that anyone can do a hate crime, road rage aid and abetting lying to the police to false arrest some else and almost have police murder someone else on this manner 28-915.01. False statement under oath or affirmation; penalty; applicability of section. 3-504.1. Truthfulness in statements to others.

    In the course of representing a client a lawyer shall not knowingly:

    (a) make a false statement of material fact or law to a third person; or

    (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

    As well as the defendant HONDA CARS OF BELLUVE DEALERSHIP by there own policy, regulations and employee handbook are fully respondale of there employee actions while they are on the clock due to no cellphone usage while on clock an invasion of privacy

57. The defendants State of Nebraska in official capacity

County Attorney Office in official capacity

City of Bellevue in official capacity

Bellevue police department in official capacity,

Papillion Police Department in official capacity

Sarpy County Jail in official capacity,

Aimee C Battalion in official capacity,

Bellevue Officer J Haggis in official capacity,

Officer D. Bafaro in official capacity,

LT Howard Banks in official capacity,

Sargent McDaniel in official capacity,

did now on the date of  Aug 1st 2024 2pm confess and commit a crime of tampering with evidence Is Tampering with Evidence a Felony?


Tampering or destroying evidence can gravely impact a criminal justice case. Therefore the Nebraska statute that defines the act of tampering with evidence also states that tampering with physical evidence is a Class IV felony. 28-922. Tampering with physical evidence; penalty; physical evidence, defined.

As well as interfering with investigation 25-328. Intervention; right; procedure.

Any person who has or claims an interest in the matter in litigation, in the success of either of the parties to an action, or against both, in any action pending or to be brought in any of the courts of the State of Nebraska, may become a party to an action between any other persons or corporations, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendants in resisting the claim of the plaintiff, or by demanding anything adversely to both the plaintiff and defendant, either before or after issue has been joined in the action, and before the trial commences. As well Confession to break any laws that don't apply to  policy or state laws as they are swore officers of the laws and have to follow all laws bill of rights federal laws ADA laws conditional laws and rights Civil rights

there for please see pictuere of there confession and please see attachment of picture rto prove the officers as well as other defendants was infact on a active lawsuit prior to this one when the attack happen .

# SECTION 3

## WHEREFORE, THE PLAINTIFF RESPECTFULLY REQUESTS THE FOLLOWING RELIEF:  Amended

Relief Demanded:
 1) The plaintiff pray of the following relief of maximum allowable by law for personal injury relief,

2) The plaintiff pray of the following relief of All persons and officers involved in the arrest be on leave without pay while being investigated by the courts The person that did the hit and run then hide at Honda dealer ship and arrest the white truck man for this issue then arrest warrants shall be issued by law

3) The plaintiff pray of the following relief of formal public apology on all news outlets and social media possible for the wrongfully done arrest by all parties. Furthermore, it's to be noted that by law

4) The plaintiff pray of the following relief of The maximum allowable by law of personal Property Damage by law

5) The plaintiff pray of the following relief of The maximum allowable by law of defamation of character  by lawy

6) The plaintiff pray of the following relief of Maximum allowable by law of emotional, physical, mental stress by law

1

7) The plaintiff pray of the following relief of an awarded of compensatory damages in the amount shown according of proof by law

8) The plaintiff pray of the following relief of such further and other relief as this court deems just and proper by law

9) The plaintiff pray of the following relief of of punitive Damages by law

10) The plaintiff pray of the following relief of under FBI/BIA to Arrest the officers that allowed the hit and run hate crime and as well as 42 usc 1983 and police brutality by law

11) The plaintiff pray of the following relief of that all lawyer that are involved in this case that are covering up government corruption be reported and stripped of there bar associations licenses  under malpractice of untruth and perjury to allow such crime to happen by law

12) The plaintiff pray of the following relief of mental abuse for she suffers now living in fear of officers going to kill her due to her disability by law

13) The plaintiff pray of the following relief of all defendants by judges orders go into  special training and work close to the Nebraska deaf and hard of hearing commission and then take ASL classes as well as live 6 months as deaf and communicate to live in the footsteps of the plaintiff life by law

14) The plaintiff pray of the following relief of to pay all medical costs of there reasonability and any full recovery needs met by the court  by law

15) The plaintiff pray of the following relief of to arrest officer haggis in official capacity Officer D. Bafaro in official capacity LT Howard Banks in official capacity, LT Howard Banks in official capacity Sargent McDaniel in official capacity Corresion officer Sargent Banks by law

16) The plaintiff pray of the following relief to have proper justice by a judge to see that the ada laws apply to this case knowing and willing to fair hearing and trial by law

17) The plaintiff pray of the following relief for help of trauma therapy for the plaintiff by law

18) The plaintiff pray of the following relief of to pay of loss wages while haven to miss work of all three jobs and loss of clients by law

19) The plaintiff pray of the following relief on the Honda cars of Bellevue to take full reasonability due to the policy regulations and employee handbook code of there employee while they are on the clock as well as hand over the employee to the police that ran her off the road hit and run and false reported to police and terminate the employees that defamation of charter misgender hate crime and slander her on Facebook while on company time by law

20) The plaintiff pray of the following relief from the defendant Auto Body authority towing and impound INC in official capacity of illegal towing that is not authorized by owner consent as well as she has a handicap placard to where she was parked all damage done by not disengagement of auto theft system  brake booster that had to all be replaced plus rental car reimbursement from enterprise as well as rental fee of illegal position of taken the car without owner consent as well as reimbursement of fees plaintiff had to pay for illegal action as they was acting in full capacity as officer contract. By law

21) The plaintiff pray of the following relief civil rights violations by law

22) The plaintiff pray of the following relief human rights violations by law

23) The plaintiff pray of the following relief LGBTQA rights violation by law

24) The plaintiff pray of the following relief state laws violation Ada law interpret violations by law

25) The plaintiff pray of the following relief federal laws ADA rights violated for interpret by law

26) The plaintiff pray of the following relief of malpractice denial of medical assts by law

27) The plaintiff pray of the following relief FIOA request non compliance by law

28) The plaintiff pray of the following relief sexual assault PREA LGBTQA law violation by law

29) The plaintiff pray of the following relief HEPPA Law violations by law

30) The plaintiff pray of the following relief invasion of privacy by law

31) The plaintiff pray of the following relief by law

32) The plaintiff pray of the following relief tampering, intimidation, retaliation, discrimination, bias, hate, sex, gardener, disability and ethic code laws violated by law

33) The plaintiff pray of the following relief police perjury maximum  by law

34) The plaintiff pray of the following relief police brutality maximum by law

35) The plaintiff pray of the following relief taken away accommodations hearing devices ADA requirement by law

36) The plaintiff pray of the following relief take all information down off the internet of the plaintiff by law

37) The plaintiff pray of the following relief to hand over all defendants to the FBI/ BIA for proper jurisdiction arrest


# Section 4 exhibits  as well for all Witness, documents, recordings

1. Dr Figgy
2. Dr pond
3. Dr krysty newmyer
4. All CHI medical records that i will attach to this complaint to show proof
5. All UNM medical records that i will attach to this complaint to show proof
6. tire plus are willing to testify that i was not resisitign and being beaten includin the manager and 6 other that was there on 4-30-2024
7. employees of Honda the posted the Facebook and pictures
8. Makaestin downing  boyfriend
9. Unit 187 4  videosrecordings and audio
10. Video and audio recording of the police body camera as well as UNM Emergency room camera how officers refused to let MS Yukie sign laungue the interpret

11. The tow yard Video and pictures to show proof the Kia Was illegal token there by officers Haggis
12. Correction officers of Sapry county
13. ASL interpret Jermery 3436 UMN
14. All doctors At Bellevue emergency room

All fire department and emt of Bellevue to Boyer, Tyler Firefighter Brittain, Mitch
Firefighter Cieslik, John
Firefighter Day, Jeffrey
Firefighter Doran, Kyle
Firefighter Doyle, Michael
Firefighter Duckwort, Phillip
Firefighter Fisher, Adam
Firefighter Foster, Jordon
Firefighter Fouts, Cody
Firefighter Guido, Giavonni
Firefighter Guido, Salvatore
Firefighter Hansen, Joshua
Firefighter Harris, Adam
Firefighter Hoins, Gabriel
Firefighter Hubbard, Grant
Firefighter Hurd, Travid
Firefighter Jobe, Chris
Firefighter Kallhoff, Bandon
Firefighter Lee, George
Firefighter Lessig, John
Firefighter Lomax, Andy
Firefighter Mainelli, Aaron
Firefighter Matthies, Grant
Firefighter Maw, Dustin
Firefighter McDonnell, Connor
Firefighter Newquist, Randy
Firefighter O'Brien, Ty
Firefighter Pechar, Jordan
Firefighter Petersen, Chuck
Firefighter Peterson, Joshua
Firefighter Pineta, Arnoldo
Firefighterr Richardson, Brendon
Firefighter Robinson, Jim
Firefighter Robison, Jeff

Firefighter Sanders, Keith
Firefighter Schenck, Nathan
Firefighter Schliep, Trevis
Firefighter Sempeck, Jacob
Firefighter Simon, Nicholas
Firefighter Smith, Dalton
Firefighter Spencer, Aaron
Firefighter Wilkinson, Tyler
Firefighter Ceballo, Max
Captain Engelman, Evan
Captain Fowler, Travis
Captain Gibilisco, Anthony
Captain Herting, Russ
Captain Johnson, Zane
Captain Martin, Adolph
Captain Nawrocki, Troy
Captain Rogers,Anthony
Captain Strachota, Kurt
Captain Zink, Jeremy

15. All Videos and audio of officer's body cameras units of Bellevue police
16. 911 Sarpy County dispatch over 4 yearlong calling and asking to asst or give updated on car wrecks or more phone number 4028501498/3252121891/402-941-4949/402-673-6516
17. The congress of Nebraska testify about assaulting a disabled person
18. Jim Pillen governor of Nebraska their diversity of protecting the disabled people and policy or anit government corruption
19. Mayor of papillon about the policy on disabled people
20. Mayor of Bellevue law and policy on disabled people
21. United states president Joe Biden how he passed a law to protect against anti-government corruption, police misconduct as well as stop hate crime
22. CEO owner Relliott community emergency respond team Sasuke Crawford
23. Dates of different police units of Bellevue police department
24. Dats and videos of Sarpy County units 2 years long
25. Dougals county 911 dispatch over 5 years long see section 18 for numbers
26. Omaha police department police units' recordings over 5 years long
27. Sisseton lake travers all Tribe council that voted yes on hate crime and other that will testify on may 29, 2024
28. Lt Avary Jenson

29. Attached Tort Claim Complaints that they refused to acknowledge or investigate on my behalf. That has passed over 6 months of the wait time

30. Letter from the ADA of department of justice and state general attorney office

31. Jermy Omaha office Of Nebraska commission Deaf and hard of hearing

32. Ashley Omaha office Of Nebraska commission Deaf and hard of hearing

33. Judicial ADA Office for interpreters Pam D,

34. Please see the picture below that will show what the officers are supposed to follow as they are sworn in

# Exhibits of proof of pictures




## NEBRASKA LAW ENFORCEMENT OFFICER
### CODE OF ETHICS

As a law enforcement officer, my fundamental duty is to serve the community, to safeguard lives and property, to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all to liberty, equality and justice. I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of law enforcement service. In furtherance of these duties, I hereby adopt and accept the following code of conduct:

I shall conduct myself at all times in a manner that does not damage or have the likely result of damaging or bringing the public image, integrity, or reputation of my agency or myself into discredit or disrespect.

I shall not possess or consume alcoholic beverages on duty or while in uniform on duty or off duty, except as expressly required for the lawful performance of my duties. Nor shall I unlawfully possess, sell, consume, use or assist in the use of any illegal or unauthorized drugs or medications on duty or off duty.

I shall not engage in any illegal or unlawful harassment or intimidation of another, nor shall I permit personal prejudices, political beliefs, animosities, or friendships to influence my decisions.

I shall not lie, give false testimony, give misleading information, or falsify written or verbal communications in official reports or in my actions with another person or organization when it is reasonable to expect that such information may be relied upon because of my position or affiliation with my agency.

I shall willfully observe and obey the lawful verbal and written rules, duties, policies, procedures, and practices of my agency. I shall also subordinate my personal preferences and work priorities to the lawful verbal, and written rules, duties, policies, procedures and practices of my agency. I shall willfully perform all lawful duties and tasks assigned by supervisory and or superior-ranked personnel. Direct, tacit or constructive refusal to do so is insubordination.

I shall obey the constitutional, criminal and civil laws of the city, county, state, and federal government. I will never engage in acts of corruption or bribery, nor will I condone such acts by other law enforcement officers.

I certify that I have read the above law enforcement officer code of conduct. I indicate that I am fully aware of each section of the code and by signing below, indicate that I agree to abide by the code of conduct.

Print Name _____

Signature _____     Date _____

Notary _____     Date _____
                                    (Seal)
TC-911                                             03/2021



📞 13m

< 🐢 **Bellevue 411 Uncensored (mostly)**
Caitlin Staub · 23h · 🔞

PSA: White Kia Sorento driving around trying to pull people over and impersonating a cop. My coworker was smart and actually called 911 to report him. The Kia followed him from the Chandler exit to work. Good job by the Bellevue police department finding the guy and getting him off the streets.

Edit: Kia is blocked by the fire truck.

⬜ Comment as Yukie Soto-Elli... 😎 GIF ☺️

📞 14m

< 🐢 **Bellevue 411 Uncensored (mostly)**
Caitlin Staub · 23h · 🔞

😆 Haha    ⬜ Comment    〜 Send

🐢🐢 **You and 105 others**

Most recent ⌄

**Yukie Soto-Elliott**
This whole statement is not true

_____ the real truth is posted with the white truck information and the real truth the owner is not in jail and gots the company car back she is filed a complaint on the officers as well as she will be filled deflation of charter she will be upload her unit car to show the proof of this guy attack her and throwing things at her car and causing almost a car wreck

Just now    Like    Reply

**Kelli Kubacak Eagen**
Very scary! Especially for young drivers who may not realize it's not an actual cop.

1h    Like    Reply

**Shawn M Jackson**
What is the pic supposed to show? There's definitely no White Kia Sorrento in it.

19h    Like    Reply                    2 😎🐢

🐢    **Caitlin Staub**
                        🐢🐢🐢
18h    Like    Reply

⬜ Comment as Yukie Soto-Elli... 😎 GIF ☺️





**Bellevue 411 Uncensored (mostly)**
Caitlin Staub · 23h · 🔆

PSA: White Kia Sorento driving around trying to pull people over and impersonating a cop. My coworker was smart and actually called 911 to report him. The Kia followed him from the Chandler exit to work. Good job by the Bellevue police department finding the guy and getting him off the streets.

Edit: Kia is blocked by the fire truck.



    

Comment as Yukie Soto-Elli...

---

**Bellevue 411 Uncensored (mostly)**
Caitlin Staub · 23h · 🔆



😆 Haha        💬 Comment        ↪ Send

🐱🥰 You and 105 others

Most recent ⌄

**Yukie Soto-Elliott**
This whole statement is not true

the real truth is posted with the white truck information and the real truth the owner is not in jail and gots the company car back she is filed a complaint on the officers as well as she will be filled deflation of charter she will be upload her unit car to show the proof of this guy attack her and throwing things at her car and causing almost a car wreck

Just now · Like · Reply

**Kelli Kubacak Eagen**
Very scary! Especially for young drivers who may not realize it's not an actual cop.

1h · Like · Reply

**Shawn M Jackson**
What is the pic supposed to show? There's definitely no White Kia Sorrento in it.

19h · Like · Reply                              2 😆🥰

**Caitlin Staub**                              🤣🤣🤣

18h · Like · Reply

Comment as Yukie Soto-Elli...   





📞 14m

**Bellevue 411 Uncensored (mostly)**
Caitlin Staub · 23h · ⚖

😆 Haha    💬 Comment    ➤ Send

😮😆😋 You and 105 others

Most recent ⌄

**Yukie Soto-Elliott**
This whole statement is not true the real truth is posted with the white truck information and the real truth the owner is not in jail and gots the company car back she is filed a complaint on the officers as well as she will be filled deflation of charter she will be upload her unit car to show the proof of this guy attack her and throwing things at her car and causing almost a car wreck

Just now   Like   Reply

**Kelli Kubacak Eagen**
Very scary! Especially for young drivers who may not realize it's not an actual cop.

1h   Like   Reply

**Shawn M Jackson**
What is the pic supposed to show? There's definitely no White Kia Sorrento in it.

19h   Like   Reply          2 😮😮

**Caitlin Staub**
Shawn M Jackson 🤣🤣🤣

18h   Like   Reply

⌾ Comment as Yukie Soto-Elli...  😂 GIF 🙂

---

📞 14m

**Bellevue 411 Uncensored (mostly)**
Caitlin Staub · 23h · ⚖

**Kaitlyn Lanam**
Top contributor
In a Kia though? Did they really think people We're going to fall for that?! 🥴
People are just so unhinged anymore 😵‍💫😳

5h   Like   Reply          1

**Angel Flores**
Wtf 🤮

15h   Like   Reply

**Berenice Laura Zambrano Mersch**
Top contributor
Why a fire truck and an ambulance though?

22h   Like   Reply

**Caitlin Staub**
he might have needed medical attention 🤷 not sure.

22h   Like   Reply          1

**Jake Palen**
Top contributor
hopefully the o pull the taser prongs out of em. 😝

22h   Like   Reply          5 😀😮

**CC Roness**
because he is crazy and bluetooth called his daddy in California to call 911.

15h   Like   Reply

👤 Write a reply...

⌾ Comment as Yukie Soto-Elli...  😂 GIF 🙂





3621.54

No tax total 25351 25351

TAX TOTAL $284.44 LATE
FEE ADDED

All accounts not paid in 90 days will quart additional fees and or mechanic lean wet will be adding each month fail to pay by law 29-2206 shall lead to extra fees charge each month of $300.00

PLEASE CHECK BOX HOW IT WAS SERVICED AND DATE AND TIME

1. CERTIFIED MAIL TRACKING NUMBER
2. EMAILED
3. FAXED
4. HAND DELIVED WITH RECORDING AUDIO
5. UPS, FEDEX, USPS

---

**R-Elliott Community**
**emergency respond Inc.**
**R-Elliott company critic**
**worldwide news Inc**
**Elliott's Ministry**

# INVOICE THIRD
# AND FINAL
# NOTICE

INVOICE: 4-30-24
DATE: 7-05-2024

Experts in earning trusts

P.o. box 641503 Omaha NE 68164

Phone: 4028561498
Relliottnews2277t4@outlook.com

2011 Kia Sorenso ex V6 AWD

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Front #N83-1687 | | 46.99 | |
| Rear Brake #193-1784 | | 52.99 | 646.94 |
| Rotors 98-07R2R | | 547.96 | |
| 4Mat Cyl frtmc90118 | | 294.99 | 294.99 |
| Par Brake Boostor #54-79411 | | 202.99 | 202.99 |
| 8pc steering kit #pss59814 | | 263.95 | 263.95 |
| Rack and pinion complete unit #390-49b | | 806.99 | 806.95 |
| Break fluit replacement /4.99 qty 2 | | 33.98 | 33.98 |
| | 24 | 2200.00 | 2200.00 |
| | | 60.06 | 60.06 |



**R-Elliott Community
emergency respond Inc.
R-Elliott company critic
worldwide news Inc
Elliott's Ministry**

# INVOICE SECOND
# NOTICE

INVOICE 4-30-24
DATE: 6-05-2024

Experts in evening tastes

P.o. box 641503 Omaha NE 68164

Phone: 4028561498
Rellisonnews2375ek@outlook.com

TO

2011 Kia Sorento ex V6 AWD

| DESCRIPTION | UNITS | RATE | AMOUNT |
|---|---|---|---|
| Front #103-1687 | | 46.99 | |
| Rear Brake #103-1284 | | 52.99 | 646.94 |
| Rotors 98-0782R | | 547.96 | |
| cMac Cyl #msc96118 | | 294.99 | 294.99 |
| Pwr Brake Booster #54-79411 | | 202.99 | 202.99 |
| 8pc steering kit #ms59814 | | 263.95 | 263.95 |
| Rack and pinion complete unit #390-49n | | 806.99 | 806.95 |
| Break fluid replacement 16.99 qty 2 | | 33.98 | 33.98 |
| | | | |
| Labor to install 95.00 hr | 24 | 2200.00 | 2200.00 |
| Tools and supplies | | 60.00 | 60.00 |

---

No tax used                      3,621.34

                          263.51      263.51

TAX                        TOTAL     3,896.85

All accounts not paid in 90 days will open additional fees and or mechanic liens we will be adding each month fail to pay by law 74-2206 shall lead to meet a fees charge each month of $100.00

PLEASE CHECK BOX HOW IT WAS SERVICED AND DATE AND TIME

1. CERTIFIED MAIL TRACKING NUMBER
2. EMAILED
3. FAXED
4. HAND DELIVED WITH RECORDING AUDIO
5. UPS FEDEX USPS







**R-Elliott Community emergency respond Inc.**
**R-Elliott company critic worldwide news Inc**
**Elliott's Ministry**

Experts in running truck

Pa box 641503 Omaha NE 68164

Phone: 4028504498
Relliottnews23736h@outlook.com

**INVOICE**
**MECHANIC LIEN**
**PLACEMENT ON**
**ALL POLICE**
**DEPARTMENT**
**VEHICLE AND**
**IMPOUD TWO**
**YARD COMPANY**
**AND ALL**
**EQUIPMENT AND**
**TOW VECHILE**
**SHALL BE FILED**
**AFTER THIS DATE**

INVOICE: 6-30-24
DATE: 8-05-2024

2011 Kia Sorenia ex V6 AWD

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Front #103-1687 | | 46.99 | |
| Rear Brake #103-1284 | | 52.99 | 646.94 |
| Rotors 98-0782R | | 547.96 | |
| 6Max Cyl 4tenc90118 | | 294.99 | 294.99 |
| Pwr Brake Booster #54-79411 | | 202.99 | 202.99 |
| 8pc steering kit #pas59014 | | 263.95 | 263.95 |
| Rack and pinion complete unit #390-49n | | 806.99 | 806.95 |

| | | | |
|---|---|---|---|
| Break fluid replacement 16.99 qty 2 | | 33.98 | 33.98 |
| Labor to install 95.00 hr | 24 | 2200.80 | 2200.80 |
| Tools and supplies | | 60.00 | 60.00 |
| No car tool | | | 3,621.54 |
| TAX | | 253.51 | 253.51 |

CHILD GATE
FEE ADDED
$339.50
ADDED
LIEN ADDED
$39.400
MECHANIC
LIEN WILL BE
FILED NOW
AND IN
EFFECT OF
ALL POLICE
DEPARTMENT
AND TOW
YARD
IMPOUND

TOTAL

All accounts not paid in 30 days will quart additional fees and or mechanic lean we will be adding each month fail to pay by law 29-2206 shall lead to extra fees charge each month of $300.00 If fail to pay July 23, 2024, lawsuit shall be filed

You have failed to comply by the federal, state, city laws of Bellevue Nebraska
There for lawsuit has been filed in the official capacity in three different courthouse records

1. Sarpy county Case CI 24-1315
2. Federal supreme court 8:2024cv00290
3. Tribal court under BIA/FBI Investigation of police misconduct, hate crime on destality, gender, sexi discremination, extimidation, tampering with plaintiff cases, fail to comply with the ADA laws, Targesing, Stalking, Harassment, Violation of the constitution rights, human rights, civil rights, interfering with case CI 23-9723, illegal towing 18-1737 violation of handicap parking laws while car had appt to be serviced on April 30,2024 @230pm plaintiff has placard register to the car.

PLEASE CHECK BOX HOW IT WAS SERVICED AND DATE AND TIME



























The Defendants is Nebraska, and their mailing address is last known to be location is and can be serviced by the FBI, BIA, U.S Marshall, Sheriff's department, Certified mail USPS, Privet Service. Or be served by the courts sheriff  department

1. Dvorak law group LLC C/O 9500 west dodge road ste 100 Omaha Ne 68114 City of Bellevue in official capacity Bellevue police department in official capacity, Aimee C Bataillon in official capacity and city of Bellevue law firm office Bellevue Officer J Haggis in official capacity Officer D. Bafaro in official capacity LT Howard Banks in official capacity, LT Howard Banks in official capacity Sargent McDaniel in official capacity
2. Papillion Police Department in official capacity & Nebraska county attorney office Sarpy County Jail in official capacity, 210 golden Gate drive #1420 Papillion NE 68046
3. Bertolini Schroeder & blount 1620 wilshire drive suite 250 bellevue NE 68005 C/O Auto Body authority towing and impound INC in official capacity
4. Gross welch marks clare pc llc 2120 south 72nd st ste 1500 omaha Ne 68124 C/O Honda cars of Bellevue

I declare under penalty of perjury that the foregoing is true and the correct to the best of my ability: I, the plaintiff, do require reasonable accommodation. Closed Captions in Japanese seem to be best doable by the courts but if the courts can find an interpreter using Japanese or Native Sign Language or American sign interpret is preferred. AS WELL THE ADA LAWS OF HAVE A DISABLE PERSON IN COURT AND THIS CASE THE PLANITIFF NEEDS TO REMIND ALL PARTIES THE LAWS ARE DIFFERENT AND BY Accommodation of judication codes they plaintiffs rights shall be protected as well as her classified address under the INDONESIA witness protection federal law to keep the plaintiff safe from all the defendants including the one that hit and ran her off the road that works at the Honda cars of Bellevue the lied to the cops

I declare under penalty of perjury, that the foregoing is true and correct to the best of my abilities:

Date this is September 3rd 2024

Yukie Soto-Elliott

Po Box 641503

Omaha NE, 68164

402-850-1498

Relliottnew2373@outlook.com    print and sign plaintiff

Yukie Soto-Elliott

Sept 3RD 2024